UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ESURANCE INSURANCE COMPANY; and ESURANCE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| KINETIX REHAB SERVICES INC.; LEVEL 1 PHYSICAL THERAPY & REHAB LLC; LEVEL 1 HEALTH SYSTEMS, LLC; LEVEL 1 HEALTH SYSTEMS OF MICHIGAN, LLC; MICHIGAN FIRST REHAB, LLC; GREENFIELD AND 9 MILE MEDICAL CENTER PLLC; SELECT MEDICAL GROUP OF MICHIGAN PLLC; NORTHLAND HEALTHCARE SERVICES PLLC; NORTHLAND CHIROPRACTIC CENTRE P.C.; MOBILE MRI STAFFING, LLC; MOTION TRANSPORTATION INC.; DEHKO INVESTMENT, INC.; SOMERSET AUTO BODY OF MI, INC.; LINCOLN INTERNATIONAL LLC / 1-800-PAIN-800; NORMAN DEHKO; SABAH DEHKO; JORDAN DEHKO; ZAHIR SHAH, P.T.; NAJM-UL HASSAN; and GEOFFREY SAGALA, D.C., | **Demand for Jury Trial** |
| Defendants. | |

<u>**COMPLAINT**</u>

Plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company (collectively, "Allstate"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.   <u>INTRODUCTION</u>

1.      This is a case about physical therapy clinics, chiropractic clinics, medical clinics, a diagnostic imaging facility, medical transportation companies, an auto body shop, and the owners, managers, agents, and representatives of the same who abused the unlimited medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.      Defendants Kinetix Rehab Services Inc. ("Kinetix"); Level 1 Physical Therapy & Rehab LLC ("Level 1 PT & Rehab"); Level 1 Health Systems, LLC ("Level 1 Health"); Level 1 Health Systems of Michigan, LLC ("Level 1 of

2

Michigan"); Michigan First Rehab, LLC ("Michigan First"); Greenfield and 9 Mile Medical Center PLLC d/b/a American Medical Center and American Medical Center Laboratory ("AMC"); Select Medical Group of Michigan PLLC ("Select Medical"); Northland Healthcare Services PLLC ("Northland Healthcare"); Northland Chiropractic Centre P.C. ("Northland Chiropractic"); Mobile MRI Staffing, LLC d/b/a Metro MRI Center ("Metro MRI"); Motion Transportation, Inc. ("Motion Transportation"); Dehko Investment, Inc. d/b/a Rent A Ride of Detroit ("Rent A Ride") (collectively, the "Defendant Entities"); Somerset Auto Body of MI, Inc. ("Somerset Auto"); Lincoln International LLC / 1-800-PAIN-800 ("1-800-PAIN"); Norman Dehko; Sabah Dehko; Jordan Dehko; Zahir Shah, P.T. ("Shah"); Najm-Ul Hassan ("Hassan"); and Geoffrey Sagala, D.C. ("Sagala") (collectively with the Defendant Entities, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants pursuant to applicable statutes and regulations.

4.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6.      As a result of the defendants' fraudulent acts, Allstate has paid in excess of $563,804 to them related to the patients at issue in this Complaint.

## II.   PARTIES

### A.   PLAINTIFFS

7.      Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

8.      Esurance Insurance Company and Esurance Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Wisconsin.

9.      Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

10.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company have their respective principal places of business in San Francisco, California.

11.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.    DEFENDANTS

#### 1.    Kinetix Rehab Services Inc.

12.    Kinetix Rehab Services Inc. is incorporated under the laws of the State of Michigan.

13.    At all relevant times, Kinetix was operated by Level 1 PT & Rehab, Level 1 Health, Motion Transportation, Somerset Auto, 1-800-PAIN, Norman Dehko, and Shah.

14.    Kinetix's principal place of business is located in Southfield, Michigan.

15.    Kinetix billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 1.

#### 2.    Level 1 Physical Therapy & Rehab LLC

16.    Level 1 Physical Therapy & Rehab LLC is organized under the laws of the State of Michigan.

17.     At all relevant times, Level 1 PT & Rehab was operated by Kinetix, Motion Transportation, and Shah.

18.     Level 1 PT & Rehab's principal place of business is located in Southfield, Michigan.

19.     Level 1 PT & Rehab billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 2.

### 3.     Level 1 Health Systems, LLC

20.     Level 1 Health Systems, LLC is organized under the laws of the State of Michigan.

21.     At all relevant times, Level 1 Health was operated by Kinetix, Northland Healthcare, Somerset Auto, 1-800-PAIN, Norman Dehko, Shah, and Sagala.

22.     Level 1 Health's principal place of business is located in Detroit, Michigan.

23.     Level 1 Health billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 3.

6

### 4.   Level 1 Health Systems of Michigan, LLC

24.   Level 1 Health Systems of Michigan, LLC is organized under the laws of the State of Michigan.

25.   Level 1 Health Systems of Michigan, LLC also does business using the registered fictitious name Level 1 Physical Therapy.

26.   At all relevant times, Level 1 of Michigan was operated by AMC, Select Medical, Northland Healthcare, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Hassan, and Sagala.

27.   Level 1 of Michigan's principal place of business is located in Huntington Woods, Michigan.

28.   Level 1 of Michigan billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 4.

### 5.   Michigan First Rehab, LLC

29.   Michigan First Rehab, LLC is organized under the laws of the State of Michigan.

30.   At all relevant times, Michigan First was operated by AMC, Select Medical, Somerset Auto, 1-800-PAIN, Norman Dehko, Jordan Dehko, Hassan, and Sagala.

31.    Michigan First's principal place of business is located in Detroit, Michigan.

32.    Michigan First billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 5.

### 6.    Greenfield and 9 Mile Medical Center PLLC

33.    Greenfield and 9 Mile Medical Center PLLC is organized under the laws of the State of Michigan.

34.    Greenfield and 9 Mile Medical Center PLLC also does business using the registered fictitious names American Medical Center and American Medical Center Laboratory.

35.    At all relevant times, AMC was operated by Level 1 of Michigan, Michigan First, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, and Hassan.

36.    AMC's principal place of business is located in Southfield, Michigan.

37.    AMC billed Allstate for treatment and testing that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 6.

### 7.   Select Medical Group of Michigan PLLC

38.   Select Medical Group of Michigan PLLC is organized under the laws of the State of Michigan.

39.   At all relevant times, Select Medical was operated by Level 1 of Michigan, Michigan First, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, and Sagala.

40.   Select Medical's principal place of business is located in West Bloomfield, Michigan.

41.   Select Medical billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 7.

### 8.   Northland Healthcare Services PLLC

42.   Northland Healthcare Services PLLC is organized under the laws of the State of Michigan.

43.   At all relevant times, Northland Healthcare was operated by Level 1 of Michigan, Northland Chiropractic, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, and Sagala.

44.   Northland Healthcare's principal place of business is located in Farmington Hills, Michigan.

45.     Northland Healthcare billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 8.

### 9.     Northland Chiropractic Centre P.C.

46.     Northland Chiropractic Centre P.C. is organized under the laws of the State of Michigan.

47.     At all relevant times, Northland Chiropractic was operated by Northland Healthcare and Sagala.

48.     Northland Chiropractic's principal place of business is located in Oak Park, Michigan.

49.     Northland Chiropractic billed Allstate for treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), and was unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 9.

### 10.     Mobile MRI Staffing, LLC

50.     Mobile MRI Staffing, LLC is organized under the laws of the State of Michigan.

51.     Mobile MRI Staffing, LLC also does business using the registered fictitious name Metro MRI Center.

52.     At all relevant times, Metro MRI was operated by AMC, Select Medical, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Hassan, and Sagala.

53.     Metro MRI's principal place of business is located in West Bloomfield, Michigan.

54.     Metro MRI billed Allstate for unlawful and unnecessary diagnostic services in relation to several patients at issue herein, including those set out in Exhibit 10.

### 11.    Motion Transportation, Inc.

55.     Motion Transportation, Inc. is incorporated under the laws of the State of Michigan.

56.     At all relevant times, Motion Transportation was operated by Kinetix, Level 1 PT & Rehab, and Shah.

57.     Motion Transportation's principal place of business is located in West Bloomfield, Michigan.

58.     Motion Transportation billed Allstate for medical transportation services that were not actually provided, were medically unnecessary (to the extent they were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 11.

### 12.    Dehko Investment, Inc.

59.    Dehko Investment, Inc. is incorporated under the laws of the State of Michigan.

60.    Dehko Investment, Inc. also does business using the registered fictitious name Rent A Ride of Detroit.

61.    At all relevant times, Rent A Ride was operated by Level 1 of Michigan, AMC, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, and Hassan.

62.    Rent A Ride's principal place of business is located in Huntington Woods, Michigan.

63.    Rent A Ride billed Allstate for medical transportation services that were not actually provided, were medically unnecessary (to the extent they were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 12.

### 13.    Somerset Auto Body of MI, Inc.

64.    Somerset Auto Body of MI, Inc. is incorporated under the laws of the State of Michigan.

65.    Somerset Auto Body of MI, Inc. also does business using the registered fictitious names Somerset Auto, Somerset Auto Center, Somerset Collision, and 1800PAIN800.

66.     Somerset Auto's principal place of business is located in Detroit, Michigan.

67.     Somerset Auto illegally and improperly solicited and induced individuals to undergo medically unnecessary treatment (to the extent treatment was provided at all) billed to Allstate by the defendants.

### 14.     Lincoln International LLC / 1-800-PAIN-800

68.     Lincoln International LLC / 1-800-PAIN-800 is organized under the laws of the State of Michigan.

69.     1-800-PAIN's principal place of business is located in Huntington Woods, Michigan.

70.     1-800-PAIN illegally and improperly solicited and induced individuals to undergo medically unnecessary treatment (to the extent treatment was provided at all) billed to Allstate by the defendants.

### 15.     Norman Dehko

71.     Norman Dehko is a resident and citizen of the State of Michigan.

72.     At all relevant times, Norman Dehko operated and conducted Kinetix, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Metro MRI, and Rent A Ride.

### 16.     Sabah Dehko

73.     Sabah Dehko is a resident and citizen of the State of Michigan.

74.     At all relevant times, Sabah Dehko operated and conducted Level 1 of Michigan, AMC, Select Medical, Northland Healthcare, and Rent A Ride.

### 17.   **Jordan Dehko**

75.     Jordan Dehko is a resident and citizen of the State of Michigan.

76.     At all relevant times, Jordan Dehko operated and conducted Level 1 of Michigan, Michigan First, AMC, and Select Medical.

### 18.   **Zahir Shah, P.T.**

77.     Zahir Shah, P.T. is a resident and citizen of the State of Michigan.

78.     At all relevant times, Shah operated and conducted Kinetix, Level 1 PT & Rehab, Level 1 Health, and Motion Transportation.

### 19.   **Najm-Ul Hassan**

79.     Najm-Ul Hassan is a resident and citizen of the State of Michigan.

80.     At all relevant times, Hassan operated and conducted Level 1 of Michigan, Michigan First, AMC, Metro MRI, and Rent A Ride.

### 20.   **Geoffrey Sagala, D.C.**

81.     Geoffrey Sagala, D.C. is a resident and citizen of the State of Michigan.

82.     At all relevant times, Sagala operated and conducted Level 1 Health, Level 1 of Michigan, Michigan First, Select Medical, Northland Healthcare, and Northland Chiropractic.

14

## III.    JURISDICTION AND VENUE

83.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961 *et seq*. because they arise under the laws of the United States.

84.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

85.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

86.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    THE DEFENDANTS' FRAUDULENT SCHEME

87.    The defendants used the Defendant Entities to submit exorbitant charges to Allstate for purported medical services, procedures, and equipment that were not actually provided, were unlawful, were not medically necessary, and were fraudulently billed.

88.    The fraudulent scheme described herein was driven by Norman Dehko; his family, including defendants Sabah Dehko and Jordan Dehko; and their

businesses and clinics, including defendants Somerset Auto, 1-800-PAIN, Level 1 Health, Level 1 of Michigan, Michigan First, and Rent A Ride.

89.    Norman Dehko, his family, and his associates oversaw a vast network of runners, tow truck drivers, solicitors, and medical providers who worked in concert to identify individuals who claimed to have been involved in motor vehicle accidents, and to unlawfully and improperly induce such individuals to present to the Defendant Entities to generate claims to Allstate, including through cash payments to patients in exchange for purported treatment.

90.    After patients were unlawfully and improperly induced to seek medical treatment that they did not actually need and did not seek out, they were directed to medical clinics owned or controlled by the defendants, including defendants AMC and Select Medical, where they were invariably prescribed an extraordinary amount of medically unnecessary treatment, testing, and services, which was billed by the Defendant Entities.

91.    The connection between the defendants' unlawful patient inducement and the unnecessary bills for medical treatment, testing, and services described herein is evidenced by the materials Somerset Auto provided to individuals claiming to have been in motor vehicle accidents, which included the phone number for "Norman" (layperson defendant Norman Dehko) and business cards for defendants 800-PAIN-800, Level 1 of Michigan, and AMC:



92.     The interplay between the illegal inducement and the claims for No-Fault benefits at issue herein is also displayed at the physical locations of several of the Defendant Entities.

93.     For example, defendant 1-800-PAIN operates in the same building as Level 1 of Michigan and Rent A Ride, located at 26321 Woodward Avenue, Huntington Woods, MI, 48070 (the "26321 building").

94.     Sabah Dehko has testified that Norman Dehko owns the 26321 building, and that Level 1 of Michigan is not charged rent for its use.

95.     Michigan First is similarly situated, as it is located in a building owned by Edmyne Dehko (a family member of Norman Dehko) through an entity called Collision Zone Inc.

96.     The 26321 building prominently features signs that read "1-800-PAIN-800 We help auto accident victims" and "248-632 PAIN Know Your Rights Call or Text Today":



97.     The 248-632-PAIN number advertised on the door of the 26321 building also advertises through a Facebook page that identifies the 26321 building as a physical therapy clinic and states: "GET THE COLLISION REPAIR, LEGAL SERVICES, & MEDICAL TREATMENT YOU NEED. $$$$$$ KNOW YOUR RIGHTS $$$$$$ WE HELP AUTO ACCIDENT VICTIMS $$$$$$."

98.     The 248-632-PAIN Facebook page also contains a link to Somerset Auto advertising material and states that it provides accident victims with attendant care, household services, free transportation, and unemployment payments.

99.   In other words, the defendants' own marketing materials confirm that they operated a closed loop of patient inducement and unnecessary medical services that was designed to maximize charges submitted to insurers like Allstate.

100.   The connection between defendants 1-800-PAIN, Somerset Auto, Norman Dehko, and the clinics that submitted the fraudulent bills to Allstate described herein is also confirmed by their respective business operations.

101.   The vans that are used to transport patients to and from the Defendant Entities, and which are emblazoned with 1-800-PAIN and 248-632-PAIN, are stored in a parking lot at Somerset Auto and drive back and forth between Somerset Auto and Level 1 of Michigan during its hours of operation.

102.   The defendants' scheme was specifically designed to take advantage of the unlimited medical benefits available under the No-Fault Act.

103.   For example, patient C.N. (Claim No. TXA-0233760)[1] was allegedly injured after slipping at the gym and her purported injury in no way involved or was related to the operation of a motor vehicle.

104.   C.N. reported to Allstate that she specifically informed her AMC physician that she was not injured in a motor vehicle accident, and the "history of the MVA" section of her AMC examination record confirms that "patient [was]

---

[1] To protect the confidentiality of its insureds, Allstate refers to them herein by initials and claim number.

exercising at LA Fitness in Livonia and she went to take a shower after her exercise. Her foot slipped in the gym shower."

105.   Despite the fact AMC was aware C.N. was not injured in a motor vehicle accident, AMC knowingly billed Allstate for extensive treatment improperly seeking payment under the No-Fault Act.

106.   C.N. also reported that "[AMC] had a hard time getting me to a therapist because all the therapists that [AMC] dealt with only dealt with car accident people" and further remarked that "[AMC] seems like a sort of scam place because [the patients were] mostly younger folks…it seemed like there wasn't nothing wrong with them…it seem[ed] like they were doing scams for the insurance."

107.   The defendants' scheme has also been confirmed by other patients for whom the defendants submitted bills for unlawful and unnecessary treatment.

108.   Patient S.W. (Claim No. 0510979222) reported that 1-800-PAIN controlled her course of treatment and at one point directed her to switch doctors.

109.   Patient J.H. (Claim No. FXP-0381126) was transported to Somerset Auto by a tow truck that appeared at the scene of her motor vehicle accident and testified that layperson Norman Dehko directed her to treat.

110.   Allstate was billed for tens of thousands of dollars of alleged treatment relative to patient J.H. following this improper inducement to seek treatment he did not need, including nearly $8,000 by defendant Level 1 PT & Rehab.

20

111.   Once solicited and improperly induced to seek unnecessary medical treatment, the defendants transported groups of patients in their vans, including through defendant Rent A Ride, to defendants AMC and Select Medical, where they were prescribed excessive and predetermined treatments and testing that were not medically necessary and were not tailored to the individual needs of each patient.

112.   AMC and Select Medical billed for medically unnecessary evaluations and services, and wrote the prescriptions the other defendants needed in order to bill Allstate for medically unnecessary MRIs, physical therapy, chiropractic treatment, and transportation.

113.   Such medically unnecessary services originated with the defendants' illegal and improper solicitation and inducements and were billed to Allstate by the Defendant Entities, as detailed below.

114.   The connections between the solicitation and inducement of patients and the claims for No-Fault benefits at issue herein are also confirmed by the defendants' own testimony and records.

115.   Defendant Sabah Dehko has testified under oath that patients of Level 1 of Michigan were obtained through 1-800-PAIN.

116.   Defendant Jordan Dehko informed Allstate that all patients of defendant Michigan First originated with 1-800-PAIN pursuant to the terms of a contractual agreement.

117.   Numerous patients have testified that they received unprompted calls from 1-800-PAIN within days of their motor vehicle accidents offering "free" transportation to AMC.

118.   Email records document hundreds of exchanges between Norman Dehko, AMC, the "Level 1" clinics, and individual physicians employed by the defendants.

119.   The defendants' bank records also reveal an extensive network of payments between the defendants and their associates that are evidence of the *quid pro quo* arrangements they used to generate patient referrals.

120.   For example, Somerset Auto and Level 1 Health exchanged more than $100,000 in checks between June 2016 through February 2018, many of which included a memo specifying the payment is for "marketing and advertising."

121.   The defendants used references to "marketing," "advertising," and "transportation" to conceal the true nature of the cash transactions that drove the scheme described herein.

122.   Somerset Auto also wrote checks to 1-800-PAIN for "advertising."

123.   Norman Dehko has admitted in sworn testimony that defendants Kinetix and Shah may have paid him for patient referrals in 2016 and 2017.

124.   Defendant Somerset Auto's bank records confirm that Kinetix paid it at least $12,500 in 2017 for "advertising/marketing."

125.   The defendants' bank records also reveal massive amounts of payments from other healthcare providers, including Mercyland Health Services, PLLC ("Mercyland"), which was the defendants' primary source of prescriptions for physical therapy and MRIs prior to defendant AMC.

126.   Indeed, AMC took over Mercyland's physical office location when the latter closed.

127.   Mercyland wrote checks totaling at least $158,000 to defendant Level 1 Health Systems during a nine-month period from June 2017 to March 2018.

128.   Level 1 Health Systems distributed the money received from providers like Mercyland to other defendants, including at least $209,300 to defendant Dehko Investment, LLC (Rent A Ride), $16,550 to Edmyne Dehko (a family member of Norman Dehko), $28,400 to Norman Dehko, and $43,220 to Somerset Auto.

129.   Mercyland also made at least $20,000 in payments directly to defendant Rent A Ride.

130.   Defendant 1-800-PAIN also maintained an American Express credit card account that was used by Mercyland's owner, Muhammad Abraham, for personal expenses, which was yet another method to make and conceal the defendants' payments for patient referrals and unlawful fee splitting with laypersons.

131.   Defendant Norman Dehko has also claimed in testimony that he leases the 1-800-PAIN number from an associate named Michael Angelo ("Angelo").

132.   In fact, Angelo is a partner with Norman Dehko in defendant 1-800-PAIN.

133.   Angelo, a New Jersey resident who is currently named as a defendant in at least three (3) separate lawsuits involving similar fraudulent schemes to abuse the Michigan No-Fault Act, also owns the building in which Mercyland was and defendant AMC is now located.

134.   On several occasions, services that were allegedly performed by defendant AMC were billed by a separate entity owned by Angelo called Block Billing Solutions, LLC.

135.   Angelo is also a member of entities that are purported to be owned by defendant Jordan Dehko, but are actually controlled by Norman Dehko (along with Angelo) including defendant Michigan First and Cure Imaging, LLC.

136.   Entities owned by Angelo routinely billed Allstate for alleged urine drug testing and filling prescriptions for medications.

137.   These transactions between the defendants and Angelo's entities are further evidence of the manner in which the defendants used the patients they improperly solicited as currency for their *quid pro quo* arrangements.

138.   Angelo also exercised control over the solicitation and referral of patients to the Defendant Entities, which is evidenced by hundreds of emails he exchanged with Norman Dehko, AMC, and AMC's physicians beginning in 2018.

139.   These email communications also confirm the layperson control over patient evaluation and treatment and the method by which patients were divvied up between Dehko and the defendants herein, Angelo and his clinics, and other associates.

140.   For example, in one such communication copied below, layperson Angelo informed defendants Hassan and Norman Dehko that he "can refer lots of patients for spinal injections," despite having absolutely no background or training that would qualify him to determine that invasive procedures were medically necessary:

```
From:      Michael Angelo [+19732704708]
Sent:      12/17/2018 1:47:25 PM
To:        Lukasz Wietrzynski P77039 [+15862169444]; Najam Hassan [+13137790091]; Norman Dehko [+12488827000]
Subject:   No Subject


Maxim says about leasing ur place
What is happening to James Reese  it he is staying I can refer lots of patients for spinal injections
I mean Nazem leased from u
```

141.   The defendants' bank records also confirm their payments to tow truck drivers in exchange for patient solicitation.

142.   One tow truck driver who received numerous payments from Somerset Auto confirmed to Allstate that he (a layperson) talked about going to physical therapy with people he picked up at accident scenes.

143.   This tow truck driver reported that he only referred these individuals to auto body shops instead of directly to providers because the auto body shops like Somerset Auto have physical therapy referrals "on lock."

144.   The defendants also attempted to conceal the extent of their interrelationships to avoid detection of their scheme.

145.   For example, Norman Dehko has testified that he and his family never had any connection or involvement with 248-632-PAIN.

146.   As noted above, the 26321 building that is owned by Norman Dehko and houses several businesses that he owns and operates prominently advertises this number on the exterior.

147.   Moreover, bank records reveal that Norman Dehko has written checks to Therian Hunt, an individual involved with 248-632-PAIN, for "advertising" from both Level One Health and Somerset Auto bank accounts.

148.   Similarly, defendant Sabah Dehko has testified that he has heard of 1-800-PAIN on the radio and has never heard of defendant Rent A Ride, but he has maintained social media profiles referring to himself as the "owner" and "founder" of defendant 1-800-PAIN and the "CEO" of Rent A Ride.

149.   In addition to concealing their relationships, the defendants withheld information from Allstate because they have extensive disciplinary and criminal histories relating to healthcare fraud.

A.   <u>NORMAN DEHKO</u>

150.   Norman Dehko has a long history of insurance fraud and unlawful solicitation of motor vehicle accident victims.

151.   In 2007, Norman Dehko, along with his mother, Latifa Dehko, and his brother, Dickow Dehko, was arrested and charged with insurance fraud in connection with a scheme that involved falsification of reports and enhancing collision damage.

152.   Norman Dehko, who was described as the ringleader of the scheme, was charged with forty (40) felonies, and was alleged to have used as many as twelve (12) separate auto body shops to perpetrate the fraud.

153.   In 2012, Norman Dehko pleaded guilty to insurance fraud conspiracy.

154.   Norman Dehko has also been implicated in a scheme in which a former Detroit police officer was convicted of misconduct in office for, *inter alia*, creating falsified police reports for Dehko and others.  *See* <u>State of Michigan v. Schuh</u>, No. 08-013141-FH, Wayne Circuit Court.

155.   The convicted officer admitted that he had received between five and seven thousand dollars in "loans" from collision shop owners that had no payback arrangement, and that were not in fact paid back.

156. Norman Dehko, a layperson, controlled the medical treatment of patients at issue herein and ensured that solicited patients were referred to the Defendant Entities.

157. As discussed above, the Defendant Entities were either owned and controlled by members of Norman Dehko's immediate family, or had financial relationships with Dehko, Somerset Auto, and 1-800-PAIN such that Norman Dehko received a financial benefit through their operation.

**B.    ZAHIR SHAH, P.T.**

158. Defendant Shah was the incorporator/organizer of defendants Kinetix, Level 1 PT and Rehab, and Motion Transportation.

159. Shortly after Shah organized Level 1 PT and Rehab on April 25, 2017, he was indicted for defrauding Medicare, including by paying kickbacks and bribes to recruiters for referrals.

160. Following Shah's indictment, members of Norman Dehko's family organized several entities using the "Level 1" name, including Level 1 Health, which was located at the same address as Shah's Level 1 PT and Rehab and was organized by Norman Dehko's relative Justin Kakoz, and Level 1 of Michigan, which was organized by Norman Dehko's son Sabah Dehko.

161.   Shah pleaded guilty on May 17, 2018 to conspiracy to commit healthcare fraud and wire fraud, as well as to conspiracy to pay and receive healthcare kickbacks.

162.   Kinetix continued to bill for physical therapy treatment allegedly performed by Shah after his indictment and after his guilty plea.

163.   Shah was sentenced to 7 years in prison and ordered to pay more than $8.3 million in restitution.

164.   Several patients at issue herein reported that they were referred to Kinetix by a physician named Vicha Janviriya, M.D. ("Janviriya"), who was also under federal indictment at the time in relation to a scheme where he referred patients for physical therapy that was not performed and was unnecessary in exchange for kickback payments.

165.   Janviriya met with patients inside Kinetix's office, and defendant Shah had possession of Janviriya's medical records.

### C.   GEOFFREY SAGALA, D.C.

166.   Defendant Sagala was employed by Level 1 Health Systems, and is the owner of defendants Northland Healthcare, Northland Chiropractic, and Select Medical.

167.   On December 14, 2012, Sagala was indicted for theft or embezzlement in connection with healthcare in relation to a scheme in which he stole billing

information from a competitor's office and then submitted bills representing that he had rendered treatment at his own chiropractic clinic.

168.   Sagala pleaded guilty to one of the charges related to his fraudulent scheme and agreed to a period of probation and payment of restitution. *See* Exhibit 13.

169.   As part of his Rule 11 Plea Agreement, Sagala acknowledged that he billed Medicare for services that were never rendered.

170.   Sagala also entered into a consent order with the Michigan Board of Chiropractors on November 20, 2014, whereby he agreed to a suspension of his chiropractic license and payment of a fine in relation to this scheme to defraud.

171.   Despite their separate ownership, the clinics owned by Sagala were closely connected to the other defendants named herein.

172.   Northland Healthcare billed for alleged treatment of patients in defendant Level 1 of Michigan's office (which is in the same building owned by Norman Dehko as 1-800-PAIN).

173.   Northland Healthcare also submitted records to Allstate using defendant Level 1 of Michigan's template forms, including those with Level 1 of Michigan's name pre-printed thereon.

174.   As with the other defendants, Norman Dehko wrote numerous checks to Sagala from Somerset Auto's bank account.

175.   Sagala and his clinics also furthered the defendants' scheme by writing prescriptions for MRIs that were billed by defendant Metro MRI.

176.   Indeed, more than 33% of the patients at issue herein for whom Select Medical submitted bills were referred to Metro MRI for imaging.  *See* Exhibits 7 and 10.

177.   At least 56% the patients at issue herein for whom Select Medical submitted bills also incurred bills for alleged physical therapy at either Level 1 of Michigan or Michigan First.  *See* Exhibits 4, 5, and 7.

178.   Select Medical also employed the same staff and physicians as defendant AMC, including Hangming Ruan ("Ruan") and Pedro Toweh, M.D. ("Toweh").

## D.   CONTROL OF OTHER DEFENDANT ENTITIES

179.   AMC is controlled by defendant Hassan and, as detailed below, operated primarily through nurse practitioners and medical assistants who were unlawfully supervised rather than medical doctors.

180.   The few physicians who AMC claims evaluated and treated the patients at issue herein have extensive and troubling histories:

- AMC billed Allstate for patients purportedly evaluated by David Jankowski, D.O. ("Jankowski").  Jankowski has been under indictment since June 7, 2017 for conspiracy to commit healthcare fraud (18 U.S.C. § 1349).  United States v. Jankowski, 17-cr-20401-BAF-DRG (E.D. Mich.).  Jankowski was under indictment the entire time he worked for AMC.  The State of Michigan

suspended Jankowski's license for 3 years on April 11, 2019 and fined him $25,000.

- Following Jankowski's license suspension, he was replaced at AMC by Ganiu Edu, M.D. ("Edu"). On December 4, 2018, Edu was indicated on numerous charges including (1) conspiracy to commit healthcare fraud (18 U.S.C. § 1349), (2) aiding and abetting healthcare fraud (18 U.S.C. § 1347), and (3) conspiracy to distribute and possess with intent to distribute controlled substances (21 U.S.C. § 846, 21 U.S.C. § 841(a)(1)). United States v. Rajendra Bothra, et al., 2:18-cr-20800-SJM-APP (E.D. Mich.). Edu was under indictment the entire time he worked for AMC.

- AMC also billed Allstate for evaluations and treatment allegedly provided by Surya Nallani, M.D. ("Nallani"). Nallani entered into a plea agreement in January 2016 admitting to unlawfully billing Medicare. United States v. Surya C. Nallani, M.D., 2:11-cr-20365-VAR-RSW (E.D. Mich.). As part of her plea agreement, Nallani was excluded from participating in all federal healthcare programs and ordered to surrender her license to prescribe controlled substances. Pursuant to an August 2016 judgment, Nallani was placed on 3 years' probation and ordered to forfeit more than $825,000. The State of Michigan filed an Administrative Complaint against Nallani in January 2017 and summarily suspended her medical license. The State of Michigan entered a Consent Order on July 2017 and placed Nallani on probation for 2 years and fined her $15,000. As per the terms of her probation, Nallani informed the State of Michigan of any changes in employment. Nallani e-mailed the State of Michigan on August 28, 2018 to say that she "will start[] to work at AMERICAN MEDICAL CENTER as a Physician designated to see Auto Injury Patients."

- AMC billed Allstate for evaluations and treatment allegedly performed by Jason Bitkowski, D.O. ("Bitkowski"). The State of Michigan filed an Administrative Complaint against Bitkowski on March 22, 2018 alleging that he ranked among the highest prescribers in the State in 2016 for multiple controlled substances.

- AMC billed Allstate for evaluations and treatment allegedly performed by Reese James, D.O. ("James"). James was summarily suspended from the practice of medicine in Michigan in early 2017. On August 3, 2017, James agreed to a fine of $35,000 and a year-long suspension of his medical license in response to an Administrative Complaint alleging that he was among the

highest prescribers of dangerous controlled substances in the State of Michigan, that his prescriptions for such substances increased six-fold in 2016, and that for a period of time in 2016 he was writing an average of more than 87 controlled substance prescriptions every day.

181.   As noted above, AMC ordered MRIs that were billed by defendant Metro MRI.

182.   Metro MRI was organized by Rakesm Lala and is operated by Michael Lala, both of whom are immediate family members of Monik Lala.

183.   Monik Lala works at Henry Ford Health System ("Henry Ford"), where several patients at issue herein were purportedly evaluated by Monik Lala immediately prior to being transported to AMC.

184.   For example, patient J.W. (Claim No. FXP-0386104) reported to Henry Ford following his purported motor vehicle accident where he underwent a CT scan that was interpreted by Monik Lala and was then immediately referred to AMC for an examination performed the same day.

185.   AMC and Metro MRI were important to the defendants' scheme for several reasons, including to create the appearance of injuries that were more severe than they actually were and to provide the prescriptions and diagnoses needed to perpetuate the extensive courses of predetermined testing, treatment, and services described below.

## V.   BILLING FOR SERVICES NOT RENDERED

186.   The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

187.   The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

188.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

189.   Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

190.   Many of the bills submitted to Allstate by the defendants for services not actually performed were the result of standard practices that were repeated for numerous patients at issue herein, as detailed below.

### A.   BILLING FOR TRANSPORTATION NOT RENDERED

191.   Rent A Ride and Motion Transportation billed for purported transportation services that were never actually provided.

192.   Motion Transportation submitted charges to Allstate for allegedly transporting patients to and from Kinetix on dates of services when the patients did not actually undergo treatment.

193.   For example, Motion Transportation billed Allstate for roundtrip transportation of patient A.B. (Claim No. 0332959220) from his home to Kinetix on April 16, 2015.

194.   However, A.B. never received treatment at Kinetix on April 16, 2015.

195.   Similarly, Motion Transportation billed Allstate for roundtrip transportation of patient T.G. (Claim No. 0341411429) from his home to Kinetix on four (4) dates of service, September 20, 2014, November 10, 2014, December 12, 2014, and December 15, 2014, on which T.G. never received treatment at Kinetix.

196.   Motion Transportation billed Allstate for roundtrip transportation of patient M.P. (Claim No. 0460037633) from his home to Kinetix on three (3) dates of services, June 19, 2017, July 7, 2017, and July 10, 2017, on which M.P. never received treatment at Kinetix.

197.   Motion Transportation billed Allstate for roundtrip transportation of patient K.G. (Claim No. 0444175921) from his home to Kinetix on July 14, 2016, but K.G. never received treatment at Kinetix on July 14, 2016.

198.   Motion Transportation billed Allstate for roundtrip transportation of patient N.U. (Claim No. 0344215330) from her home to Kinetix on August 29, 2016, but N.U. never received treatment at Kinetix on August 29, 2016.

199.   For patient L.N. (Claim No. 0545177743), Rent A Ride billed Allstate for purported roundtrip transportation on May 13, 2019.

200.   L.N. never received any treatment on May 13, 2019.

201.   Rent A Ride billed Allstate for roundtrip transportation of patient C.R. (Claim No. 0519936925) from his home to Level 1 of Michigan on three (3) dates of service, November 5, 2018, November 7, 2018, and November 12, 2018, that C.R. never received treatment at Level 1 of Michigan.

202.   In addition to bills for transportation on dates that patients never received treatment, both Kinetix and Motion Transportation submitted separate bills for roundtrip transportation alleged provided from patient A.B.'s (Claim No. 0332959220) home to Kinetix on September 18, 2014, September 19, 2014, September 22, 2014 and September 23, 2014.

203.   Charges for medical transportation of patients when patients did not actually receive medical care are billing for services not rendered.

### B.   BILLING FOR ONE-ON-ONE SUPERVISION NOT PERFORMED

204.   Much of the treatment billed by the defendant physical therapy and chiropractic clinics required direct one-on-one supervision by a qualified healthcare

professional for the entirety of treatment, including all therapeutic exercises, neuromuscular reeducation, gait training, massage, manual therapy, and therapeutic activities, and some electrical stimulation.

205.   All of the defendant physical therapy and chiropractic clinics regularly billed Allstate for purported therapeutic exercises using Current Procedural Terminology ("CPT") Code[2] 97110, which cannot be billed relative to previously taught exercises, patients performing exercises independently, or the use of exercise equipment without the direct, one-on-one intervention or skills of the therapist.

206.   A mandatory post-service requirement of proper billing for alleged one-on-one therapeutic exercises requires that documentation clearly indicate: (1) an adequate description of the nature, extent, need for the procedure, the exercise or activity performed; (2) the time spent in the performance of each procedure; (3) the equipment necessary to provide the service as well as the equipment settings, and patient response; and (4) evidence to support one-on-one care.

207.   As discussed below, the defendants routinely failed to document the time spent performing each exercise (or document any time at all) and did not provide evidence supporting the use of one-on-one care.

---

[2] CPT Codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

208.   The therapeutic exercises most commonly billed by the defendants, such as "stretching," "treadmill," and "exercise bike," are not the type that require one-on-one supervision and (if performed at all) were done by the patients on their own or together with other patients in a group setting.

209.   Several patients at issue herein reported to Allstate that treatments billed by the defendants were not actually supervised.

210.   For example, Patient J.B. (Claim No. 0484341078) testified that his exercises at Level 1 of Michigan included unattended use of an exercise bike, which Level 1 of Michigan  routinely billed using CPT Code 97110, thus (mis)representing that the exercises involved supervision not actually performed.

211.   At Michigan First, patient walked on treadmills with no staff present in the room, yet Michigan First frequently included "treadmill" as part of its purported direct therapeutic exercised billed to Allstate using CPT Code 97110.

212.   Kinetix's office had just one (1) exercise room, yet Kinetix never billed Allstate for a single unit of group therapy and instead only billed for alleged "one-on-one" exercises, which can be billed at a higher rate.  *See* Exhibit 1.

213.   The defendants' billing for therapeutic modalities that require direct, one-on-one patient contact from a licensed therapist when the exercises are performed, if at all, by patients on their own constitutes billing for services not rendered.

## C.    BILLING FOR CONSTANT ATTENDANCE SERVICES NOT PERFORMED

214.    The defendant chiropractic and physical therapy clinics also regularly billed Allstate for services that require constant, one-on-one oversight, including ultrasound and certain electrical stimulation treatment.

215.    Patients for whom the defendants submitted such bills have confirmed that their treatment was not actually performed with constant attendance, but instead occurred without a therapist present.

216.    Indeed, patients reported that staff employed by the defendant clinics were only present to set and stop a timer for the treatments requiring constant attendance.

217.    For example, patient J.P. (Claim No. 0507664340) testified that during his alleged electrical stimulation treatment Kinetix set a timer "for 15, 20 minutes, once it go off he come back in the room, unhook you and you go to your next exercise."

218.    Kinetix billed Allstate for this alleged electrical stimulation using CPT Code 97032, which requires direct, one-on-one patient contact and constant attendance throughout the duration of the treatment.

219.    Patient R.W. (Claim No. TXA-0188788) likewise testified that Kinetix set a timer for her electrical stimulation and only returned once the set time was over.

220.    Kinetix repeatedly billed Allstate for two (2) units of electrical stimulation allegedly provided to R.W. using CPT Code 97032, which requires constant attendance that R.W. confirmed was not provided.

221.    Patient J.B. (Claim No. 0484341078) testified that he was by himself when he underwent electrical stimulation at Level 1 of Michigan, yet Level 1 of Michigan exclusively billed Allstate for attended electrical stimulation.

222.    Electrical stimulation that is unattended must be billed using CPT Code 97014, yet the defendant clinics routinely billed for purported "attended" stimulation using CPT Code 97032 because it is paid at a higher rate.

223.    Level 1 of Michigan also billed Allstate for hands-on massage treatment using CPT Code 97124, which is another treatment that requires constant attendance by the practitioner, but J.B. testified the "massage" treatment he was received was simply sitting in a massage chair.

### D.    BILLING MULTIPLE TIMES FOR THE SAME SERVICE

224.    The defendants also routinely billed Allstate for multiple units of untimed treatments that are only permitted to be billed once per date of service.

225.    Physical therapy services that are untimed are only permitted to be billed once per date of service.

226.   Kinetix and Level 1 of Michigan billed Allstate for allegedly applying hot/cold packs to patients more than once on numerous dates of service.  *See* Exhibits 1 and 4.

227.   Level 1 of Michigan and Michigan First also billed Allstate for allegedly performing multiple units of unattended electrical stimulation on patients on the same date of service.  *See* Exhibits 4 and 5.

228.   Unattended electrical stimulation billed using CPT Code 97014 cannot be billed multiple times on a single date of service.

229.   Submission of multiple units for performing the same service on the same date when coding rules prohibit more than one unit constitutes billing for services not rendered.

### E.   BILLING FOR TIMED SERVICES NOT RENDERED

230.   As discussed further below, the defendant physical therapy and chiropractic clinics billed for nearly identical courses of treatment for almost every patient, regardless of their age, injury, medical history, and comorbidities.

231.   The majority of the treatments and modalities used in these protocol courses of treatment were timed services for which each unit billed to an insurer represents fifteen (15) minutes of treatment.

232.   Medical coding rules require a minimum of eight (8) minutes of treatment be performed in order to bill for a unit of a timed service.

233.   To properly bill for multiple units of a timed service, a provider must perform the full fifteen (15) minutes of service for the first (and any subsequent) unit, and at least eight (8) minutes of service for the second (or subsequent) unit.

234.   The defendants routinely submitted charges for purported timed exercises, often alleging multiple units were performed, that failed to document the amount of time purportedly spent performing each service.

235.   For example, therapeutic exercises allegedly performed by defendant Sagala at Level 1 Health, a timed exercise, were recorded and billed to Allstate using nothing more than a check box:



236.   Kinetix and Shah similarly submitted bills for multiple units of purported therapeutic exercises that failed to indicate the time spent on specific exercises:

**CPT Code(s)**
CPT code entry: 97010 : HOT/COLD PACK Units: 1
CPT code entry: 97124 : MASSAGE Units: 1
CPT code entry: 97110 : THERAPEUTIC EXERCISES Units: 2

Subjective information: Patient is complaining of pain on upper extremity, Patient is complaining of pain on lower extremity, Patient reported stiffness on upper extremity, Patient reported stiffness on lower extremity

**Intervention**
Exercises: Therapeutic Exercise - Increase endurance, Therapeutic Exercise - Strengthen, Therapeutic Exercise - increase ROM

237.   It is improper to submit bills for timed exercises when the time spent for each treatment is not accurately recorded, and all claims by the defendant clinics for timed services not properly documented to allow for any form of authentication were fraudulent.

238.   As evidenced by the numerous representative patients discussed herein for whom timed treatments were not performed for the minimum time required, the Defendant Clinics' failure to measure and record the time spent performing treatment was done intentionally to mask the fact that they did not perform treatment for the length of time required to bill Allstate.

239.   The defendants' bills for timed treatments that are not documented with any actual time performed or are contradicted by functional limitations constitute billing for services not rendered.

### F.   BILLING FOR SERVICES RENDERED BY OTHER PROVIDERS

240.   Defendant AMC routinely submitted charges to Allstate for urine drug testing that was performed and durable medical equipment (DME) that was issued by other providers, if it was performed and issued at all.

241.   As part of the predetermined protocol of testing and treatment described below, AMC collected urine specimens from nearly every patient at nearly every appointment to generate charges for an incredible amount of unnecessary urine drug testing.

242.   From its inception, AMC billed Allstate for the alleged performance of screens on these specimens, which are tests that are performed in the practitioner's office.

243.   AMC also allegedly sent the urine specimens to outside laboratories that were owned by its associates and with whom it had *quid pro quo* referral relationships, including a lab owned by Angelo, for purported definitive testing.

244.   Beginning in or about May of 2018, AMC began submitting its own claims for alleged performance of definitive urine drug testing.

245.   However, the other laboratories with which AMC was associated continued submitting claims for the same purported testing on the same urine specimens.

246.   For example, AMC and an entity called North West Labs, Inc. ("North West Labs") each billed for nearly identical alleged definitive testing of urine specimens of patient L.G. (Claim No. 0438133043) on June 28, 2018, July 26, 2018, August 23, 2018, September 19, 2018, November 16, 2018, December 13, 2018, and January 23, 2019.

247.   Similarly, AMC and North West Labs billed for nearly identical alleged definitive testing of urine specimens of patient F.O. (TXA-0193420) on seven separate dates.

248.   AMC also submitted bills for DME that was actually issued, if at all, by a pharmacy owned by Angelo called US Health Pharmaceuticals, LLC d/b/a Meds Direct ("Meds Direct").

249.   For example, Meds Direct purportedly issued a transcutaneous electrical nerve stimulation ("TENS") device to patient M.M. (Claim No. 0511595059) on October 5, 2018 based on a prescription from AMC.

250.   AMC submitted a separate charge to Allstate also claiming to have issued a TENS device to M.M. on October 5, 2018, when the DME was issued, if at all, by Meds Direct.

### G.   BILLING FOR INJECTION SERVICES NOT PERFORMED

251.   Defendant AMC routinely billed Allstate for purportedly performing invasive injections using ultrasound guidance.

252.   Bills from AMC involving purported ultrasound guidance were submitted using CPT Code 20611 and experimental CPT Codes 0216T and 0217T. *See* Exhibit 6.

253.   To properly bill for a procedure involving ultrasound guidance, it is required that the provider perform a focused ultrasound evaluation that is interpreted through multiple planes and is separately documented.

254.   AMC never performed the focused evaluation required to properly bill for use of ultrasound guidance, nor separately documented any purported use of the procedure.

255.   Therefore, bills submitted by AMC that included claims for ultrasound guidance seek payment for a service that was not actually performed.

## H.   SPECIFIC EXAMPLES OF BILLING FOR SERVICES NOT RENDERED

256.   In addition to the fraudulent practices detailed above, each of which were standard practices of the defendants that resulted in numerous claims submitted to Allstate for payment for services not actually performed, the defendants faxed and/or mailed fraudulent bills and medical records relative to each of the following representative exemplar patients:

- Patient J.B. (Claim No. 0484341078) testified that he went to Level 1 of Michigan only five (5) or six (6) times.  Level 1 of Michigan billed Allstate for fifteen (15) purported dates of service.  J.B. also reviewed an "attending physician's report" signed by Sagala that indicated he received treatment at Level 1 of Michigan on 14243 W. 8 Mile Rd.:



J.B. testified that he never received treatment at or even went to a Level 1 facility located at this address.  Northland Healthcare billed for treatment allegedly provided to J.B. by Sagala on three (3) dates of service: December 5, 2017, December 12, 2017, and December 27, 2017.  Northland Healthcare billed Allstate for rendering chiropractic manipulative treatment, hot/cold packs, mechanical traction, massage therapy, and therapeutic exercises.  J.B., however, testified that he never received chiropractic manipulative treatment

and confirmed that Sagala never provided any hands-on chiropractic treatment. On May 3, 2018, Level 1 of Michigan billed for two (2) units of therapeutic exercises using CPT Code 97110, which requires at a minimum twenty-three (23) minutes of treatment. This was not actually performed. On May 25, 2018, Level 1 of Michigan again billed for two (2) units of therapeutic exercises using CPT Code 97110, which was again not performed.

- Patient D.F. (Claim No. 0529272312) testified that he never treated at any facility called "Level One," stating "I don't remember recalling hearing nothing about no place called Level One. I don't even know where Level One is." Defendant Level 1 PT & Rehab nevertheless billed Allstate $57,240 for 116 separate alleged dates of treatment of D.F.

- On June 27, 2018, AMC billed Allstate for an alleged examination and urine drug test of C.B. (Claim No. 0358449998). AMC submitted one charge for presumptive testing of a urine specimen allegedly provided by C.B. using CPT Code 80307, and a separate charge for purported definitive drug testing using HCPCS Code G0483. On this same June 27, 2018 date of service, AMC also billed Allstate for definitive testing using twenty-five (25) separate CPT Codes specific to the drugs/analytes purportedly tested. Only one (1) laboratory report was submitted relative to the purported test of C.B. on June 27, 2018, confirming that at most just one (1) definitive test was performed and not the twenty-five (25) that were billed. AMC also submitted two (2) separate charges for an alleged re-examination of C.B. on May 5, 2016. C.B. only received a single re-examination on that date, if she was examined at all, and billing two (2) distinct re-examination charges for one (1) examination constitutes billing for services not rendered.

- AMC submitted two (2) separate bills for purported injections to patient R.S. (Claim No. 0510241649) on August 27, 2018. One bill listed the place of service as 16100 19 Mile Road. This bill was signed by Jankowski on September 6, 2018 and included only a single charge for an SI joint injection. A second bill for the alleged August 27, 2018 date of service, also signed by Jankowski but dated November 12, 2018, lists the place of service as 20905 Greenfield Road, and adds three (3) separate charges for supplies allegedly used. The record submitted with this second bill indicates the procedure was performed at AMC's 20905 Greenfield Road location, and therefore the second charge for a procedure at a separate location for the same patient on the same date of service that never occurred constitutes billing for services not rendered.

- AMC submitted two separate bills for the same purported September 17, 2018 re-examination of patient M.M (Claim No. 0511595049).  Each bill was signed by the same physician, yet they claim the examinations occurred at two (2) separate service addresses and represent that different levels of complexity were performed.  The AMC record from September 17, 2018 lists the 20905 Greenfield Rd address as the facility where treatment was allegedly rendered.  AMC's duplicate charge for a purported September 17, 2018 re-examination at AMC's 16100 19 Mile Rd office was for a service that was never performed.  AMC also submitted two (2) separate records for a purported evaluation of M.M. on October 5, 2018, representing that two (2) different doctors performed the evaluation, when at most just one (1) evaluation occurred.

- On January 4, 2019, AMC ordered electrodiagnostic testing of patient L.R. (Claim No. 0530629286) despite a lack of any specific findings to justify such testing.  AMC submitted a record dated January 11, 2019, purporting to record the results of electrodiagnostic testing of L.R.'s upper extremities only.  AMC submitted two (2) separate bills for this purported procedure.  One of the bills claimed that testing was performed on all four (4) of L.R.'s extremities, and the other claimed that testing was performed on two (2) of L.R.'s extremities.  In total, AMC billed for electrodiagnostic testing of six (6) extremities on January 11, 2019, when at most just two (2) were actually performed.

- For patient J.W. (Claim No. 0487022600), Level 1 of Michigan billed for two (2) units of therapeutic exercises using CPT Code 97110 on April 23, 2018 that were not provided.

- Patient K.M. (Claim No. 0510979222) reported to Allstate that his treatment at Level 1 of Michigan consisted of ten (10) minutes on a bike, sitting on a massage chair, and electrical stimulation, and he denied any other treatment.  Level 1 of Michigan frequently billed Allstate for purportedly performing two (2) units of therapeutic exercise at each appointment, which would have required more than twice as much time and would have required constant supervision that would not be required for simply riding an exercise bike.  Level 1 of Michigan also routinely billed Allstate for manual therapy and application of hot packs to K.M., neither of which were performed at all per K.M.'s contemporaneous report of his actual treatment.

- For patient D.F. (Claim No. 0529272312), Level 1 PT & Rehab submitted two (2) charges for mechanical traction using CPT Code 97012 on October 24, 2018 and October 29, 2018 that did not occur as billed.

- For patient R.W. (Claim No. TXA-0188788), Kinetix billed Allstate for two (2) units of purported attended electrical stimulation for all but R.W.'s first date of service. R.W. testified that she did not actually receive electrical stimulation on every date of service it was billed by Kinetix.

- For patient J.P. (Claim No. 0507664340), Kinetix billed Allstate for two (2) units of attended electrical stimulation using CPT Code 97032 on November 13, 2018, which requires a minimum twenty-three (23) minutes of treatment. J.P. did not receive twenty-three (23) minutes of electrical stimulation, thus the two (2) units charged to Allstate are billing for services not rendered. Kinetix also billed for two (2) units of ultrasound on two (2) dates of service (May 17, 2018 and May 18, 2018), which requires at a minimum twenty-three (23) minutes of treatment that was likewise not performed as billed.

- For patient L.H. (Claim No. 0433097440), Kinetix billed for two (2) units of attended electrical stimulation using CPT Code 97032 on eleven (11) separate dates of service between June-November 2017. L.H. did not receive the billed-for treatment.

- For patient K.Y. (Claim No. 0494245848), Kinetix billed for two (2) units of ultrasound on three (3) dates of service (March 8, 2018, March 30, 2018, and June 20, 2018), which requires at a minimum twenty-three (23) minutes of treatment. On each date of service, K.Y. only received (at most) eleven (11) minutes of ultrasound treatment, thus the two (2) units charged to Allstate on each date of service are billing for services not rendered.

- Defendant Northland Healthcare routinely billed Allstate for two (2) units of therapeutic exercises allegedly performed for patient A.Y. (Claim No. 0275194066) despite only performing one (1) unit of exercises, including on April 7, 2014, April 11, 2014, May 2, 2014, May 9, 2014, May 12, 2014, May 14, 2014, June 11, 2014, and June 13, 2014. Northland Healthcare also billed for two (2) units of massage therapy allegedly rendered on May 7, 2014 and June 9, 2014, despite only one (1) unit actually being performed.

- Northland Chiropractic billed Allstate for purported chiropractic manipulation allegedly performed on five (5) regions for patient C.W. (Claim No. 0313918708) on thirty-one (31) separate dates of service. The treatment notes from these dates of service indicate that chiropractic manipulation was actually provided to only three (3) distinct spinal regions on each date of service, as the record from all thirty-one appointments documents that chiropractic manipulative treatment ("CMT") was rendered to only the "C" (cervical), "T" (thoracic), and "L" (lumbar) regions:



- Northland Healthcare submitted bills for twenty-three (23) separate dates of service relative to patient H.A. (Claim No. 0557192614). Each of these bills identifies the service facility as Northland Healthcare. On each of these dates of service, Sagala also separately billed Allstate for identical treatment purportedly performed at New Horizon Chiropractic PLLC ("New Horizon"), a separate entity that he owns and controls. The records Sagala attached to both sets of bills confirm treatment occurred, if at all, at New Horizon. Each of the twenty-three (23) bills Northland Healthcare and Sagala submitted for treatment that never actually occurred at Northland Healthcare and were separately billed by another entity constitute clear billing for services not rendered.

257.   The defendants submitted fraudulent claims to Allstate relative to each of the above-referenced exemplar patients and categories of services that were not actually provided, and Allstate relied on such submissions in adjusting the claims.

258.   Allstate is not required to pay the defendants for services that were not actually rendered and is entitled to reimbursement for payments it was induced to make by the defendants' fraudulent submissions.

## VI.   UNLAWFUL SOLICITATION AND FACTORS OTHER THAN LEGITIMATE MEDICAL JUDGMENT USED TO GENERATE UNLAWFUL BILLS TO ALLSTATE

### A.   MICHIGAN'S ANTI-SOLICITATION LAWS

259.   The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers.

260.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

261.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

262.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

263.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

264.   As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law, which renders the treatment they billed unlawful.

### B.   IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

265.   Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

266.   Multiple patients at issue in this Complaint have reported that they were approached by tow truck drivers associated with defendant Somerset Auto at the scenes of their alleged accidents.

267.   The tow truck drivers either towed the involved vehicle to Somerset Auto, where patients were then coerced by layperson Norman Dehko to seek medical treatment, or the tow truck drivers obtained the contact information of the accident victims so that Norman Dehko could contact them and induce them to undergo medical evaluation and treatment with the Defendant Entities even though these persons did not seek out or need medical treatment.

268.   When accident victims presented to Somerset Auto to pick up their vehicles that had been towed, Norman Dehko, a layperson, offered patients

transportation to AMC or directed patients to immediately undergo treatment at Level 1 of Michigan.

269.   As discussed *supra*, Norman Dehko and Somerset Auto also operate several phone numbers, including 1-800-PAIN and 248-632-PAIN, that were also used to unlawfully solicit alleged accident victims and set up transportation to the Defendant Entities.  As Norman Dehko is a layperson, these directives to treat did not involve considerations of medical need and legitimate medical treatment.

270.   By steering patients to the Defendant Entities with which they had established *quid pro quo* relationships, the defendants knew that the patients would be prescribed excessive and medically unnecessary treatment according to a predetermined treatment protocol, as set forth more fully below, to maximize the charges for medical treatment.

271.   Indeed, the layperson defendants who solicited the patients at issue herein remained involved in directing patient treatment long after the original improper solicitation.

272.   Patient testimony confirms that treatment decisions and referrals were controlled by layperson employees of Somerset Auto and 1-800-PAIN, including Norman Dehko, rather than by licensed medical professionals.

273.   For example, patient S.W. (Claim No. 0510979222) informed Allstate that 1-800-PAIN told her to switch doctors during the course of her treatment.

274.   Allstate was billed by defendants Level 1 of Michigan, AMC, and Metro MRI relative to patient S.W.

275.   Patient J.W. (Claim No. 0487022600) testified that Level 1 was "in charge" of his treatment and confirmed he stopped going to a medical clinic because the person who originally solicited him (Norman Dehko) decided that he (Norman Dehko) did not like that doctor.

276.   Patient L.N. (Claim No. 0545177743) told Allstate that she met with "Norm" after calling 1-800-PAIN and was immediately sent to Level 1 in the same building.

277.   L.N. talked to "Norm" on a weekly basis and reported to Allstate that "Norm" also sent her to his "new doctor" at Select Medical.

278.   The defendants also offered cash payments to patients to induce them to undergo medically unnecessary treatment and imaging.  Patients who require cash payments do not need medical treatment.

279.   Patient N.K. (Claim No. 0548072965) testified that his doctor at AMC had an agreement with the driver who transported him to AMC, physical therapy, and MRIs.

280.   N.K. confirmed he was offered cash to comply with AMC's MRI and physical therapy referrals:

> Q.    All right.  And, sir, I was going to ask you if they offered you any money so, first of all, did they offer you any money?  I know you said

you didn't receive any money, did either the doctor or the physical therapy place or the guy from the church offer you money to keep pursuing some kind of a claim related to this accident?

A.    My understanding was if we stayed three months in therapy and continue with them and do all the MRIs, each one three of them, they would give us $1,000 each.

Q.    Who told you that?

A.    The guy that took us to therapy.

Q.    Did the guy who said you would get $1,000 say who he would get the money from?

A.    Supposedly from therapy.  He would take it from them.

281.   Patient C.N. (Claim No. TXA-0233760) reported that she heard other patients in the lobby of AMC saying they were being paid to receive treatment and that "you could get money for going for an MRI…and that they were paying so many people $100."

282.   The defendants also offered patients they perceived to be high value other in-kind payments, including free housing.

283.   Kickback payments, unlawful solicitation, and treatment directed by laypersons negate the validity of the medical treatment purportedly provided by the defendants.

284.   Referrals of patients who were solicited and offered payments in exchange for treatment bore no relation to actual medical necessity, as the patients

at issue in this Complaint would not have sought treatment but for the unlawful solicitation and improper inducements.

285.  All treatment that was unlawfully solicited, improperly induced, or directed by laypeople was unlawful, unreasonable, and unnecessary, and Allstate has no obligation to pay any charges associated therewith.

## C.   SPECIFIC EXAMPLES OF PATIENT SOLICITATION

286.  Patients at issue in this Complaint have confirmed that they were solicited to treat by and with the defendants.

287.  The following representative patients exemplify the fact and extent of the defendants' illegal solicitation efforts:

- Patient S.W. (Claim No. 0510979222) reported that she received a phone call from "Norman" with 1-800-PAIN after an alleged accident, and that Norman referred her to defendant AMC.  S.W. never called 1-800-PAIN and had no idea how Norman got her number.  Patient K.M. (Claim No. 0510979222), who was involved in the same alleged accident as S.W., confirmed that 1-800-PAIN called S.W. and sent him (K.M.) to treat at AMC.  K.M. further reported that 1-800-PAIN transported both himself and S.W. to its 26231 Woodward Avenue address using a van marked with "1-800-PAIN-800."  When they arrived at the 26231 Woodward Avenue building, 1-800-PAIN "wrote us some papers . . . [for] doctors and stuff" and then both he and S.W. were immediately "sent downstairs" to defendant Level 1 of Michigan in the same building.  S.W. also reported that 1-800-PAIN maintained contact throughout her treatment and at one point directed her to switch doctors.

- Patient J.H. (Claim No. FXP-0381126) was involved in an alleged motor vehicle accident on June 25, 2018.  J.H. testified that she called her insurance company immediately following her accident and stated she was not injured.  A tow truck arrived to the accident scene and transported J.H. to Somerset Auto.  At Somerset Auto, Norman Dehko told J.H. that he had a medical company she could go to where she would not have to use her medical

insurance.  Norman Dehko also informed her that his company would transport her to medical appointments, and gave her a Somerset Auto business card with the "1-800-PAIN" number on it.  The following day a van was sent to transport her (and two other patients) to a pain management clinic, which immediately issued a prescription for physical therapy to be performed at defendant Level 1 of Michigan.  J.H. described the course of events at Somerset Auto and Level 1 of Michigan as a "racket" and testified that after she eventually received her car back from Somerset Auto it had additional side and back end damage that was not present when she photographed the car at the scene of the alleged accident.

- Patient J.B. (Claim No. 0484341078) testified that a tow truck driver from Somerset Auto "appeared" at the site of his alleged accident.  The tow truck driver directed J.B. to receive treatment at Mercyland, which was controlled by Angelo and was used interchangeably with AMC as a means of obtaining *pro forma* physical therapy prescriptions for the defendant clinics.  Per the defendants' scheme, J.B. was immediately referred for physical therapy at Level 1 of Michigan and chiropractic treatment at Northland Healthcare.

- Patient R.W. (Claim No. TXA-0188788) testified that following her alleged accident, a tow truck driven by a man named Eli and with the word "Extreme" written on the side appeared and drove her to a hospital, where she decided she did not need care.  Eli gave R.W. a business card with Norman Dehko and Somerset Auto's 248-632-PAIN number.  The following day, Somerset Auto arranged for R.W. to obtain a physical therapy prescription from Mercyland and initiate treatment at defendant Kinetix despite R.W. neither seeking out nor needing any treatment.

- Patient J.W. (Claim No. 0487022600) testified that he received a phone call at his home the day after his alleged motor vehicle accident from "Norman" with Level 1 of Michigan.  This phone call was used to set up transportation to Level 1 of Michigan the very next day even though J.W. did not seek out or need any transportation or treatment.

- Patient J.P. (Claim No. 0507664340) testified that an attorney called immediately following an alleged motor vehicle accident and said "I got a transportation that's gonna come to pick you up and take you out to the hospital."  J.P. was taken to a pain management clinic associated with the defendants where he was referred to Kinetix for alleged physical therapy the

very same day.  J.P. confirmed that Kinetix set him up with transportation, which was billed to Allstate by Motion Transportation.

- Patient C.R. (Claim No. 0519936925) testified that he received a call from Norman Dehko of Level 1, who referred to himself as "Bob," following a purported motor vehicle accident.  C.R. believed that Norman Dehko got his contact information from the police.  Norman Dehko told C.R. that he had a doctor who could evaluate him and sent somebody to pick C.R. up even though C.R. did not seek out nor need medical treatment.

- Patient K.G. (Claim No. 0532574968) testified that he heard about defendant 1-800-PAIN through a tow truck driver who gave him a business card at the scene of his alleged accident.  The tow truck driver had arrived at the scene even before the police.  When he called 1-800-PAIN he was immediately referred to AMC, and started physical therapy at defendant Level 1 of Michigan the following day.

- Patient O.C. (Claim No. 0526234240) testified that he was given a card for 1-800-PAIN by a tow truck driver.  1-800-PAIN had O.C. transported to the 26321 building where he met with Norman Dehko and was told that he needed to be evaluated by AMC and begin physical therapy at Level 1.  O.C. further explained that when he presented at AMC they were ready for him, confirming that Dehko also communicated with AMC about what should be done for O.C. prior to his evaluation.

- Patient T.E. (Claim No. 0563730829) testified that after she filed a police report following an alleged accident, she began receiving unsolicited telephone calls, including from 1-800-PAIN.  T.E. was sent by 1-800-PAIN to defendant Select Medical, and was immediately prescribed a course of physical therapy at defendant Michigan First even though T.E. did not need or seek out treatment.

288.   Allstate is not required to pay the defendants for unnecessary treatment

and services that derived from illegal solicitation.

## VII.   <u>UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES</u>

289.   The defendants violated several Michigan laws and regulations in their efforts to bill Allstate for as much treatment as possible.

### A.   <u>UNLICENSED ISSUANCE OF DME</u>

290.   AMC routinely billed Allstate for the purported issuance of DME to patients at issue herein without possessing the licensure required by the State of Michigan.

291.   A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** . . . ."  Mich. Comp. Laws § 333.17722 (emphasis added).

292.   AMC has never possessed a valid license to issue DME in the State of Michigan.

293.   Despite having no license to issue DME, AMC billed Allstate for more than $183,000 of DME purportedly issued to the patients at issue herein.  *See* Exhibit 6.

294.   Not only was this DME nearly always medically unnecessary, discussed in detail *infra*, it was unlawful and not compensable under the No-Fault Act.

295.   Because none of the DME purportedly issued by AMC to the patients at issue herein was lawful, none of it was ever compensable pursuant to Michigan's

No-Fault Act, and Allstate is entitled to repayment for all unlawful charges it was induced to pay through AMC's misrepresentations.

### B. UNREGISTERED TRANSPORTATION SERVICES

296.   Defendants Motion Transportation and Rent A Ride billed Allstate for alleged transportation of patients at issue herein despite not possessing valid licenses to perform such transportation services in Michigan.

297.   The Michigan Department of Licensing and Regulatory Affairs ("LARA") currently regulates 1-8 passenger transportation vehicles ("limousine carriers").

298.   LARA requires all transportation companies to obtain a valid limousine carrier license, which must be renewed yearly with proof of automobile liability insurance.

299.   Motion Transportation and Rent A Ride failed to comply with these licensure requirements.

300.   Defendant Motion Transportation had actual notice from the State of Michigan that it was not properly licensed to perform the services for which it billed Allstate.

301.   LARA sent Motion Transportation a letter dated September 14, 2016 that its Certificate of Authority was revoked as of September 14, 2016 due to Motion Transportation's failure to maintain an active insurance policy.  *See* Exhibit 14.

302.   Motion Transportation nevertheless billed Allstate for more than $12,300 dollars for approximately 199 trips during the period after September 14, 2016 when its license was revoked.  *See* Exhibit 11.

303.   Rent A Ride first billed Allstate for purported transportation services on February 16, 2018.  *See* Exhibit 12.

304.   Jordan Dehko did not attempt to file Rent A Ride's Limousine Carrier license application until January 17, 2019, more than eleven (11) months after Rent A Ride first billed Allstate for unlicensed transportation.  *See* Exhibit 15.

305.   Rent A Ride also filed an incomplete application that failed to include required proof of insurance and entity organization documents, and was therefore never issued a valid Limousine Carrier license.  Id.

306.   Since it never obtained a mandatory license, each and every charge Rent A Ride submitted to Allstate was unlawful and non-compensable.

307.   Allstate is not required to pay Motion Transportation or Rent A Ride for unlawful transportation without a valid license, and is entitled to reimbursement for payments made for these unlicensed and unlawful services.

## C.   UNSUPERVISED TREATMENT BY ASSISTANTS

308.   A former AMC nurse practitioner explained in sworn testimony that the clinic is run by nurses.

309.   This nurse practitioner provided testimony that she worked under the supposed "supervision" of AMC physician Abid Agha, M.D. ("Agha"), yet he was rarely present in AMC's office when she evaluated patients.

310.   When questioned at her deposition, this nurse practitioner did not even know her "supervising" physician Agha's first name.

311.   The former AMC nurse practitioner further testified that nurse practitioners at AMC prescribed physical therapy, MRIs, and narcotic pain medication on their own without physician oversight or supervision.

312.   Michigan law mandates that for delegation to nurse practitioners, supervision by a licensed physician is required.   *See* Mich. Comp. Laws § 333.16215.  Any tasks and functions delegated to nurse practitioners must also fall within the nurse practitioner's scope of practice.  *See* id.

313.   However, a physician "licensee ***shall not*** delegate an act, task, or function under this section if the act, task, or function, under standards of acceptable and prevailing practice, requires the level of education, skill, and judgment required of the licensee under this article."  Id. (emphasis added).

314.   AMC also routinely misrepresented the medical qualifications of its nurse practitioners on bills submitted to Allstate in order to conceal the fact that services that should have been provided by physicians were in fact being provided, if at all, by assistants.

315.  For example, AMC improperly charged Allstate for treatment purportedly rendered by Judith Tigay, a nurse practitioner, signed as "Judith Tigay, D.O.":



316.  Deangella Simpson, a registered nurse practitioner, was similarly identified as "Deangella Simpson, D.O." on bills submitted by AMC:



317.  AMC knowingly misrepresented the qualifications of its nurse practitioners on bills submitted to Allstate because its nurse practitioners billed for treatment and services that require the expertise of a licensed physician without the requisite supervision required by Michigan law.

318.  By falsely holding out its nurse practitioners as "osteopathic physicians," AMC sought to induce Allstate into paying bills for alleged treatment and services that, if performed at all, were rendered by nurse practitioners on their own contrary to Michigan law.

319.  Allstate is not required to pay for treatment and services that were performed, if at all, by AMC nurse practitioners without legally required physician supervision.

### D.   UNLICENSED NARCOTIC PRESCRIPTIONS BY NURSE PRACTITIONERS

320.   In addition to billing for unlawful treatment allegedly performed by nurse practitioners, AMC nurse practitioners prescribed narcotic pain medication in violation of Michigan law.

321.   Michigan Compiled Laws §333.17211a(1)(b) provides that a nurse practitioner may only prescribe Schedule II-V controlled substances if delegated by the supervising physician.

322.   Michigan Compiled Laws 333.17211a(b)(2) further requires that "if an advanced practice registered nurse prescribes a controlled substance under subsection (1)(b), both the advanced practice registered nurse's name and the physician's name shall be used, recorded, or otherwise indicated in connection with that prescription."

323.   A former AMC nurse practitioner testified that AMC physicians did not review medication prescriptions written by nurse practitioners, including narcotic prescriptions.

324.   AMC's prescriptions routinely listed only the nurse practitioner as the issuing provider without recording any supervising physician, in direct violation of Michigan law:

Issued By:  Monet Murphy, NPC
Supervisor:
Location:  American Medical Center 8 Mile SF
20905 Greenfield Road 607M
Southfield, MI 48075

PRESCRIPTION AS FOLLOWS
Written: 01/09/2019          Escript Expiration:
DEA Schedule:  Schedule4  (Authentic EPCS : SI indicator Received)
Medication:  DiazePAM 5 MG Oral Tablet

325.   As detailed below, AMC used narcotics to incentivize continued patient participation in their predetermined course of excessive treatment, including referrals to the other defendant clinics.

326.   Allstate is not required to pay for medically unnecessary treatment and services induced by unlawful narcotic prescriptions.

## VIII.  FALSIFIED MEDICAL RECORDS

327.   In order to conceal their fraud and induce Allstate to make payments to which the defendants were not entitled, the defendants routinely altered, forged, and falsified records submitted to falsely support their bills.

328.   Many of AMC's notes for examinations/re-examinations billed to Allstate were not immediately signed by the medical provider that allegedly performed the evaluation.

329.   AMC created medical records using software called Practice Fusion, which does not lock a medical record from revision until it is signed by the physician.

330.   Thus, AMC had the ability to edit unsigned records up until they were electronically signed, and clearly did edit patient records well after the dates that treatment and services billed to Allstate were allegedly rendered.

331.   Records from Practice Fusion confirm that layperson defendant Hassan was also given authority to make edits to medical records at the level of "phys./MD/DO."

332.   A former AMC nurse practitioner testified that she would type out her AMC treatment notes but did not immediately sign off on her completed charts because she was told by "office manager" Hassan to not sign off.

333.   This nurse practitioner confirmed that she was never actually provided confirmation to sign her record while at AMC, and testified that several members of AMC had the ability to access, edit, and sign her electronic records.

334.   Because others at AMC, including Hassan, who was not a licensed medical professional, could edit her records and then sign the edited version in her name, this nurse practitioner testified that she could not confirm patient records submitted to Allstate by AMC in her name were accurate.

335.    In fact, this nurse practitioner filed a police report regarding AMC's practice of having others sign edited records in her name.

336.   AMC's routine practice of editing patient records well after their alleged examinations is exemplified by patient C.B. (Claim No. 0358449998), who was allegedly evaluated at AMC on February 4, 2017, but the note for this purported evaluation was not actually signed until nearly a year later on February 1, 2018.

337.   The record allegedly created on February 4, 2017 includes an "Active Medication" section that lists prescriptions, including narcotic medication, allegedly prescribed more than one (1) year after the examination, including months after the record was purportedly signed:



338.   The "historical diagnosis" section also included alleged injuries dated well after both the examination date and the date the record was allegedly signed:

| Historical Diagnoses | ACUITY | START | STOP |
|---|---|---|---|
| (M25.561) Pain in right knee | Chronic | | 05/09/2018 |
| (279.891) Long term (current) use of opiate analgesic | Chronic | | 05/09/2018 |
| (M25.561) Pain in right knee | Chronic | | 05/20/2017 |
| (G89.4) Chronic pain syndrome | Chronic | | 01/07/2017 |

339.   Most egregiously, C.B. was prescribed narcotics based on this February 4, 2017 examination, but the "Plan" section of the record indicates that MAPS was reviewed more than two (2) months **after** the examination allegedly occurred.

340.   AMC also wholly fabricated patient histories to create the appearance that injuries were far more severe than they actually were.

341.   For example, Patient J.W. (FXP-0386104) was involved in an alleged motor vehicle accident on July 19, 2018 and reported to AMC five (5) days later on July 24, 2018, where a nurse practitioner documented the following description of his purported motor vehicle accident reproduced verbatim below:

> "The airbags deployed.  He reports that he lost consciousness for a second… a few block later t-boned on the driver's side and his car flipped three times.  He was taken to Sinai Grace.  X-rays and MRIs were done.  Told he has fractured ribs to the left side.  No other fractures, but he has a black and swollen right eye."

342.   Patient J.W. reviewed AMC's purported accident and injury description and provided sworn testimony that the following AMC representations were incorrect:

- The airbags did not deploy.
- He did not lose consciousness.
- His car did not flip over three (3) times.
- He was not transported to Sinai Grace.  He transported himself to Henry Ford Hospital.
- He did not sustain any fractured ribs.
- He did not sustain any eye injury.

68

343.   AMC's creation of medical records that falsified and fabricated information about patients' conditions and histories was designed to induce Allstate to remit payment for the extensive and unnecessary medical treatment billed pursuant to the defendants' predetermined protocol, as detailed below.

344.   Defendants Level 1 of Michigan and Michigan First also routinely falsified their records to create the appearance that AMC was operated by medical doctors and that referrals and prescriptions for physical therapy were medically necessary.

345.   For example, AMC nurse practitioner Monet Murphy was falsely referred to as a medical doctor by Level 1 of Michigan:



346.   Level 1 of Michigan similarly falsely misrepresented nurse practitioner Marilyn Ngundam as a purported "physician" referring provider:



347.   Michigan First likewise misrepresented its referrals from AMC nurse practitioner Monet Murphy:



Michigan First
21331 W 8 Mile Rd
Detroit, MI 48219-1222
Phone: (313)366-6500
Fax: (313)366-6700

**Daily Note /
Billing Sheet**

Date of Birth: ████████

Referring Physician(s):  murphy, monet MD

Date of Daily Note: 03/20/2019
Injury/Onset/Change of Status Date: 03/16/2019  New Injury
Diagnosis:  ICD10: M54.12: Radiculopathy, cervical region,

348.   Allstate relied on the bills and records submitted by the defendants to accurately and truthfully document the treatment performed and by whom.

349.   Allstate is entitled to reimbursement for all payments it was induced by make by the defendants' fraudulent submissions.

## IX.   UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

350.   The defendants' willingness to bill Allstate for services that were (1) never rendered, (2) induced by kickbacks and other unlawful and improper actions, and (3) not lawfully provided demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

351.   The defendants' goal was to bill for as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

352.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment, as discussed more fully below.

353.   The defendants' treatment violated established standards of care in the medical community, as the vast majority of testing, diagnostics, DME, referrals, and treatment was not indicated, redundant, excessive, and repeated without any objectively documented benefit to patients.

354.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

355.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 12.

356.   All of the claims submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

357.   Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

358.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident

within the four corners of the medical records and bills submitted to Allstate by the defendants.

### A. THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

359.   Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely recording substantially similar diagnoses regardless of each patient's reported injuries; (2) providing mirrored treatment plans, including referrals to co-defendants for purported services, further indicating that patients were subjected to a predetermined treatment protocol; and (3) failing to indicate short- and/or long-term goals for patients.

### 1. AMC and Select Medical's Role in the Defendants' Predetermined Treatment Protocol

360.   Many of the services for which the defendants billed, including physical therapy, non-emergency medical transportation, MRIs, and DME, required physician prescriptions.

361.   All of the patients at issue herein required diagnoses to create the appearance of the existence of injuries that would justify the extraordinary amounts of bills submitted to Allstate.

362.   AMC and Select Medical were frequently used by the defendants to manufacturer these diagnoses and to obtain the required prescriptions to facilitate further billing by the other defendants.

72

363.   AMC and Select Medical were also used by the defendants to directly bill Allstate for unreasonable and unnecessary evaluations, procedures, testing, and DME as described herein.

364.   As detailed above, many of the patients for whom AMC submitted bills were only ever evaluated by nurse practitioners in violation of Michigan laws requiring medical supervision.

365.   The records created by AMC's nurse practitioners are remarkably similar and nearly always used identical language that was pre-printed before a patient was even evaluated.

366.   A former AMC nurse practitioner has confirmed in sworn testimony that AMC used a template for its purported initial patient evaluations.

367.   AMC's template included the language "modifying factors that alleviate the pain…meds, rest, and physical therapy," and was used even when patients had not actually attempted the listed treatments.

368.   This language was designed by the defendants to create the false appearance that conservative measures were not sufficient for AMC's patients, and to attempt to justify AMC's excessive predetermined course of medications, urine drug testing, DME, diagnostic imaging, and referrals to the other defendant clinics for treatment that was not medically necessary and bore no relation to the patient's actual injuries or current treatment.

369.   For example, AMC falsely reported that on August 16, 2018, patient D.A. (Claim No. 0501139729) reported that his pain was alleviated by physical therapy despite the fact D.A. had not actually attempted physical therapy and did not begin physical therapy until February 7, 2019.

370.   Nearly every patient of AMC received identical, nonspecific diagnoses of their alleged injuries, including "cervicalgia," "pain in thoracic spine," "low back pain," and "pain" in various extremities and joints.

371.   "Pain" is not a diagnosis, it is a symptom, and it is not properly used to establish medical necessity for the extensive range of services billed by the defendants.

372.   In addition to these boilerplate reports of patient histories and diagnoses that are pre-printed and so generic as to be rendered meaningless, AMC almost invariably prescribed the same exact unnecessary and extensive treatment, including:

- Medications;
- Physical therapy three (3) times per week for four (4) weeks;
- Chiropractic treatment;
- Total disability from work for four (4) weeks;
- Replacement household services for four (4) weeks;
- Driving restriction for four (4) weeks;
- Diagnostic imaging including MRIs; and
- Urine drug testing.

373. Because AMC ordered the same predetermined course of extensive treatment and testing for nearly every patient, regardless of their age, injury, comorbidities, or status, such treatment was rarely, if ever, appropriate.

374. The application of AMC's nearly identical treatment "plan" to patients for which it was not appropriate is exemplified by the following representative patients:

- L.R. (Claim No. 0530629286) – a 75-year-old female that AMC's initial "plan" included physical therapy, DME, a urine drug screen, multiple MRIs, and medications. AMC's initial examination specifically notes that the 75-year-old patient was "offered" disability, but "patient refused."

- L.C. (Claim No. TXA-0198607) – an 11-year-old female at the time of her initial AMC evaluation. AMC's "plan" included physical therapy, multiple items of DME, a urine drug screen, multiple MRIs, and medications. AMC even issued the 11-year-old patient a disability certificate that included driving restrictions.

- N.P. (Claim No. 0498315167) – a 16-year-old female who suffered from schizophrenia, bipolar disorder, and oppositional defiant disorder ("ODD"). N.P.'s mother testified that she had the mental capacity of a 13-year-old and because of this was homeschooled and did not drive or work. Despite N.P.'s unique mental impairments, AMC's "plan" established at N.P.'s initial date of service did not vary and still included physical therapy, DME, a urine drug screen, multiple MRIs, and medications. AMC also issued N.P. a disability certificate that included work/employment disability and driving restrictions.

- A.A. (Claim No. 0517198296) – a 15-year-old female at the time of her initial AMC evaluation whose sole injury was right wrist pain described as "dull, no radiation" and rated as only a 4/10. The "history of present illness" section of AMC's second examination specifically states A.A. "wanted to stop her therapy." AMC's "plan" still included physical therapy, medications, an MRI, and disability prescribed to the 15-year-old patient.

375.   AMC also hardly ever altered its predetermined treatment protocol even when patients were involved in alleged motor vehicle accidents many years prior to their initial AMC examination and had already undergone extensive treatment:

- Patient K.D. (Claim No. 0332959220) was involved in an alleged motor vehicle accident on July 7, 2014.  K.D. first presented to AMC more than three (3) years and seven (7) months later on February 20, 2018.  AMC's "history of present illness" section confirmed that "the patient has been treated with injections, pain meds, TENS Unit, PT, and surgery."  Despite this extensive prior treatment, AMC's initial treatment "plan" still included physical therapy, multiple items of DME, a urine drug screen, medications, and injections.

- Patient B.C. (Claim No. 0432135218) was involved in an alleged motor vehicle accident on September 21, 2016.  B.C. first presented to AMC more than two (2) years later on December 19, 2018.  Despite B.C. having previously received extensive physical and massage therapy, AMC's initial treatment "plan" included physical therapy, a urine drug screen, medications, multiple x-rays and CT scans, and disability.

- Patient R.H. (Claim No. 0529599639) was involved in an alleged motor vehicle accident on December 29, 2018 and reported to AMC for an initial examination billed only six (6) days later on January 4, 2019.  AMC's "plan" for the for the recent motor vehicle accident patient was not altered or modified in any way and likewise included physical therapy (billed by Level 1 of Michigan on the same January 4, 2019 date of service), a urine drug screen, multiple MRIs (billed by Metro MRI only two (2) days later on January 6, 2019), medications, and disability including work/employment disability, housework restrictions, and replacement services.

376.   As set out further below, the predetermined treatment plans used by AMC resulted in a gross overutilization of physical therapy and chiropractic

treatment at the defendant clinics, medications, urine drug testing at AMC, and diagnostic imaging orders at Metro MRI in clear disregard for standards of care.

377. AMC used the records with falsely reported treatment histories and unsubstantiated diagnoses to order extensive diagnostic testing that was billed as a matter of course and in disregard to the applicable standards of care, as discussed in detail below.

378. A former AMC nurse practitioner confirmed that AMC's purported managing physician Agha required nurse practitioners to order MRIs of all body parts for which auto accident patients complained of any pain and to order urine drug testing for auto accident patients at every appointment.

379. Defendant Hassan has admitted to Allstate that AMC subjects every patient to urine drug screenings as a matter of course.

380. AMC nurse practitioners were also instructed by Agha that all auto accident patients should be classified as disabled from work, and issued prescriptions for attendant care, household services, and transportation.

381. In addition to creating the appearance of injury, such *pro forma* disability certificates and orders were used by AMC to entice patients to continue to return to the clinic where they were subjected to additional unnecessary treatment and referrals.

382.   Indeed, Somerset Auto's packet provided to alleged auto accident victims included both a card for AMC as well as "Replacement (Household) Services Statement" forms, evidencing that the promise of compensation for such alleged services was used as an enticement for patients:



383.   These packets, which include calendars for replacement services for **future** months were provided to alleged accident victims **before** they were referred (through unlawful solicitation) to AMC, indicating that the defendants knew AMC would find the Somerset Auto customer to be disabled.

384.   AMC also took steps to ensure that its prescriptions were used to generate claims by the other participants of the scheme described herein.

385. AMC's treatment notes frequently included specific references identifying patients as an "800 PAIN MVA" and specifying physical therapy would be performed at Level 1:

PATIENT NOTES

800 pain MVA 7/19/18 Insurance: Progressive Claim: 184742505 Tel: 1-586-722-9050 Adjustor: April Dawson Attroney:Robert Canner PT. Level One Urine is with AI 8/8/18

386. When Select Medical was organized by defendant Sagala in June 2019, it operated a highly similar predetermined treatment scheme that likewise directed medically unnecessary referrals to Metro MRI, Level 1 of Michigan, and Michigan First for imaging and physical therapy ordered as a matter of course.

387. For example, more than 61% of the patients for whom Level 1 of Michigan submitted bills to Allstate were purportedly evaluated at AMC or Select Medical. *See* Exhibits 4, 6, and 7.

388. Similarly, more than 56% of Select Medical patients were prescribed physical therapy billed by either Level 1 of Michigan or Michigan First. *See* Exhibits 4, 5, and 7.

389. More than 33% of Select Medical patients were ordered MRIs billed by Metro MRI. *See* Exhibits 7 and 10.

390. Defendant AMC was also used by the defendants to lure patients and induce them to return for treatment through improper and excessive prescriptions for narcotic medications.

391.   As discussed *supra*, AMC nurse practitioners routinely prescribed narcotic pain medication on their own without the supervision of a licensed physician in violation of Michigan law.

392.   When AMC physicians actually took part in patient examinations, they were nearly exclusively performed by physicians, including Jankowski, Edu, Nallani, and Bitkowski, who have well-documented and extensive histories of improperly prescribing controlled substances.

393.   In many cases, these AMC nurse practitioners and physicians prescribed medications that were not indicated at all for the treatment of the patient's purported condition.

394.   AMC's frequent prescription of opioid pain medication is particularly egregious, as it contributed to a significant public health crisis in Michigan.

395.   On October 26, 2015, a bipartisan task force formed by then Michigan Governor Rick Snyder issued a report "addressing the growing prescription drug and opioid problem in Michigan."

396.   The task force reported:

Prescription drug abuse has reached epidemic proportions. The increased availability of prescription drugs, coupled with general misperceptions regarding the safety of physician-prescribed medications, has led to exponential growth of drug users and drug abusers. In Michigan, the number of drug overdose deaths – a majority of which are from prescription drugs – has tripled since 1999.

397.   It has been estimated that the risk of addiction for patients receiving long-term prescriptions for opioid painkillers is as high as 56% of all such patients.  Bridget A. Martell, *et al.*, *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-127 (2007).

398.   AMC's reckless prescriptions of drugs, especially narcotics, is exemplified by the following patients:

- Patient A.Y. (Claim No. TXA-0220105) first allegedly presented to AMC on January 2, 2019.  AMC's initial examination expressly noted that A.Y. is an opioid dependent patient, yet he was still (unlawfully) prescribed 30 hydrocodone-acetaminophen 10-325 mg pills by an AMC nurse practitioner. On February 11, 2019, AMC renewed A.Y.'s narcotic pain medication despite clear indications that he was not taking his medication as prescribed, including a January 15, 2019 urine drug test ordered by AMC that confirmed A.Y. was "negative" for the prescribed medication diazepam and a January 30, 2019 urine drug test ordered by AMC that confirmed A.Y. was negative for the prescribed hydrocodone.  AMC ordered additional urine drug testing on February 11, 2019 that once again confirmed A.Y. was not taking hydrocodone as prescribed, yet AMC again renewed the prescription on February 27, 2019.  At each examination where A.Y.'s narcotic medication was renewed despite repeatedly inconsistent results, AMC falsely reported that "UDS reviewed and consistent."  On March 25, 2019, A.Y. was re-evaluated at AMC and the examining nurse practitioner indicated that urine drug screening results ordered on February 27, 2019 were "still pending."  The February 27, 2019 urine drug results were not still pending, but were in fact reported on March 4, 2019 and once again indicated A.Y. tested negative for hydrocodone.  Clearly without reviewing the February 27, 2019 laboratory report, the AMC nurse practitioner again renewed A.Y.'s hydrocodone prescription on March 25, 2019.

- Patient R.H. (Claim No. TXA-0216616) was involved in an alleged motor vehicle accident on October 31, 2018 and presented to AMC the same day. R.H. was immediately prescribed 20 hydrocodone-acetaminophen 7.5-325

mg pills by AMC.  Only eight (8) days later, R.H. allegedly returned to AMC for a re-examination that included a urine drug screening that confirmed R.H. was negative for all substances, including the prescription for hydrocodone. Another eight (8) days later, on November 16, 2018, R.H. allegedly returned to AMC for a purported "MEDS ONLY" follow-up evaluation performed by a nurse practitioner.  Despite characterizing the re-evaluation as a "MEDS ONLY" follow-up, AMC failed to acknowledge R.H.'s inconsistent urine drug test result from the previous week and instead falsely reported that R.H.'s "UDS reviewed and consistent."   Not only did AMC renew R.H.'s hydrocodone on November 16, 2018, the AMC nurse practitioner also prescribed an additional 60 Tramadol HCL 50 mg pills.  AMC ordered additional urine drug testing performed on December 11, 2018 that once again confirmed R.H. was negative for all substances, including the prescribed hydrocodone and tramadol.  AMC again failed to acknowledge R.H.'s inconsistent urine drug test results on December 11, 2018, yet doubled R.H.'s hydrocodone-acetaminophen 7.5-325 mg from 20 to 40 pills.  About a month later on January 17, 2019, AMC increased R.H.'s same hydrocodone-acetaminophen 7.5-325 mg to 60 pills for the same thirty (30) day supply period.  AMC not only continuing but increasing R.H.'s narcotic prescriptions despite multiple inconsistent drug screenings evidencing clear misuse or diversion of the same violated established standards of care.

- Patient C.B. (Claim No. 0358449998) first allegedly reported to AMC on December 5, 2015 and was immediately prescribed 120 Percocet 10-325 mg pills.  Following this initial examination and narcotic prescription, C.B. continued to report to AMC for monthly re-examinations to have her medications refilled for more than four (4) years, including as recently as February 24, 2020.  The only purpose of these continuing examinations was to obtain prescription re-fills, as C.B. had stopped other treatment in early 2018.  C.B.'s narcotic pain medication was also renewed at every AMC examination despite numerous urine drug screenings confirming C.B. was not taking it as prescribed. AMC knew C.B. was abusing her narcotic medication, as the "plan" section of C.B.'s August 24, 2018 AMC examination confirms five (5) separate inconsistent tests in just over a four (4) month period:

PLAN:
- MAPS reviewed today and within expected parameters 8/24/18.
- UDS reviewed today and inconsistent w/ prescribed medications- date collected - 7/25/18. She is positive for Oxycodone and metabolites. Also positive for hydrocodone. States she is allergic to Norco so she could have have taken any. Reports getting itchy, having fevers, and vomiting when taking Norco. Final warning given. Patient reports understanding that her Percocet will be discontinued next visit if UDS is inconsistent. Monitor.
- MAPS reviewed today and within expected parameters 7/25/18.
- UDS reviewed today and inconsistent w/ prescribed medications- date collected - 6/27/18. She is positive for Oxycodone and metabolites. Also positive for hydrocodone. States she is allergic to Norco so she could have have taken any. Reports getting itchy, having fevers, and vomiting. Final warning given. Patient reports understanding. Monitor.
- MAPS reviewed today and within expected parameters 6/27/18.
- UDS reviewed today and inconsistent w/ prescribed medications- date collected - 6/6/18. She is positive for Oxycodone and metabolites. Also positive for hydrocodone. State she is allergic to Norco so she could have have taken any. Warning given. Patient reports understanding. Monitor. Decrease next visit if inconsistent.

- MAPS reviewed today and within expected parameters 6/6/18.
- UDS reviewed today and inconsistent w/ prescribed medications- date collected - 5/9/18. She is negative for Oxycodone and metabolites. States she ran out about a week early due to taking more than prescribed. Warning given. Patient reports understanding. Monitor.
- MAPS reviewed today and within expected parameters 5/9/18.
- UDS reviewed today and inconsistent w/ prescribed medications- date collected - 4/11/18. She is positive for Oxycodone, but also a small amount of hydrocodone. Reports that she took some Norco a few months ago, but brought them back because she is allergic to Norco. Monitor.
- Had a long discussion with patient regarding opioid agreement. Patient agrees to not obtain prescriptions for narcotics from any other provider, to stop taking any other narcotics not prescribed by this office, and to take narcotic medications as prescribed by this office only.

Despite AMC's claims that C.B.'s narcotic medication would be decreased or discontinued if she continued to misuse her medication, she once again tested positive for non-prescribed hydrocodone on November 15, 2018.  AMC acknowledged this inconsistent result during a December 13, 2018 re-examination, yet once again renewed C.B.'s narcotic medication and explained away the inconsistent result (her sixth inconsistent result in just over seven (7) months) as "possibly a lab error."

399.   The testing, diagnostics, referrals, and treatment ordered and billed by AMC and Select Medical were not indicated, redundant, excessive, and repeated without any benefit to the patient or influence on the predetermined course of treatment.

400.   Moreover, AMC and Select Medical were used to create the prescriptions and diagnoses required for the other defendants to bill Allstate for unreasonable and unnecessary services, as detailed below.

## 2.   Medically Unnecessary Physical Therapy and Chiropractic Treatment

401.   Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, Northland Healthcare, and Northland Chiropractic (collectively, the "defendant PT and chiro clinics") and their owners and managers billed Allstate for treatment that far exceeded applicable standards of care.

402.   Valid orders for courses of chiropractic and physical therapy treatment require the services be objectively indicated and not based on a patient's subjective complaints of pain alone.

403.   In the vast majority of all motor vehicle accident cases, mild injuries will resolve themselves within a few weeks without any treatment whatsoever.

404.   Thus, the immediate resort to physical therapy and chiropractic treatment using a predetermined protocol of excessive treatment was not related to the care, recovery, or rehabilitation of the patient, thus rendering such services medically unnecessary and not compensable under applicable provisions of the Michigan No-Fault Act.

405.   Moreover, the defendants' immediate resort to extensive treatment at the defendant clinics may have caused harm to the patients at issue herein, as acute processes of injury were not allowed to dissipate naturally and follow the expected course of recovery.

406.   Because physical therapy exceeding twenty-one (21) days or ten (10) visits must be prescribed by a licensed medical or osteopathic doctor pursuant to Mich. Comp. Laws § 333.17820(1), Kinetix, Level 1 PT & Rehab, Level 1 of Michigan, and Michigan First required the participation of defendants AMC and Select Medical in their scheme to submit bills to Allstate.

407.   Pursuant to the defendants' scheme, patients solicited by Norman Dehko, 1-800-PAIN, and Somerset Auto were transported to AMC for physical therapy prescriptions to clinics owned by the Dehko family, including Level 1 of Michigan and Michigan First.

408.   AMC's immediate referrals for medically unnecessary physical therapy at Level 1 of Michigan are exemplified by the following representative patients:

- Patient K.M. (Claim No. 0510979222): Allstate was billed for alleged treatment at AMC and Level 1 of Michigan on July 26, 2018, which was only one (1) day after K.M.'s purported motor vehicle accident.

- Patient R.H. (Claim No. 0511280331): Allstate was billed for alleged treatment at AMC and Level 1 of Michigan on July 30, 2018, which was just two (2) days after R.H.'s purported motor vehicle accident.

- Patient D.T. (TXA-0211441): Allstate was billed for the start of alleged treatment at AMC and Level 1 of Michigan on the same date, September 13, 2018.

- Patient J.W. (TXA-0208046): Allstate was billed for a purported initial evaluation at AMC on July 12, 2018, which was only two (2) days after J.W.'s alleged motor vehicle accident. Physical therapy at Level 1 of Michigan was billed starting the following day, July 13, 2018.

- Patient M.K. (TXA-0213447): Allstate was billed for an alleged initial examination at AMC on September 25, 2018, which was only one (1) day after M.K.'s purported motor vehicle accident.  Physical therapy at Level 1 of Michigan was billed starting the following day, September 26, 2018.

409.   Michigan First likewise billed for immediate physical therapy referrals from both Select Medical and AMC pursuant to the same internal referral arrangement:

- Patients T.B. (Claim No. 0571952845):  Allstate was billed for a purported initial evaluation of T.B. at Select Medical on December 17, 2019, which was only two (2) days after her alleged motor vehicle accident.  Michigan First started billing Allstate for alleged physical therapy the following day, December 18, 2019.

- Patient T.E. (Claim No. 0563730829): Allstate was billed for an alleged initial evaluation at Select Medical on October 9, 2019, which was only two (2) days after her purported motor vehicle accident.  Michigan First started billing Allstate for alleged physical therapy only two (2) days later on October 11, 2019.

- Patient L.L. (Claim No. 0553929779): Allstate was billed for the start of alleged treatment at Select Medical and Michigan First on the same date, July 19, 2019.

- Patient K.L. (Claim No. 0552740466): Allstate was billed for an alleged initial evaluation at AMC on July 17, 2019, which was just eight (8) days after his purported motor vehicle accident.  Michigan First began billing Allstate for alleged physical therapy five (5) days later on July 22, 2019.

410.   Once referred to the defendant physical therapy clinics, patients' complaints and findings were routinely exaggerated in an attempt to create the appearance of justification for the extensive courses of treatment ordered.

411.   For example, patient R.H. (Claim No. 0511280331) presented to the Henry Ford emergency department on July 29, 2018, one (1) day after his alleged motor vehicle accident.

412.   Henry Ford's emergency physician found that R.H. had normal range of motion in his cervical, thoracic, and lumbar spine.

413.   R.H. then allegedly presented to AMC the next day, July 30, 2018, and was again found to have "full ROM in all 4 extremities."

414.   Immediately following the purported evaluation by AMC, R.H. was allegedly evaluated at Level 1 of Michigan, which claimed that R.H.'s range of motion was severely restricted, including to 60-70% of normal in his cervical and lumbar spine.

415.   Level 1 of Michigan also claimed that R.H. had significant decreases in muscle strength that were never noted by physicians, including only 3/3+/5 in R.H.'s spine, shoulder, and hip, the last of which was a body part for which he had reported no injury at either Henry Ford or AMC.

416.   Range of motion ("ROM") and motor muscle tests ("MMT") were routinely used by the defendant PT and chiro clinics to create the false impression of significant injuries to the patients at issue herein.

417.   The results of MMT tests are scored using the Oxford Scale, as described on the chart below:

| Grade | Observation |
|:---:|---|
| 0 | No muscle contraction is detected. |
| 1 | A trace contraction is noted in the muscle by palpating the muscle while the patient attempts to contract it. |
| 2 | The patient is able to move the muscle when gravity is eliminated. |
| 3 | The patient may move the muscle against gravity but not against resistance from the examiner. |
| 4 | The patient may move the muscle group against some resistance from the examiner. |
| 5 | The patient moves the muscle group and overcomes the resistance of the examiner.  This is normal muscle strength. |

418.   The MMT scores reported by the defendant PT and chiro clinics reflect patients who allegedly presented with crippling injuries, not the (at most) minor soft-tissue injuries that were reported by other physicians treating the patients and the patients themselves.

419.   Indeed, if these reported MMT scores were accurate, the patients would not be able to perform the treatments billed to Allstate as they would not be able to perform any exercises.

420.   As exemplified by patient R.H., the purported findings recorded by the defendant PT and chiro clinics were often contradicted by findings recorded by physicians who had made referrals for physical therapy or chiropractic treatment.

421. The defendant PT and chiro clinics similarly reported wildly exaggerated injuries and limitations at initial examinations, as exemplified by the following representative patients:

- Patient L.H. (Claim No. 0433097440) was evaluated at St. John Hospital & Medical Center on October 20, 2016, where he was found to have "strength is symmetric and 5/5 in upper and lower extremities." Four (4) days later on October 24, 2016, L.H. was evaluated by an osteopathic physician who confirmed his "range of motion in neck is normal." L.H. then allegedly presented at Kinetix on October 28, 2016, where he was reported to have just 2-3/5 strength in all muscle groups, including areas for which L.H. had not previously complained of pain, including his elbow, wrist, knee, and hip. A muscle strength limitation of 2/5 indicates that an injury is so severe that the patient cannot even move the body part against gravity. Kinetix also claimed that L.H.'s cervical spinal ROM was only 10 degrees in extension, 15 degrees in left rotation, and 15-20 degrees in left/right side bending. Kinetix's claim that L.H. had these severely debilitating injuries was made only four (4) days after an osteopathic physician confirmed that L.H. actually had normal muscle strength and ROM.

- Patient M.P. (Claim No. 0460037633) was evaluated at the Henry Ford emergency department on June 7, 2017, where it was expressly noted that M.P. showed "no C-spine tenderness…no complaints of pain" and had "full active range of motion present." Only nine (9) days later, Kinetix claimed that M.P. had muscle strength of only 2/5 in all extremities examined, including areas for which M.P. had not reported any injury at Henry Ford such as his hip, ankle, and spine. A muscle strength limitation of 2/5 indicates that an injury is so severe that the patient cannot even move the body part against gravity. Kinetix also claimed that M.P. displayed cervical, lumbar, and thoracic extension, rotation, flexion, and bending range of motion of only 10/15 degrees, an extreme limitation that dramatically varied from Henry Ford's finding of no spinal injury or range of motion restrictions.

- Patient C.C. (Claim No. 0434178983) was involved in an alleged motor vehicle accident on October 29, 2016. C.C. was initially evaluated by an osteopathic physician two (2) days later on October 31, 2016, who performed muscle strength testing that noted it was "5/5" in all tested muscle groups. Kinetix then billed for an initial examination of C.C. purportedly performed by Shah the very same day, and reported C.C. to have only a "2" "2+" or "2-" muscle strength in nearly all areas tested. Shah's October 31, 2016 initial examination further reported C.C. displayed "0 degree" range of motion in her right side bending, left side bending, and left rotation, yet she was allegedly able to perform therapeutic exercises billed to Allstate.

- Patient A.Y. (Claim No. 0275194066) presented to Lakeland Community Hospital immediately following an alleged motor vehicle accident on February 2, 2013, and was found to have only minor neck and pelvic pain with "normal range of motion…no pain in the entire spine." Approximately one month later, on March 5, 2013, Northland Chiropractic billed for an initial examination of A.Y. and claimed that A.Y. had limited ROM in both her cervical and lumbar spine. Using these purported findings, Northland Chiropractic billed Allstate for an extensive course of chiropractic treatment including therapeutic exercises, CMT, mechanical traction, massage, and ultrasound treatment that continued unchanged for more than one (1) year and four (4) months. This extensive treatment focused heavily on A.Y.'s lumbar and thoracic spine, areas for which A.Y. did not report any injury at the time of the alleged accident. Northland Chiropractic never billed Allstate for any re-examinations throughout this entire treatment period.

- Patient D.F. (Claim No. 0529272312) was involved in an alleged motor vehicle accident August 31, 2018. D.F. presented to the Detroit Medical Center emergency department, where he complained of only neck and back pain and upon examination exhibited normal musculoskeletal range of motion and strength without tenderness. Only eleven (11) days later on September 11, 2018, Level 1 PT & Rehab billed for a purported initial examination of D.F. Level 1 PT & Rehab's examination "diagnosed" several new purported injuries to D.F.'s head, right thigh, and left eye. In addition to these new injuries, Level 1 PT & Rehab's examination further reported extreme range of motion restrictions and muscle strength limitations of "3+" in numerous areas D.F. was never diagnosed with any injury, including his wrists, hands, fingers, hips, and ankles. Based on this exaggerated September 11, 2018 examination, Level 1 PT & Rehab proceeded to bill Allstate for nearly eleven (11) months of treatment.

- Patient M.H. (Claim No. 0434178983) was a nineteen (19) year old female involved in an alleged motor vehicle accident on October 29, 2016. M.H. was not hospitalized following accident. Only two (2) days later on October 31, 2016, M.H. was evaluated by a physician who performed muscle strength testing and confirmed she exhibited "5/5" strength in her upper and lower extremities. On the same day, Level 1 Health billed for an initial examination allegedly performed by Sagala. Sagala's same-day examination reported a number of injuries not documented or diagnosed by the physician, including pain in not only her neck but also her mid-back, low-back, and shoulder. Sagala's examination further claimed M.H. exhibited restricted lumbar spinal

range of motion and diminished shoulder strength.  Based on this exaggerated examination, Level 1 Health immediately began billing Allstate for CMT purported rendered to 3-4 spinal regions as well as therapeutic massage. These treatments require "injuries" to multiple spinal regions as well as a non-spinal extremity, which did not exist according to the physician evaluation performed on the same day Level 1 Health began treatment.

- Patient L.L. (Claim No. 0553929779) was involved in an alleged motor vehicle accident on July 18, 2019 and reported to the Garden City Hospital emergency department that day.  L.L.'s Garden City Hospital examination failed to document any range of motion or muscle strength restriction and determined L.L. exhibited no cervical spinal tenderness.  The next day, July 19, 2019, Michigan First billed for an initial examination of L.L. that claimed any minor neck movement made L.L. so dizzy that no neck range of motion or muscle strength tests could be performed.  Despite not performing any actual tests or examination on L.L.'s neck, Michigan First's "plan" still included such goals as improving muscle strength in L.L.'s neck to a "4+" and improving his neck range of motion by "20-30%."  The inclusion of these pre-printed "goals" related to an examination that never occurred confirms that Michigan First reports restrictions below these ranges as a matter of course. Michigan First's perceived limitations in L.L.'s neck were also directly contradicted by L.L.'s examination at Select Medical, billed on the same July 19, 2019 date of service, which documented a barely diminished 90% neck range of motion.

422.   After developing the appearance of necessity for treatment through fabricated examinations that exaggerated ROM and muscle strength limitations, the defendant PT and chiro clinics ordered highly similar courses of therapy for every patient so that they could bill Allstate for extensive unnecessary treatment over the course of many months pursuant to a predetermined protocol.

423.   For example, the defendant physical therapy clinics nearly always prescribed treatment consisting of therapeutic exercises, electrical stimulation, manual therapy, and application of hot/cold packs.

424.   Kinetix billed for application of hot/cold packs and therapeutic exercises for 100% of Allstate insureds, electrical stimulation for more than 90% of Allstate insureds, and manual therapy for more than 78% of Allstate insureds.  *See* Exhibit 1.

425.   Level 1 PT & Rehab billed for application of hot/cold packs, therapeutic exercises, electric stimulation, and manual therapy for 100% of Allstate insureds.  *See* Exhibit 2.

426.   Level 1 of Michigan billed for application of hot/cold packs and therapeutic exercises for more than 91% of Allstate insureds, electrical stimulation for more than 86% of Allstate insureds, and manual therapy for more than 74% of Allstate insureds.  *See* Exhibit 4.

427.   Michigan First billed for application of hot/cold packs and electrical stimulation for more than 92% of Allstate insureds, therapeutic exercises for more than 85% of Allstate insureds, and manual therapy for 42% of Allstate insureds.  *See* Exhibit 5.

428.   The defendant chiropractic clinics likewise billed Allstate pursuant to a standard predetermined treatment protocol that included mechanical traction, CMT, massage, therapeutic exercises, and application of hot/cold packs.

429.   Northland Healthcare billed for application of hot/cold packs for 100% of Allstate insureds, massage for more than 94% of Allstate insureds, mechanical

traction and therapeutic exercises for more than 88% of Allstate insureds, and CMT for more than 82% of Allstate insureds.  *See* Exhibit 8.

430.   Northland Chiropractic billed for mechanical traction, CMT, massage, therapeutic exercises, and application of hot/cold packs for 100% of Allstate insureds.  *See* Exhibit 9.

431.   Level 1 Health billed for mechanical traction and application of hot/cold packs and CMT for 70% of Allstate insureds.  *See* Exhibit 3.

432.   Once referrals were made to the defendant clinics and patients were started on these excessive predetermined courses of treatment, neither AMC, Select Medical, nor the defendant PT and chiro clinics evaluated the efficacy of treatment billed, and did not alter or discontinue the predetermined course of treatment.

433.   Level 1 PT & Rehab, Level 1 Health, Northland Healthcare, and Northland Chiropractic never billed Allstate for a single re-evaluation of any patient at issue herein.

434.   In the five (5) year period during which it billed Allstate from 2015-2019, Kinetix only billed for two (2) purported re-evaluations.

435.   To the extent that re-evaluations were conducted at all, the defendants' predetermined treatment protocol was almost never altered.

436.   Indeed, many of the patients of the defendant clinics failed to improve at all, or in many cases, got worse, despite purportedly undergoing treatment for many months or years.

437.   Specific examples of patients for whom the defendants submitted bills that far exceed standards of care include the following:

- Patient S.B. (Claim No. 0495098005) was involved in an alleged motor vehicle accident on April 15, 2017.  S.B. was allegedly examined at Mercyland on April 19, 2017, and was referred to Level 1 PT & Rehab on the same day.  Level 1 PT & Rehab claimed S.B.'s pain was 7/10 in her cervical spine/neck area and muscle strength was 3/5 in her cervical spine and 4/5 in her lumbar spinal.  S.B. was placed on Level 1 PT & Rehab's predetermined protocol of therapeutic exercises, massage, dynamic therapeutic activities, hot/cold packs, electrical stimulation, manual therapy and mechanical traction.  Level 1 PT & Rehab billed for alleged treatment of S.B. pursuant to this predetermined protocol three (3) times weekly for more than seven (7) months.

  Only seven (7) days after Level 1 PT & Rehab stopped billing, S.B. presented to Kinetix for an initial physical therapy evaluation based on a referral from AMC's Jankowski.  Kinetix reported that S.B.'s cervical and lumbar spinal ROM was significantly worse than before her course of alleged treatment at Level 1 PT & Rehab.  Kinetix then billed for a nearly identical course of physical therapy that had failed at Level 1 PT & Rehab, including therapeutic exercises, massage, dynamic therapeutic activities, hot/cold packs, electrical stimulation, manual therapy and mechanical traction.  Kinetix billed for treatment purportedly provided to S.B. pursuant to this established predetermined protocol for an additional ten (10) months.  Despite S.B.'s extensive treatment, her reported pain level as of her final September 20, 2018 Kinetix appointment was documented at 7/10, the exact same as it was at Level 1 PT & Rehab seventeen (17) months prior.

  Five (5) days after her last Kinetix appointment, S.B. presented to Northland Healthcare where she was allegedly evaluated by defendant Sagala. Northland Healthcare reported that S.B.'s cervical ROM flexion was even worse than exhibited during either her Level 1 PT & Rehab or Kinetix

evaluations.  Nevertheless, Northland Healthcare's course of treatment again included many of the same modalities that had previously failed, including mechanical traction, therapeutic exercises, hot/cold packs, and massage.  As of October 15, 2018, S.B. reported her pain was an 8/10, worse than the pain level she had at the outset of this extraordinary course of purported treatment.  During the entire course of more than eighteen (18) months of alleged physical therapy and chiropractic treatment billed by the defendants, not one (1) re-examination was performed.

- Patient K.L. (Claim No. 0390106060) allegedly presented to Kinetix on November 17, 2015, and was claimed to have neck and back muscle strength of only 2+/5 and zero degree ROM in her neck.  Despite these extremely severe purported limitations, Kinetix ordered its standard predetermined treatment protocol that involved billing for numerous treatment modalities including therapeutic procedures, electrical stimulation treatment, application of hot/cold packs, massage and ultrasound treatment.  Kinetix billed for this course of alleged treatment for more than nine (9) months without performing a single re-examination of K.L.  Northland Healthcare then billed for an alleged evaluation of K.L. on February 14, 2017.  Despite the extensive purported treatment billed by Kinetix, K.L.'s pain was reported to be 10/10 at by Northland Healthcare, which was worse than her pain reported at her initial Kinetix evaluation.  Despite failing treatment at Kinetix, Northland Healthcare billed for identical therapeutic procedures, massage, and application of hot/cold packs for six (6) additional months.

- Patient A.D. (TXA-0177296) was involved in an alleged motor vehicle accident on November 17, 2016.  Only five (5) days later on November 22, 2016, Kinetix billed for an initial examination allegedly performed by Shah. The William Beaumont emergency department had examined A.D. the day of his motor vehicle accident and determined he exhibited a full musculoskeletal range of motion, yet Shah's examination claimed his range of motion was severely restricted with a reported "0 degree" lumbar rotation, extension, and bending.  Shah further claimed A.D.'s strength was an extremely limited "2/5" or "2+/5" throughout his entire spine.  A.D. would not have been able to perform active physical therapy exercises with these alleged injuries, yet Kinetix still billed Allstate pursuant to its standard predetermined course of treatment, which included therapeutic exercises, massage, dynamic therapeutic activities, hot/cold packs, electrical stimulation, manual therapy and mechanical traction.  Kinetix billed Allstate pursuant to this treatment

protocol for more than one (1) year and three (3) months without ever performing a single re-examination.

At the same time Kinetix was billing Allstate for this extensive treatment, Level 1 Health was billing Allstate for many of the exact same treatment modalities. Level 1 Health first billed Allstate for an initial examination of A.D. allegedly performed by Sagala on November 28, 2016, only six (6) days after A.D. first reported to Kinetix. Following its initial examination, Level 1 Health billed Allstate for nearly four (4) months of continuous treatment, including charges for therapeutic exercises, massage, mechanical traction, and application of hot/cold packs identical to the treatment being simultaneously billed by Kinetix. Despite both Kinetix and Level 1 Health billing for the same redundant, overlapping treatment modalities over an extended period, A.D. reported his pain was actually more severe towards the end of this treatment. A.D. reported a pain score of 6/10 during a November 23, 2016 Kinetix appointment, yet reported a pain score of 7/10 more than one (1) year later during a November 27, 2017 Kinetix appointment. Despite this clear lack of improvement, the defendants did not alter their predetermined protocol of alleged treatment.

- Patient D.M. (Claim No. 0474896668) was involved in an alleged motor vehicle accident on September 13, 2017. Three (3) days later, D.M. reported to the Sinai Grace emergency department. D.M. was 81 years old at the time of her Sinai Grace examination, which determined she exhibited a full range of motion in her shoulders and knees, good strength in her hands, and could walk and move without difficulty. The Sinai Grace physician diagnosed D.M. with only an "acute left trapezius strain secondary to seatbelt." When Northland Healthcare billed for an initial examination, it claimed that D.M. suffered injuries to her neck, mid-back, low-back, shoulder, and head and reported restricted range of motion in her cervical and lumbar spine. Northland Healthcare placed D.M. on its standard predetermined treatment protocol that included CMT, therapeutic exercises, massage, and application of hot/cold packs.

Just eight (8) days after D.M.'s final Northland Healthcare appointment, Level 1 of Michigan billed for an initial physical therapy evaluation that claimed D.M.'s condition had somehow diminished even further, including such new injuries as radiating pain in her left hand, motor difficulties, and range of motion restrictions in her shoulders, hips, knees, and elbows. Level 1 of Michigan likewise placed the 81-year-old D.M. on a highly similar course of

treatment that had apparently already failed at Northland Healthcare, including therapeutic exercises, massage, and application of hot/cold packs for more than two (2) additional months.

- Patient C.W. (Claim No. 0291832657) was involved in an alleged motor vehicle accident on June 29, 2013 and was examined in the DMC Harper University Hospital emergency department the same day.   DMC Harper's examination found no radiating pain, no point tenderness in C.W.'s thoracic or lumbar vertebrae, and no diminished muscle strength or range of motion limitations.  Only two (2) days later on July 1, 2013, Northland Chiropractic billed for an initial examination allegedly performed by Sagala.  Sagala's examination claimed nearly C.W.'s entire spine was "tender to touch" and reported cervical and lumbar flexion, extension, and rotation range of motion restrictions.  Based on this exaggerated examination, Northland Chiropractic billed Allstate for more than one (1) year and three (3) months of treatment that included therapeutic exercises, massage, and application of hot/cold packs.   In addition to this extensive treatment billed by Northland Chiropractic, Northland Healthcare inexplicably billed for an initial examination on July 11, 2013, which was only ten (10) days after Northern Chiropractic's initial examination.  Northland Healthcare then billed Allstate for sixteen (16) purported appointments, all of which were billed simultaneously with Northland Chiropractic's charges and included many identical treatment modalities, including therapeutic exercises, massage, and application of hot/cold packs.

438.  Numerous patients have also testified to the clinic defendants' excessive and unnecessary predetermined treatment protocols.

439.  Patient S.W. (Claim No. 0510979222) told Allstate that  she went to Level 1 of Michigan for physical therapy three (3) times each week for three (3) months and had no improvement.

440.  Patient J.B. (0484341078) testified that Sagala, who allegedly performed J.B.'s treatment at Level 1 of Michigan, "would ask me do I want massage, and I would tell them yes or no."

97

441.   The physical therapy billed by Kinetix, Level 1 PT & Rehab, Level 1 of Michigan, and Michigan First was frequently redundant of treatments that patients were supposedly already receiving through extensive courses of chiropractic treatment billed by Level 1 Health, Northland Healthcare, and Northland Chiropractic.

442.   For example, Kinetix and Level 1 Health billed Allstate for identical purported treatments to patient C.C. (Claim No. 0434178983) on twelve (12) of the same dates. *See* Exhibits 1 and 3.

443.   Treatment billed by both Kinetix and Level 1 Health for C.C. on the same dates included therapeutic exercises, mechanical traction, manual therapy, and application of hot/cold packs.   Id.

444.   As discussed above, Northland Chiropractic billed Allstate for an extensive course of chiropractic treatment of patient A.Y. (Claim No. 0275194066).

445.   During the same time period that Northland Chiropractic billed for purported chiropractic treatment, Northland Healthcare billed for nearly identical alleged physical therapy treatment.

446.   Many treatments billed by Northland Chiropractic and Northland Healthcare relative to A.Y. were allegedly performed on the same dates of service, including therapeutic exercises, massage, ultrasound treatment. *See* Exhibits 8 and 9.

447.   Identical treatment simultaneously billed for and allegedly rendered on the same date by two (2) defendant clinics was clearly redundant and medically unnecessary, and Allstate is not required to pay for this alleged treatment performed pursuant to a predetermined treatment protocol as opposed to prescribed based on patients' actual medical need.

448.   The electrical stimulation billed by the defendant physical therapy clinics was also redundant of the treatment patients were supposedly getting from the TENS devices that AMC and Select Medical ordered and billed as a matter of course.

449.   Allstate is not required to pay the defendant clinics for any of the unnecessary and excessive physical therapy and chiropractic treatment that was performed, if at all, based upon false and exaggerated examination findings and pursuant to their predetermined treatment protocol.

## B.   EXCESSIVE AND MEDICALLY UNNECESSARY MRIS

450.   Another component of the predetermined treatment protocol used by the defendants was to immediately order MRI imaging.

451.   AMC and Select Medical ordered these MRIs because they allowed their associates, including defendant Metro MRI, to submit tens of thousands of dollars of additional charges to Allstate for imaging studies billed at absurd rates that cost very little to perform.

452.    In one example involving patient W.P. (Claim No. 0535517460), three (3) separate AMC physicians immediately ordered a total of twelve (12) MRIs after their alleged initial examinations regardless of prior imaging or actual medical need.

453.    On April 19, 2019, an imaging facility billed for allegedly performing lumbar and right knee MRIs for W.P. ordered by an AMC nurse practitioner.

454.    This same facility also billed for an alleged April 19, 2019 brain MRI ordered for W.P. by AMC physician Pierre Rojas, M.D. ("Rojas").

455.    Both right shoulder and left shoulder MRIs were additionally billed only four (4) days later on April 23, 2019 based on alleged referrals from the same AMC nurse practitioner.

456.    Rojas then ordered a second, redundant brain MRI billed by this same imaging facility on August 29, 2019.

457.    On October 12, 2019, AMC physician Nallani ordered six (6) additional MRIs, including redundant lumbar spine, right shoulder, and right knee MRIs that AMC had already previously ordered for W.P.

458.    All of these MRIs were billed by associates of the defendants in an amount totaling $58,900.

459.    A former AMC nurse practitioner testified that AMC expressly directed nurse practitioners to immediately order MRIs for any area the patient complained of pain:

Q.    But you have training and you have discretion as to whether to order MRIs or not; correct?

A.    Dr. Agha, who is my collaborative physician, gave a verbal order to prescribe MRI[s] to everyone that came in for auto claims.

460.   These MRIs specifically ordered for "auto claims" were designed to inflate treatment costs billed to Allstate as opposed to performed for patients' actual medical need or benefit.

461.   According to MRI utilization data maintained by the State of Michigan, in 2019, AMC's policy of immediately referring every patient for MRIs accounted for 72% of Metro MRI's patients.

462.   Patients at issue herein have also testified as to the manner in which the defendants pressured them to undergo MRIs.

463.   For example, patient S.W. (Claim No. 0510979222) testified that she was provided a pre-printed MRI prescription form to Metro MRI from an employee at AMC's front desk at her first presentation to the clinic prior to being evaluated by any physician.

464.   AMC ordered four (4) MRIs of S.W. pursuant to its predetermined protocol, all of which were billed by defendant Metro MRI.

465.   S.W. reported that she was not given a choice as to where she would undergo the prescribed MRIs and nobody at AMC or Metro MRI ever discussed the results with her.

466.   Patient K.M. (Claim No. 0510979222) testified that AMC had a "stack of scripts" that included MRI prescriptions to Metro MRI, where he was referred for three (3) MRIs immediately following his purported initial evaluation at AMC.

467.   Defendant Select Medical also referred patients to Metro MRI for unnecessary imaging immediately upon presentation.

468.   More than 58% of the MRIs ordered by Select Medical were billed by Metro MRI within one (1) week of the Select Medical initial examination.

469.   The MRIs ordered by AMC and Select Medical and billed by Metro MRI were not used to guide patient care.

470.   Indeed, MRIs billed by Metro MRI that were supposedly interpreted by its radiologist Monik Lala often did not have any correlation to patients' actual conditions.

471.   For example, Metro MRI billed for an alleged lumbar MRI of patient R.D. (Claim No. 0538416579) interpreted by Lala on April 7, 2019.

472.   R.D. had a history of lumbar fusion surgery and had metallic fusion hardware in his spine, none of which was mentioned at all by Lala's radiology report.

473.   Rather than identify the obvious post-operative changes in R.D.'s spine, the report submitted by Metro MRI contains only vague references to protrusions that could not possibly have been used to properly guide R.D.'s care.

474.   As set forth below, the defendants' practice of ordering MRIs as a matter of course at patients' initial date of service at the directive of layperson Hassan violates established standards of care for MRI testing.

### 1.   Standard of Care for MRIs

475.   Metro MRI had a responsibility to ensure that MRIs were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate.

476.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

477.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

478.   For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

479.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a basic neurological

examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

480. The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

481. For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

482. Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistent pain following failure of conservative management only in select cases."

483. Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

484. The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

485.   MRIs should not be ordered in violation of the ACR Practice Parameters unless there is an overriding clinical reason in the specific case and that reason must be documented in the patient's medical record.

486.   AMC nurse practitioners were improperly directed to order MRIs without physician supervision, and were told to base these MRIs on subjective pain complaints in direct contravention of the ACR guidelines requiring subjective neurologic complaints or objective neurologic examination findings.

487.   Vague, minor, and non-specific pain complaints are precisely the findings that the ACR Appropriateness Criteria are designed to remove from early resort to MRIs.

488.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

489.   If the prescription does not contain sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who should be familiar with the patient's clinical problem or question) to obtain the missing information.

490.   Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

491.   MRI findings may be misleading if not closely correlated with the patient's clinical history, clinical examination, or physiological tests.

492.   The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

493.   Nevertheless, the MRIs at issue in this Complaint routinely lack any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

494.   Pursuant to the ACR guidelines, it is the responsibility of Metro MRI to assure that all MRIs referred are proper.

495.   Rather than perform the duties required by the ACR, the defendants routinely billed for excessive and medically unnecessary MRIs in order to increase the amount of payment sought from Allstate.

### 2.   MRIs Performed During Initial Stages of Treatment

496.   MRIs at issue herein were routinely ordered by Select Medical and AMC at the outset of the patient's treatment, thus evidencing that MRIs were

resorted to as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

497.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."   Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

498.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

499.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

500.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

501.   Metro MRI routinely performed MRIs of patients who had only just initiated treatment.

502.   More than 76% of the patients at issue herein for whom Metro MRI submitted bills were alleged to have had MRIs within two (2) months of their purported motor vehicle accidents.

503.   On several occasions, Metro MRI billed for the purported performance of multiple MRIs just two (2) days after patients' alleged motor vehicle accidents.

504.   More than 58% of the MRIs ordered by Select Medical were billed by Metro MRI within one (1) week of the Select Medical initial examination.

505.   It is not possible for patients for whom MRIs were billed just days or weeks after their alleged motor vehicle accidents to have attempted the conservative treatment required by the ACR guidelines before resorting to MRIs.

506.   Medically unnecessary MRIs ordered and billed during initial stages of treatment in violation of established ACR guidelines are exemplified by the following representative patients:

- Patient L.L. (Claim No. 0553929779) was allegedly involved in a motor vehicle accident on July 18, 2019.   L.L. allegedly presented to Select Medical the following day, where he was immediately ordered three (3) MRIs be performed at Metro MRI.  These MRIs were billed the very next day on July 20, 2019, which was only two (2) days after L.L.'s purported motor vehicle accident and before any conservative treatments could have been attempted.

- Patient R.H. (Claim No. TXA-0216616) was involved in an alleged motor vehicle accident on October 31, 2018 and reported to AMC the same day. AMC ordered cervical and lumbar spine MRIs, which were in complete disregard of the proper standard of care given R.H.'s same-day alleged accident.  Further, the MRI order from AMC is time-stamped 10:00 a.m.,

which was less than two (2) hours after the alleged accident and before the purported evaluation of R.H. even occurred.

- AMC ordered seven (7) MRIs for patient M.M. (Claim No. 0511595059), including five (5) MRIs that were billed by Metro MRI. Three (3) MRIs (cervical, lumbar, left knee) were ordered by AMC at M.M.'s August 13, 2018 initial examination by a nurse practitioner and were billed on August 18, 2018, only five (5) days after M.M.'s initial AMC examination and well before any conservative treatment was attempted.

- Patient S.W. (Claim No. 0510979222) was involved in an alleged motor vehicle accident on July 25, 2018. S.W. presented to AMC the following day on July 26, 2018 for an initial examination by a nurse practitioner. At this initial examination, S.W. was prescribed multiple items of DME including a back brace, a knee brace, and a shoulder brace, and was also prescribed medications as well as physical therapy. Before waiting to evaluate any improvement from this prescribed treatment, AMC ordered four (4) MRIs (thoracic, lumbar, cervical, right knee) to be performed at Metro MRI.

- Patient R.H. (Claim No. 0529599639) was allegedly involved in a motor vehicle accident on December 29, 2018. R.H. presented to AMC for an initial examination on January 4, 2019 by an AMC nurse practitioner. Three (3) MRIs (lumbar, cervical, thoracic) were ordered by the nurse practitioner at this initial examination and were billed by Metro MRI only two (2) days later on January 6, 2019, which was only eight (8) days after R.H.'s alleged motor vehicle accident and well before the benefit of any conservative treatment could have been evaluated in adherence with applicable ACR guidelines.

507.   The patients at issue herein who received MRIs at Metro MRI within the first days and weeks after their alleged motor vehicle injuries had non-emergent medical conditions, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging.

508.   Allstate is not required to pay Metro MRI for MRIs performed at the outset of patients' treatment that were ordered by AMC and Select Medical as a matter of course in furtherance of the defendants' scheme and their *quid pro quo* network of inter-referrals.

### 3.   Excessive MRI Scans

509.   In addition to performing MRIs as soon as possible after an alleged accident in violation of the standard of care, Metro MRI also sought to maximize the amount of the charges submitted to Allstate by performing far more MRIs than were medically necessary.

510.   MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region.

511.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2019, which documents that just 12.32% (111,535 of 905,103) of all patients underwent MRIs of multiple body parts during the same visit.

512.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

513.  By comparison, in 2019, Metro MRI performed multiple MRIs at more than seven (7) times the statewide average, with 84% of patients purportedly receiving multiple MRIs.

514.  Because the defendants intentionally targeted automobile insurers for excessive and medically unnecessary MRIs, the patients at issue in this Complaint received multiple MRIs at an even higher rate; Allstate was billed for MRIs of more than one body part relative to 88.15% of the patients at issue herein.  *See* Exhibit 10.

515.  The extreme number of MRIs per patient performed by Metro MRI is illustrated on the chart below:



516.  Of the 65 patients at issue herein who purportedly underwent MRIs at Metro MRI, forty-one (41) patients had MRIs of three (3) or more body parts.  *See* Exhibit 10.

517.   All but nine (9) patients who underwent MRI imaging at Metro MRI received multiple MRIs.  Id.

518.   Moreover, Metro MRI often performed MRIs of the same patient that were just days or weeks apart, which obscures the true number of MRIs performed per patient by Metro MRI in the data reported to the State of Michigan.

519.   Metro MRI billed for as many as eight (8) separate MRIs relative to patients at issue herein.  *See* Exhibit 10.

520.   Metro MRI also billed for at least five (5) MRIs for five (5) separate patients, and four (4) MRIs for an additional eighteen (18) patients.  Id.

521.   Metro MRI never provided MRIs to patients seeking emergency diagnosis and treatment.

522.   As discussed above, AMC's nurse practitioners immediately ordering MRIs for all "auto claims" falls dramatically short of American Medical Association ("AMA") standards for appropriate MRIs, and produced excessive medically unnecessary Metro MRI charges that Allstate is not required to pay.

523.   Patient N.K. (Claim No. 0548072965), who was allegedly involved in a motor vehicle accident with his son and daughter, testified that AMC "want[ed] to take advantage of me.  They wanted to do three MRIs for each one of us.  Three times three, that's nine."

112

524.   N.K. confirmed that he and his children were offered $1,000 each to comply with AMC's medically unnecessary MRI referrals, yet refused because "nothing was wrong with all of us.  Why would we do all of that?"

525.   Allstate is entitled to the return of money paid for Metro MRI's medically unnecessary imaging billed pursuant to the defendants' predetermined treatment protocol.

### C.   UNNECESSARY URINE DRUG TESTING

526.   Defendant AMC billed Allstate for a litany of urine drug testing that was not actually performed; was medically unnecessary, unreasonable, and excessive; and was not performed in accordance with established standards of care for urine drug testing.

527.   AMC routinely ordered and billed for testing for dozens of substances for the same patient on a regular schedule, often within just days or weeks of each other, which violates the standard of care for urine drug testing.

### 1.   Medically Unnecessary Urine Drug Test Orders

528.   AMC physicians and nurse practitioners ordered both presumptive and definitive urine drug testing to be performed for the vast majority of patients at issue in this Complaint who were allegedly evaluated at AMC.

529.   Hassan, who is not a licensed medical professional and therefore should not have any role in directing the course of patient treatment, informed Allstate that

all patients receive urine drug testing as an AMC policy because AMC is in a "high risk" area.

530.   Pursuant to this (improper) policy, AMC billed Allstate for alleged presumptive urine screens associated with hundreds of purported AMC patient examinations, even when patients were not prescribed narcotics or other medications susceptible to abuse or misuse.

531.   Even when these presumptive screens showed no unexpected results or indications that patients were misusing their prescribed medications, AMC still routinely ordered and billed for full comprehensive definitive drug testing panels.

532.   All of the urine drug testing ordered and billed by AMC was performed as a matter of course and without regard to medical necessity.

533.   AMC's practice of billing for urine drug testing at nearly every appointment regardless of medical necessity routinely resulted in multiple tests being billed within just days of one another, and in at least one case, on consecutive days, as exemplified by the following patients:

- AMC billed for alleged urine drug screens relative to patient V.P. (Claim No. 0460037633) on January 23, 2018 and January 24, 2018;

- AMC billed for alleged urine drug screens relative to patient M.M. (Claim No. 0511595059) on September 13, 2018 and again just four (4) days later on September 17, 2018; and

- AMC billed for alleged comprehensive definitive urine drug testing relative to patient W.P. (Claim No. 0535517460) on August 21, 2019 and again just five (5) days later on August 26, 2019.

534.   It is almost never proper to order both a presumptive screening test and confirmatory laboratory testing at the same time.

535.   Only when screening shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed, should confirmatory testing be performed.

536.   This standard is documented by the Substance Abuse and Mental Health Services Administration (SAMHSA), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary.  Clinical correlation is appropriate . . . .  In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.  However, if the patient disputes the <u>unexpected findings</u>, a confirmatory test should be done" (emphasis added).

537.  Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

538.   The level of confirmation defendant AMC ordered and billed for the specimens of patients undergoing pain management treatment after involvement in low-level motor vehicle accidents significantly exceeded the level of confirmation

required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing confirmation.

539.   Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

540.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3).

541.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing."  10 C.F.R. § 26.5.

542.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

543.   Even when presumptive screens produce unexpected results, it is not proper to immediately refer a urine specimen for more extensive testing.

544.   Instead, the physician should discuss the unexpected results with the patient, and if the patient admits to drug misuse, further confirmatory testing is unnecessary.

545.   AMC never addressed unexpected test results with patients through discussion, as both the urine screens and confirmatory tests it ordered and allegedly performed were only intended to generate bills to Allstate.

546.   The automatic ordering of definitive urine drug testing for nearly every patient at nearly every appointment illustrates the lack of consideration of individual medical necessity for such testing.

547.   In fact, AMC routinely ordered and performed urine drug tests on patients even when the patient was not prescribed any medications, which has no medical basis.

548.   For example, patient R.H. (Claim No. 0529599639) allegedly presented to AMC for an initial evaluation on January 4, 2019 and was not prescribed new medication.

549.   AMC nevertheless billed Allstate a total of $3,431.50 for both a presumptive drug screen and extensive definitive testing on a urine specimen allegedly provided by R.H.

550.   AMC also routinely billed for both presumptive screens and definitive urine drug testing at nearly every patient evaluation despite the lack of any unexpected test results or change in medication prescribed.

551.   Even on the rare occasion that a patient's urine drug test revealed an unexpected result, AMC did not use the results to make any change to further prescription of medications.

552.   AMC's failure to monitor patients' urine drug testing results is exemplified by patient A.Y. (Claim No. TXA-0220105), who was (improperly) prescribed multiple narcotic medications by an AMC nurse practitioner, including diazepam and hydrocodone.

553.   AMC noted that A.Y. was opioid dependent, but his urine specimens routinely tested negative for the presence of both of these dangerous prescribed substances.

554.   For example, a purported definitive test billed on January 15, 2019 was negative for diazepam, but at A.Y.'s next appointment on January 29, 2019 he was noted to have consistent urine drug test results.

555.   A.Y. had additional inconsistent urine drug test results on January 30, 2019, February 11, 2019, and February 27, 2019, but his narcotic prescriptions were nevertheless refilled at each appointment at AMC.

556.   Urine drug tests that have no bearing on patients' treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

557.   Billing for services that are not medically necessary for each patient's care, recovery, or rehabilitation is prohibited under the Michigan No-Fault Act.

558.   Allstate reasonably relied on AMC's bills to contain truthful and accurate representations regarding the urine drug testing allegedly performed and the necessity for the same.

### 2.   Improper Predetermined Urine Drug Tests

559.   AMC knew that the urine drug testing ordered by its nurse practitioners was medically unnecessary but nevertheless billed Allstate for its alleged performance.

560.   Abusive laboratory practices, including non-patient-specific testing and the use of pre-printed forms that encourage excessive testing, have been condemned by authorities.

561.   None of the records submitted to Allstate by AMC contain any indication that the physicians or nurse practitioners ordering urine drug tests made any determination as to what type of testing should be performed or what substances should be tested.

562.   The federal government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  63 Fed. Reg. 45080 (Aug. 24, 1998).

563.   Further, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."

564.   AMC rarely, if ever, submitted requisition forms to Allstate and it appears that no such forms were used for the purported testing billed by AMC.

565.   Instead, AMC only occasionally submitted a form called a "Vendor Order" that simply listed the name of the test to be performed and did not provide any patient specific information to evidence that an independent medical decision had been made.

566.   AMC was actually aware that its requisition documentation was improper and insufficient, as it was twice served with Statements of Deficiencies by the Department of Health and Human Services ("DHHS"), on September 6, 2016 and September 19, 2018, both of which addressed its failure to properly document orders for urine drug testing.

567.   No physician or testing facility can properly make a blanket determination across all patients and all dates of service as to what constitutes reasonable definitive urine drug testing in all cases.

568.   Instead, the individual provider must determine the reasonableness and necessity of urine drug testing on a patient-by-patient and visit-by-visit basis.

569.   AMC billed for all of the urine drug tests at issue herein performed, if at all, without such determination as it billed for alleged tests for the same drugs and analytes for every patient.

570.   Use of such a predetermined slate of tests is necessarily not patient-specific as the drugs/analytes to be tested are established prior to the patient's urine drug testing referral.

571.   By way of example, phencyclidine (PCP) was routinely billed to Allstate by AMC without the referring provider indicating the medical necessity of testing for such an illicit substance.

572.   By testing for the same exact substances for each patient, regardless of age, medications prescribed, comorbidities, or other factors, AMC knowingly submitted claims that could not have been medically necessary for each patient's clinic condition.

573.   The OIG also guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition." *See* 63 Fed. Reg. at 45079.

574.   Instead of taking steps to ensure that it was only submitting claims for necessary urine drug testing, AMC intentionally worked to increase the number of medically unnecessary tests referred by physicians and billed to payors like Allstate.

575.   The purported urine drug tests billed by AMC were also unreliable and improper because AMC failed to properly calibrate and test the instruments allegedly used to perform the testing.

576.   The DHHS Statement of Deficiencies from September 6, 2016 found that AMC's laboratory director did not approve verification studies of the instruments prior to patient testing.

577.   The September 19, 2018 DHHS Statement of Deficiencies found that AMC failed to perform routine daily quality control, failed to follow written policies to address and correct issues problems with laboratory analytic systems, and failed to perform required annual verifications.

578.   Urine drug tests that were improperly ordered and performed, and which produced unreliable results, could not have been used to actually guide patient care.

### 3. <u>Examples of Improper and Medically Unnecessary Urine Drug Testing</u>

579.   AMC's medically unnecessary and excessive urine drug testing is exemplified by the following representative patients:

- AMC billed for alleged screens of urine specimens provided by patient F.O. (TXA-0193420) on twenty-two (22) separate dates as little as five (5) days apart from one another.  AMC also billed for purported definitive testing of urine specimens provided by F.O. on twelve (12) separate dates.  On six (6) of the dates for which AMC billed for these tests, it also inexplicably sent F.O.'s urine specimen to North West Labs, which billed for the same definitive testing using nearly identical CPT Codes as those billed by AMC.

- Patient E.L. (Claim No. 0397904939) was first allegedly examined at AMC on November 22, 2017 and was immediately prescribed the narcotic drug acetaminophen with codeine.  AMC then billed for monthly re-examinations that included charges for urine drug screens and definitive testing billed by both AMC and outside facilities.  On December 26, 2017, E.L.'s monthly urine drug testing confirmed that E.L. tested positive for the narcotic hydrocodone, which was not prescribed by AMC or any other physician. Despite these inconsistent results, AMC continued to renew E.L.'s narcotic pain medication and order both presumptive and comprehensive drug testing at each appointment.  During an October 19, 2018 re-examination, AMC expressly acknowledged E.L.'s repeated inconsistent results:

  Breach of contract: Positive for hydrocodone 5/16/18. Positive for norhydrocodone 6/27/18. Positive for hydrocodone and metabolites 7/25/18. Positive for norhydrocodone 8/20/18. Positive for hydorcodone/norhydrocodone 9/21/18. Positive for norhydrocodone 10/19/18.

  On each of these dates of service that urine drug testing confirmed E.L. was abusing addictive and dangerous narcotic medication, AMC entirely ignored the testing results and failed to alter or suspend E.L.'s narcotic prescription. Despite these urine drug tests having no actual influence on E.L.'s course of treatment, AMC continued to order monthly comprehensive urine drug testing to generate extensive additional bills for submission to Allstate.

- Patient R.S. (Claim No. 0510241649) was involved in an alleged motor vehicle accident on July 8, 2018 and first presented to AMC only twelve (12) days later on July 20, 2018.  R.S. was not prescribed any narcotic pain medication by AMC at this initial examination or subsequent re-examinations, yet AMC routinely billed for urine screens, which uniformly confirmed R.S.'s results were consistent and he was not taking any non-prescribed medications. On November 27, 2018, after AMC had already billed for four (4) separate screens that all confirmed R.S. was taking only the prescribed non-narcotic medication, AMC inexplicably ordered and billed for full comprehensive drug

testing.  This comprehensive drug testing was not medically necessary for a patient who was not prescribed narcotic medication and whose multipole urine drug screens had reported no inconsistent results.

- Patient B.R. (Claim No. 0531282622) was involved in an alleged motor vehicle accident on January 11, 2019 and first presented to AMC only six (6) days later on January 17, 2019.  B.R. was not prescribed any narcotic pain medication by AMC, yet AMC still ordered and billed for both presumptive and comprehensive urine drug testing.  These unnecessary drug tests confirmed B.R. was not taking any prescribed narcotic medication and indicated no abnormal results.  Despite these consistent results, AMC again ordered and billed for medically unnecessary presumptive and comprehensive urine drug testing on April 8, 2019.

- Patient W.P. (Claim No. 0535517460) first allegedly presented to AMC on March 7, 2019.  W.P. was not prescribed any narcotic pain medication by AMC at this initial examination, and even expressly informed his AMC examining nurse practitioner that he had just recently got out of prison and had no narcotic pain medications while in prison.  AMC nevertheless billed for both presumptive drug testing and a complete comprehensive urine drug panel, which was completely unnecessary for a patient not prescribed any narcotic medication.

580.   Allstate is not required to pay the defendants for urine drug testing that is redundant, not patient-specific, and that is unnecessary, and is entitled to a return of monies it paid to the defendants for these medically unnecessary urine drug tests.

### D.   UNNECESSARY DME

581.   Another integral part of the defendants' predetermined treatment protocol was to prescribe and bill for excessive and unnecessary items of DME.

582.   AMC routinely prescribed and issued the same types of DME regardless of patients' individual medical needs.

583.   DME was ordered and issued not based on medical necessity, but rather based on the amount of billing it would generate to Allstate.

584.   AMC frequently prescribed multiple units of DME at initial examinations of patients with only minor sprains or strains.

585.   For example, Patient S.W. (Claim No. 0510979222) was involved in an alleged motor vehicle accident on July 25, 2018.  S.W. allegedly reported to AMC the following day which resulted in bills from AMC totaling $4,190 for a TENS unit, cervical collar, lumbar-sacral brace, knee brace, and shoulder brace.

586.   One of the most commonly prescribed and issued DME items were TENS devices, which were ordered and issued by the defendants only because they cost very little to purchase.

587.   There was rarely, if ever, any medical support for the defendants' prescriptions and bills for TENS devices.

588.   There is no medical support for use of TENS devices for chronic low back pain, which is defined as pain that has existed for greater than three (3) months.

589.   Home electrotherapies are also never medically necessary for acute injuries.

590.   The defendants routinely improperly ordered and issued TENS devices for injuries that were in the acute stage and for chronic low back pain, neither of which could be medically necessary.

591.   In many cases, defendant AMC ordered and issued TENS devices before attempting to perform conservative treatments, in violation of applicable standards of care.

592.   For all patients, AMC ordered and issued TENS devices without having patients undergo a trial period to determine if electrotherapy would be efficacious, in violation of applicable standards of care.

593.   AMC also failed to monitor the use of TENS devices it ordered and issued, which is both a violation of the standard of care and resulted in the issuance of TENS devices that could not possibly have been used as intended.

594.   When used properly and in accordance with instructions, electrodes that attach to a patient's skin last for approximately one month.

595.   AMC issued replacement electrodes to just one (1) patient at issue herein, meaning that none of the other patients to whom TENS devices were allegedly issued could have used the devices for any extended period of time.

596.   In addition to being unnecessary because it was issued without regard for individual patient need (but rather was dispensed as a matter of course) prior to attempting any conservative treatment, much of the DME allegedly issued by AMC was also duplicative of physical therapy treatments allegedly provided by the defendant clinics.

597.   AMC prescribed and billed for TENS devices for patients who were already undergoing electrical stimulation as part of the extensive courses of treatment billed by the defendant physical therapy clinics.

598.   For example, patient M.M. (Claim No. 0511595059) was involved in an alleged motor vehicle accident on July 30, 2018.

599.   M.M. was first examined at AMC only fourteen (14) days later on August 13, 2018 and was immediately prescribed physical therapy at Level 1 of Michigan, which included electrical stimulation treatment.

600.   On October 5, 2018, while M.M. was allegedly receiving electrical stimulation at Level 1 of Michigan, AMC prescribed a redundant and medically unnecessary TENS device for the sole purpose of increasing the cost of bills submitted to Allstate.

601.   AMC's *pro forma* DME orders also included orthotics that were selected based solely on their expensive prices, as detailed below.

602.   The issuance of braces to every patient who complained of pain was medically unnecessary, and often was counter-productive to treating the type of myofascial pain complaints reported by the majority of patients at issue herein.

603.   As with the TENS devices purportedly issued, AMC rarely, if ever, evaluated the efficacy of the use of the braces billed to Allstate.

604.    AMC also billed Allstate for issuing the same DME to the same patient on multiple occasions.

605.    For example, AMC billed Allstate for allegedly issuing a TENS device, a knee brace, a compression sleeve, and two (2) lumbar braces to patient C.B. (Claim No. 0358449998) on December 10, 2016.

606.    On January 12, 2017, AMC billed for allegedly issuing C.B. another two (2) knee braces, another two (2) compression sleeves, another two (2) TENS devices, and another lumbar brace.

607.    One of the knee braces and one of the compression sleeves were billed as rentals, but were charged at the same rates as the equipment that was allegedly issued permanently.

608.    It cannot ever be medically necessary for a patient to require three (3) lumbar braces, three (3) TENS devices, or three (3) knee braces, and none of the DME allegedly issued to C.B. was reasonable or proper.

609.    AMC also billed Allstate for purportedly issuing two (2) separate TENS devices to patient N.P. (Claim No. 0498315167), a sixteen-year-old with severe mental disabilities, less than two (2) months apart from one another, on June 25, 2019 and August 20, 2019.

610.    AMC also ordered and billed for DME that could not have actually been necessary for patients' treatment, as evidenced by the lengthy gaps between the

supposed determination of medical necessity and the actual issuance of the equipment.

611.   For example, AMC billed for the alleged issuance of multiple items of DME to patient J.C. (Claim No. TXA-0198607) on June 15, 2018.

612.   The DME that was purportedly issued to J.C. was first ordered by AMC nearly four (4) months prior, on February 23, 2018.

613.   The lengthy delay in issuing the DME to J.C. did not result in any change to her predetermined treatment plan, and confirms that the DME was never actually medically necessary.

614.   DME that was prescribed and issued for the defendants' financial gain and not based on an individualized evaluation of medical necessity is fraudulent and non-compensable under Michigan's No-Fault Act.

615.   Allstate is not required to pay AMC for DME that was medically unnecessary, and is entitled to reimbursement for monies it paid to AMC for this medically unnecessary DME.

### E.   UNNECESSARY P-STIM APPLICATION

616.   The defendants' scheme included repeated applications of clinically worthless P-Stim devices to patients without any clinical indications or signs of improvement from treatment.

617.   At least one patient, T.W. (Claim No. TXA-0190398), has testified that defendant Dehko, who illegally solicited her to undergo treatment, told her that the P-Stims were "basically just to get money."

618.   P-Stim is not widely accepted in the medical community, has not been shown to be beneficial, and is not considered payable by the Centers for Medicare & Medicaid Services under any Medicare Benefit Category.

619.   The P-Stim device is a miniaturized, battery-powered, transcutaneous electrical nerve stimulator with pre-programmed frequency, pulse, and duration for the stimulation of auricular acupuncture points.

620.   The P-Stim device provides a form of acupuncture combined with electrical stimulation where all of the acupuncture points are located behind a patient's ear.

621.   The P-Stim device is held behind the patient's ear by an adhesive dressing.

622.   The P-Stim device connects via three (3) stainless steel wires to acupuncture needles applied to three (3) points behind a patient's ear, as illustrated by the photograph below:



623. The P-Stim operates until its battery runs out of power, typically three (3) days after application, at which point patients remove the device themselves and throw it away.

624. The majority of the patients at issue herein received P-Stim devices manufactured by a company called ANSi.

625. The device sold by ANSi has only been reviewed by the FDA through its "Premarket Notification" 510(k) review program.

626. Under the 510(k) program, a device manufacturer submits a premarket notification submission to the FDA at least 90 days before a device is introduced into interstate commerce for commercial distribution. 21 U.S.C. § 360(k).

627. The FDA determines whether devices meet the criteria for market clearance within ninety (90) days, on the basis of whether the device is "substantially equivalent" to a legally marketed "predicate" device. 21 U.S.C. §§ 360(n), 360c(i).

628. The FDA reviews whether the new device has the same technological characteristics as the predicate device, or whether despite any technological differences the new device is as safe and effective as the predicate device.

629.   ANSi was compared to a predicate device called the Acu-Stim.

630.   The FDA's determinations were not based on any clinical or scientific data submitted in relation to the P-Stim device.

631.   Further, the FDA's 510(k) determination in relation to Acu-Stim makes clear that the P-Stim's predicate device was not reviewed for treatment of pain at all. *See* Exhibit 16.

632.   Instead, the "Acu-Stim" identified by the FDA as a predicate device to the P-Stim is in fact the "Acuslim" electro-acupuncture device, which is intended for weight loss.  Id.

633.   AMC applied P-Stim devices despite a dearth of reputable clinical studies supporting the use of P-Stim treatment, since this minor, non-invasive treatment was billed at exorbitant rates and dramatically increased treatment costs.

634.   Like most other services billed by AMC, P-Stim was applied, if at all, by nurse practitioners as opposed to licensed physicians.

635.   A former AMC nurse practitioner informed Allstate that Agha made her watch a P-stim application video so that she became "certified" to place the P-stims and she was able to give them to all auto patients.

636.   Allstate is not required to pay AMC for the alleged application of medically unnecessary P-Stim devices used solely as a means to increase the

amounts charged to Allstate, and it is entitled to reimbursement for payment already tendered.

**F.   MEDICALLY UNNECESSARY TRANSPORTATION**

637.   Motion Transportation and Rent A Ride billed Allstate for purported medical transportation services that were medically unnecessary and performed, if at all, only to multiply the amount of the defendants' claims for No-Fault payments.

638.   To receive medical transportation, a licensed healthcare provider must determine that an individual is disabled and unable to drive and must document this determination in the patient's medical record.

639.   Once a patient is evaluated and determined disabled, the licensed healthcare provider provides the patient with a disability certificate that identifies the forms of necessary assistance, including medical transportation if necessary.

640.   Defendants AMC and Select Medical routinely issued disability certificates claiming that patients were unable to drive, but they never explained why or how patients' supposed injuries impacted their ability to drive.

641.   Indeed, defendants AMC and Select Medical rarely, if ever, performed the types of orthopedic and neurological examinations that would permit them to make a determination of whether a patient was capable of driving.

642.   Defendants Motion Transportation and Rent A Ride knowingly obtained these unsupported disability certificates from AMC, Select Medical, and

others, and used them to attempt to justify their medically unnecessary purported services.

643.    Moreover, both Motion Transportation and Rent A Ride repeatedly billed for transportation services prior to any determination by a licensed healthcare provider that the patient required transportation services.

644.    Motion Transportation nearly exclusively transported patients to Kinetix, as both entities were owned and controlled by defendant Shah.

645.    Rent A Ride likewise nearly exclusively transported patients to Level 1 of Michigan, as both entities are owned and controlled by the Dehko family.

646.    Motion Transportation and Rent A Ride's medically unnecessary transportation is exemplified by the following patients:

- Patient R.H. (Claim No. 0529599639) was allegedly involved in a motor vehicle accident on December 29, 2019.  R.H. purportedly presented to AMC for an initial examination on January 4, 2019 and was issued a disability certificate that did not include driving restrictions.  Despite AMC not disabling R.H. from driving, Rent A Ride billed Allstate for purported transportation to Level 1 of Michigan, including on the same January 4, 2019 date of service.  Neither AMC nor any other medical provider issued R.H. any subsequent disability certificate.  Rent A Ride nevertheless submitted charges to Allstate seeking payment for at least fourteen (14) dates of service for which there was no medical need.

- Patient K.G. (Claim No. 0444175921) was allegedly involved in a motor vehicle accident on November 13, 2015.  K.G. first obtained a disability certificate restricting his ability to drive more than nine (9) months later on August 18, 2016.  Well prior to being issued a disability certificate, Motion Transportation billed for purported transportation of K.G. to Kinetix on eighteen (18) separate dates of service.  These transportation charges all

submitted before any physician had determined K.G. was unable to drive were medically unnecessary and improper.

- Patient N.E. (Claim No. 0341411429) was allegedly involved in a motor vehicle accident on September 16, 2014.  On September 19, 2014, Motion Transportation picked N.E. up at her home and transported her to Kinetix where she received an initial physical therapy evaluation.  At the time that N.E. was transported by Motion Transportation to Kinetix just three (3) days after her alleged motor vehicle accident, she had yet to be evaluated by any physician and it had not been determined she was unable to drive.

647.   Allstate has no obligation to pay for transportation services that were medically unnecessary.

## G.   MEDICALLY UNNECESSARY INJECTIONS

648.   Defendants AMC and Select Medical subjected their patients to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services.

649.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon adequate diagnosis and legitimate medical necessity.

650.   As discussed above, examinations performed by the defendants, if they were performed at all, resulted only in boilerplate findings and treatment plans that were not adequate to support the performance of invasive procedures.

651.   Many of the injections billed by the defendants had no explanation at all and were not part of treatment plans allegedly established for the patients at issue herein.

652.   For example, AMC billed for an alleged sacroiliac joint injection by indicted physician Jankowski to patient G.B. (Claim No. TXA-0214256) on October 31, 2018.

653.   G.B. had allegedly been evaluated by AMC physician Toweh on October 11, 2018, but he did not indicate that an injection was necessary or make any findings that could support the performance of an injection.

654.   Toweh then purportedly evaluated G.B. again on November 7, 2018, and did not address the fact that an injection had allegedly been performed in the interim.

655.   Jankowski never performed his own evaluation of G.B., so he could not have developed an independent justification for performance of an injection.

656.   Moreover, the defendants routinely conflated the injection procedures that are intended to be used for diagnostic purposes with procedures that are intended for therapeutic purposes.

657.   The defendants ignored diagnostic information gleaned from previous injections, and instead persisted in recommending that patients undergo additional rounds of injections to generate bills for submission to Allstate.

658.   Consequently, patients received unjustified invasive procedures that offered little therapeutic efficacy while subjecting the patients to unnecessary risks of infection.

659.   Defendants AMC and Select Medical also resorted to injections without regard for conservative forms of treatment.

660.   Even in those instances where patients reported improvement from conservative treatment, AMC and Select Medical nevertheless pushed for injections to be administered.

661.   AMC and Select Medical frequently ordered repeat injections without analyzing the efficacy of prior procedures, in derogation of established standards of care.

662.   Indeed, the defendants routinely scheduled patients for multiple injections at once, an improper practice that makes it impossible to evaluate the efficacy of the first (and subsequent) injection.

663.   Applicable standards of care direct that physicians should not perform steroid injections too frequently, usually no more than three (3) times per six (6) month period or four (4) times per year.

664.   Facet injections should not be performed more frequently than once every three (3) months.

665.   AMC and Select Medical disregarded these practice standards, and placed their patients in danger, to maximize the amount of bills submitted to Allstate.

666.   For example, AMC billed for alleged epidural steroid injections to patient C.N.'s (Claim No. TXA-0233760) lumbar and cervical spine, along with a major joint injection, on August 21, 2019.

667.   On both November 11, 2019 and December 4, 2019, AMC billed for additional alleged lumbar epidural steroid injection and major joint injections to C.N.

668.   In total, AMC billed for seven (7) injections to C.N., including four (4) epidural steroid injections, in a period of just over three (3) months.

669.   AMC billed for performing three-level facet injections to patient J.P. (Claim No. 0536245780) on March 11, 2019 and then again less than a month later on April 8, 2019, which was well before the three (3) month interval required for patient safety.

670.   AMC billed for another round of three-level facet injections to patient J.P. less than a month apart from one another on February 11, 2020 and March 10, 2020.

671.   The defendants also failed to use the injections performed for their intended purpose.

672.   For example, medial branch block injections are used to predict a patient's response to a radiofrequency ablation/rhizotomy procedure.

673. If a patient has a positive response to a medial branch block injection, the standard of care calls for proceeding to a rhizotomy.

674. However, in order to maximize the amounts charged to Allstate, the defendants billed for the performance of rhizotomies on patients who were never given medial branch block injections.

### H.  MEDICALLY UNNECESSARY ELECTRODIAGNOSTIC TESTING

675. Defendants AMC and Select Medical routinely referred and billed for medically unnecessary electrodiagnostic testing that was not indicated when ordered and was not used to inform patients' courses of treatment.

676. Electrodiagnostic testing includes electromyography (EMG) and nerve conduction studies (NCS).

677. EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

678. A needle EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

679. To perform a NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

680.   NCS involve non-invasive tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

681.   The records of the patients who purportedly underwent EMG and NCS testing at AMC and Select Medical reflect that the testing was predominantly unjustified and was not indicated by the patients' complaints and neurological examination findings.

682.   For EMG and NCS testing to be medically justified, the clinical examination must indicate symptoms or signs of radiculopathy.

683.   Radiculopathy is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

684.   The patient's subjective symptoms alone cannot properly support the performance of an electrodiagnostic study absent objective findings by the practitioner because such studies are an extension of the clinical exam.

685.   EMG and NCS studies are reserved for cases of actual neurologic abnormalities.

686.   EMG and NCS are not indicated where, as is the case with nearly all patients at issue herein, neurologic deficits are not detected in the patients.

687.   The defendants also did not use the electrodiagnostic testing allegedly performed to inform or influence patients' treatment plans, which were predetermined.

688.   For example, AMC billed Allstate for the alleged performance of electrodiagnostic testing on patient J.C. (Claim No. TXA-0198607) on August 3, 2018, despite a lack of any specific finding to require such testing.

689.   Not only were the results of the tests never used to guide J.C.'s treatment, at her following examination at AMC on August 29, 2018, the AMC physician reported that she needed to be scheduled for the same EMG testing that was already performed.

690.   On May 1, 2019, AMC physician Nallani ordered electrodiagnostic testing of patient I.K.'s (Claim No. 0489270233) upper and lower extremities despite not making any specific findings to justify the procedure.

691.   On May 8, 2019, AMC inexplicably billed for purported electrodiagnostic testing of I.K.'s upper extremities only, contradicting the purported order of its own physician.

692.   Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

693.   Accordingly, the nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

694.   Likewise, the provision of EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

695.   Use of a protocol-based approach to electrodiagnostic testing can lead to overutilization of such testing.

696.   As discussed above, AMC and Select Medical referred patients for electrodiagnostic testing even if they did not present with any neurological deficits or any other objective symptoms indicating a suspected radiculopathy, and often without any subjective complaints, supporting that such referrals were made on the basis of a predetermined protocol of maximizing referrals for diagnostic testing.

697.   Patients for whom AMC and Select Medical billed Allstate for electrodiagnostic testing almost always had testing performed on the same nerves and muscle groups, regardless of the patients' individual complaints and without regard to the results being found by the physician performing the tests.

698.   Electrodiagnostic testing that is performed pursuant to a predetermined protocol and without medical justification is not compensable pursuant to the No-Fault Act, and Allstate is entitled to repayment of amounts it was induced to pay by the defendants' misrepresentations.

## X.       FRAUDULENT BILLING PRACTICES

699.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

700.   The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

701.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes, which are published by the AMA.

702.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

703.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

704.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

### A.   FRAUDULENT UNBUNDLING

705.   The Centers for Medicare and Medicaid Services ("CMS") instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

706.   The NCCI contains an edit table entitled the "Column One/Column Two Correct Coding Edit Table" that identifies billing codes that should not be reported together because the services (and payment) of the Column Two code is subsumed by the services (and payment) for the Column One code.

707.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same claimant) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure which are included in another billing code also billed for the same date of service.

708.   If a provider reports the two codes of an edit pair, the Column Two code is denied and the Column One code is eligible for payment.

709.   The defendants routinely unbundled services billed to Allstate, which resulted in tens of thousands of dollars in fraudulent bills.

### 1.   AMC and Select Medical's Fraudulent Unbundling

710.   One frequent method of improperly unbundled charges used by AMC was to submit charges for ultrasound or fluoroscopic guidance for procedures that have such guidance built into their descriptions.

144

711.   For example, AMC billed Allstate for a purported facet injection to patient C.B. (Claim No. 0358449998) on May 17, 2018 using CPT Code 64495, which expressly includes imaging guidance in its definition.

712.   AMC also submitted a separate charge to Allstate for this purported facet injection using CPT Code 76942, which is for the same ultrasound guidance expressly included in the charge for the injection itself.

713.   Indeed, the AMA coding guideline for CPT Code 76942 explicitly states "do not report 76942 in conjunction with 64495."

714.   Each time AMC submitted charges for separate ultrasound or fluoroscopic guidance for injections and other procedures, it was attempting to fraudulently induce Allstate to make a second payment for services that were already included in the injections and procedures themselves.

715.   Select Medical also fraudulently unbundled its bills for injections, including by submitting multiple claims for purported injections that are properly included in just one charge.

716.   For example, Select Medical billed for alleged trigger point injections to patient A.M. (Claim No. TXA-0240642) on December 5, 2019 using CPT Codes 20552 and 20553.

717.   CPT Code 20552 describes performance of 1-2 trigger point injections, and CPT Code 20553 describes performance of 3 or more trigger point injections.

718. It is not proper to bill CPT Code 20552 in conjunction with CPT Code 20553 as the latter encompasses any number of trigger point injections above three (3).

719. Similarly, Select Medical billed Allstate for purported trigger point injections to patient R.H. (Claim No. TXA-0216616) with two (2) separate charges using CPT Code 20552 on October 17, 2019.

720. It is not proper to bill using two (2) separate charges for 1-2 trigger point injections when there is a specific code (CPT Code 20553) that describes 3 or more such injections.

## 2. Defendant Physical Therapy and Chiropractic Clinics' Fraudulent Unbundling

721. Defendants Kinetix, Level 1 PT & Rehab, and Level 1 Health each routinely submitted charges to Allstate using CPT Code 97124 ("*massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)*") and CPT Code 97140 ("*manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes*") for the same patient on the same date of service. *See* Exhibits 1 through 3.

722. CPT Code 97124 is a Column Two code and CPT Code 97140 is a Column One code when billed for the same patient on the same date of service.

723. The submission of these codes for the same patient on the same date of service constitutes fraudulent unbundling.

146

724.   Kinetix, Level 1 PT & Rehab, and Level 1 Health each routinely submitted claims for purported massage using CPT Code 97124 on the same dates of service they billed for purported manual therapy using CPT Code 97140, which amounts to fraudulent unbundling. Id.

725.   In addition to unbundling the same codes for massage and manual therapy, Level 1 Health, Northland Healthcare, and Northland Chiropractic further unbundled massage (CPT Code 97124) and manual therapy (CPT Code 97140) with chiropractic manipulation treatment (CPT Codes 98941 and 98942) allegedly performed on the same date of service. *See* Exhibits 3, 8, and 9.

726.   CPT Codes 97124 and 97140 are Column Two codes and CMT billed using CPT Codes 98941 and 98942 are Column One codes when billed for the same patient on the same date of service.

727.   Level 1 Health, Northland Healthcare, and Northland Chiropractic submitted claims totaling at least $32,240 for purported CMT using CPT Codes 98941 and 98942 on the same dates of service they billed for either purported manual therapy using CPT Code 97140 or massage using CPT Code 97124, all of which amounts to fraudulent unbundling. Id.

728.   All claims submitted to Allstate for CMT, massage, and manual therapy allegedly performed on the same date of service were fraudulently unbundled, and none of these unbundled claims were compensable.

## B.    FRAUDULENT UPCODING

729.   Physician examinations of patients are billed using CPT Codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT Code for the complexity involved in the examination.

730.   As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and/or (3) were wholly unwarranted and unnecessary.

731.   The bills codes submitted to Allstate by AMC and Northland Chiropractic also consistently exaggerated the complexity of evaluations purportedly provided in order to inflate the charges submitted to Allstate.

732.   There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

733.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920"; reexaminations are billed using a CPT Code that starts with the numbers "9921"; and consultations are billed using a CPT Code that starts with the numbers "9924."

734.   The final number to complete each five-digit CPT Code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

735.   To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

736.   To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history, performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

737.   The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

738.   Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 reexaminations typically involve 25 minutes of face-to-face time.

739.   AMC almost always submitted charges billed to Allstate claiming that it performed level 4 examinations (i.e., CPT Codes 99204 and 99214), and also billed Allstate for purported level five follow-up visits (i.e., CPT Code 99215). *See* Exhibit 6.

740.   All bills submitted using CPT Codes 99204, 99214, and 99215 as a matter of course rather than based on an independent assessment of the complexity of medical decision-making were fraudulent.

741.   AMC has billed Allstate for at least 894 patient examinations since 2015.   Id.

742.   Just ten (10) (1.12%) of these purported examinations were billed as a level 1 or 2 encounter.  Id.

743.   Just 102 (11.41%) of the 894 patient examinations billed by AMC were billed as level 3 encounters.  Id.

744.   To warrant a medical bill demanding payment for a level four examination, the injury/condition necessarily requires:

- moderate risk of mortality, morbidity and/or complications;

- moderate diagnoses and review of complex data; and

- the defendants to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

745.   To warrant a medical bill demanding payment for a level five examination, the injury/condition necessarily requires:

- high risk of mortality, morbidity, and/or complications;

- extensive diagnoses and review of complex data; and

- the defendants to: (1) obtain <u>comprehensive</u> patient histories; (2) conduct <u>comprehensive</u> examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 60 minutes.

746.  AMC's examinations fall woefully short of meeting the threshold standard to bill for level four or five office visits.

747.  For the patient appointments resulting in pre-printed and formulaic office records based off the predetermined treatment protocol described above, AMC uniformly improperly upcoded bills to represent alleged complex medicals evaluations.

748.  AMC's records do not support evaluations as extensive or complex as those represented by the charges he submitted.

749.  AMC almost never documented a detailed patient history, and its former nurse practitioner provided sworn testimony that AMC used form templates for initial examinations that resulted in all examinations consisting of pre-printed, non-patient specific language.

750.  While AMC uniformly billed for purported "comprehensive" examinations, AMC's evaluations in actuality fabricated patient injuries and mischaracterized the severity of alleged motor vehicle accidents in an attempt to create the appearance of more significant injuries and falsely justify their predetermined course of excessive treatment.

751.   For example, patient N.K. (Claim No. 0548072965) testified that his initial examination occurred together with his son and daughter who were simultaneously examined in the same room, who were all allegedly involved in the same motor vehicle accident.

752.   N.K. testified that the group examination took around thirty-forty (30-40) minutes total, yet AMC fraudulently upcoded each patient's initial examination billed as purported comprehensive level four initial evaluations, which require approximately forty-five (45) minutes of face-to-face evaluation personalized to **each** individual patient.

753.   Further, both AMC and Northland Chiropractic fraudulently upcoded their charges by improperly billing Allstate for multiple new patient initial examinations.

754.   The CPT Codebook defines a new patient as:

one who has not received any professional services from the physician/qualified healthcare professional or another physician/qualified healthcare professional of the exact same specialty and subspecialty who belongs to the same group practices, within the past three years.

755.   New patient evaluations are billed using CPT Codes 99201-99205 and are normally paid at higher rates than established patient evaluations billed using CPT Codes 99211-99215.

756.  The following representative patients exemplify AMC's fraudulent upcoding through submitting multiple charges for initial patient examinations:

- For patient N.J (Claim No. 0471077895), AMC billed Allstate for a level 4 new patient examination on November 9, 2017.  Less than one (1) month later, on December 7, 2017, N.J. allegedly returned to AMC and was evaluated by a nurse practitioner.  Nurse practitioners must be supervised by a licensed physician and thus necessarily fall into the same "specialty/subspecialty" as their supervising physician.  However, AMC improperly billed this December 7, 2017 examination performed by a nurse practitioner under Agha's alleged supervision billed as a second level 4 initial examination.

- Patient E.L. (Claim No. 0397904939) was allegedly examined at AMC performed by nurse practitioner Deangella Simpson on November 22, 2017, which was billed to Allstate as a level 4 initial examination.  Only six (6) days later on November 28, 2017, Simpson allegedly performed a second examination of E.L. that was improperly billed as another level 4 initial examination.

757.  Northland Chiropractic routinely improperly billed every examination performed by defendant Sagala as "new" patient evaluations.  For example:

- Northland Chiropractic billed Allstate for a level 4 new patient examination of patient A.Y (Claim No. 0275194066) on March 5, 2013.  Over the next one (1) year and three (3) months of purported treatment, Northland Chiropractic submitted five (5) additional charges for purported level 3 new patient initial evaluations, as well as one (1) additional charge for a purported level 4 new patient initial examination.

- Northland Chiropractic billed Allstate for a level 4 new patient examination of patient C.W. (Claim No. 0291832657) on July 1, 2013.  Sagala's next two purported examinations of C.W., allegedly performed on July 29, 2013 and September 3, 2013, were improperly billed as level 3 new patient examinations.  C.W. was then allegedly involved in another motor vehicle accident on January 25, 2014 (Claim No. 0313918708).  Sagala used this purported second motor vehicle accident to again bill Allstate for a level 4 new patient evaluation on February 3, 2014, despite the fact C.W. remained an established patient.  Northland Chiropractic billed Allstate for an additional

two (2) level 3 new patient examinations allegedly performed on April 2, 2014 and October 16, 2014.

- Northland Chiropractic billed Allstate for a level 4 new patient examination of patient V.S. (Claim No. 0344997233) on October 29, 2014.  Within the next five (5) months, Northland Chiropractic submitted three (3) charges for alleged level 3 new patient evaluations, all of which were allegedly performed by the same chiropractor who performed V.S.'s initial examination.

758.   By creating medical bills that included CPT Codes for office visits and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

759.   However, all of the bills prepared, faxed, and mailed by the defendants were submitted using fraudulent and deceptive examination CPT Codes.

760.   As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

## C.   FRAUDULENT P-STIM BILLING

761.   Each time AMC allegedly applied a medically unnecessary and clinically useless P-Stim device, Allstate received a raft of improper charges totaling as much as $9,570.

762.   As detailed above, the application of P-Stim devices was medically unnecessary and therefore non-compensable under the No-Fault Act.

763. The billing practices used in relation to the P-Stim devices were also independently fraudulent.

764. AMC used four (4) separate CPT and HCPCS Codes to bill Allstate for P-Stim devices:

- **63650** – "Percutaneous implantation of neurostimulator electrode array, epidural";

- **64555** – "Percutaneous implantation of neurostimulator, peripheral nerve";

- **95972** – "Electronic analysis of implanted neurostimulator pulse generator system; complex spinal cord or peripheral neurostimulator pulse generator/transmitter, with intraoperative or subsequent programming"; and

- **A6237** – "Hydrocolloid dressing, wound cover, sterile, pad size 16 sq. in. or less, with any size adhesive border, each dressing."

*See* Exhibit 6.

765. P-Stim devices are transcutaneous, not percutaneous, and are simply acupuncture devices affixed to an area behind a patient's ear, not "implanted."

766. Because P-Stim devices are not percutaneous or implanted, none of the codes submitted by AMC for purported application of P-Stim devices correctly describe the service allegedly performed.

767. Further, the services that are described when AMC submitted bills using CPT Code 95972 amount to merely checking the battery of the P-Stim devices.

768. AMC's P-Stim application was routinely billed to Allstate for $520 each time one of its nurse practitioners allegedly checked P-Stim batteries.

769.    AMC also charged Allstate for three (3) units of CPT Codes 63650 and 64555, one (1) for each of the wires of the P-Stim device.

770.    AMC also submitted charges to Allstate for alleged P-Stim application using CPT Code 63650, which describes the implantation of a spinal cord stimulator.

771.    As with CPT Code 64555, charges using CPT Code 63650 were also improperly billed as three (3) units, one for each P-Stim wire.

772.    Allstate is not obligated to pay any pending bills for alleged P-Stim application fraudulently billed using billing codes that do not property describe the treatment performed, and it is entitled to reimbursement for payment already tendered.

### D.    AMC'S FRAUDULENT BILLING FOR EVALUATIONS ASSOCIATED WITH PROCEDURES

773.    AMC also routinely submitted claims for evaluations for which it was not entitled to any payment at all.

774.    The CPT Codes used by AMC for certain procedures are for "global packages," which include all necessary services normally furnished by a physician before, during, and after a procedure.

775.    The amount of post-procedure treatment covered by the CPT Code for the procedure varies between procedures, but always includes at least the evaluation performed on the day of the procedure.

776.   AMC's bills for dates on which procedures were allegedly performed consistently included a charge for the evaluation purportedly performed on the same date, even though evaluations cannot be separately billed unless the medical necessity of a separately identifiable examination is thoroughly documented.

777.   As documented *supra*, AMC's template-based examinations never documented the medical necessity of performing a separate evaluation on the dates on which it allegedly performed these procedures carrying global packages, and instead AMC frequently billed for level four encounters in violation of the global package billing rules.

778.   For example, for patient S.B. (Claim No. 0466511516), AMC billed for alleged P-Stim application on December 7, 2017, a procedure that carries a ten (10) day global billing restriction period.

779.   However, on this same date of service, AMC billed Allstate for a level four examination without properly documenting the examination as a significant, separately identifiable procedure.

780. AMC billed for alleged injections to patient C.B. (Claim No. 0358449998) on January 7, 2017, which include a global billing restriction for the day of the procedures.

781.   On this same date of service, AMC billed Allstate for a level four re-examination without properly documenting the examination as a significant, separately identifiable procedure.

782.   AMC submitted claims for payment and accompanying medical records relative to Allstate patients through the U.S. Mail and interstate wires for examinations fraudulently billed separately from procedures, and Allstate relied upon the same in adjusting the claims.

783.   Allstate is not required to pay AMC for examinations performed during procedures' global package billing restriction period, and is entitled to a return of the monies it paid in reliance on AMC's fraudulent submissions.

## XI.   EXCESSIVE AND UNREASONABLE CHARGES

784.   The defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

### A.   CHARGES SUBMITTED BY METRO MRI

#### 1.   Metro MRI's Representations Regarding Cost and Revenue

785.   On or about July 7, 2016, Metro MRI submitted documents to the Michigan Department of Health and Human Services (MDHHS) in support its application for a CON to acquire an existing mobile MRI host site from an entity called Metropolitan Diagnostic Imaging.  *See* Exhibit 17.

786.   The CON application included a "project costs" component that represented that the total cost to Metro MRI to acquire this CON, including a two (2) year space lease and a two (2) year equipment lease, was $316,656.  Id.

787.   On or about December 7, 2016, Metro MRI submitted documents to the MDHHS in support of an additional CON acquisition that included a "project costs" component representing that the total two (2) year costs to Metro MRI to acquire this second CON was $134,736.  *See* Exhibit 18.

788.   In total, Metro MRI's CON applications represent costs to it of approximately $225,000 per year to operate the two (2) separate MRI host sites it used to generate charges to Allstate.

### 2.   Metro MRI's Charges to Allstate

789.   Metro MRI began regularly billing Allstate for the purported performance of MRIs of patients at issue herein on December 18, 2016, and continues to bill Allstate to the date of this filing.  *See* Exhibit 10.

790.   Metro MRI has submitted the following charges for the MRIs purportedly rendered:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70551 | Brain MRI, without contrast | $4950.00 to $5,800.00 |
| 72141 | Cervical MRI, without contrast | $4,900.00 to $5,000.00 |
| 72146 | Thoracic MRI, without contrast | $4,900.00 to $5,000.00 |
| 72148 | Lumbar MRI, without contrast | $4,900.00 to $5,000.00 |
| 73221 | Upper extremity joint MRI, without contrast | $4,900.00 to $5,000.00 |
| 73721 | Lower extremity MRI, without contrast | $5,000.00 |

791.   As documented above, Metro MRI billed Allstate at least $4,900.00 for each MRI since commencing operations.

792.   Because Metro MRI almost always billed for multiple MRIs of patients, and because of its unreasonable charges per MRI, Metro MRI has billed Allstate more than $994,150 in the less than four (4) years it has existed.

793.   The amount billed to Allstate alone (excluding all other insurers and payors in the State of Michigan) is nearly double the amount of the total cost to Metro MRI to operate its business.

794.   In other words, Metro MRI's charges were so excessive and unreasonable, that it billed Allstate enough to make a nearly 70% profit on its investment even before it submitted a single charge to any other payor.

795.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

796.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

797.   Metro MRI's charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### 3.   Metro MRI's Charges Far Exceeded the Amounts Paid by Other Michigan Payors

798.   In addition to its charges being unreasonable and excessive, Metro MRI's charges are also grossly excessive when compared to other prominent Michigan payors.

799.   For example, Medicare paid for MRIs performed in Macomb, Oakland, and Wayne counties at the following amounts for MRIs performed in 2015 through 2018:

|  | 2015A | 2015B | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **CPT Code 70551** | $230.15 | $231.30 | $232.01 | $234.22 | $236.32 |
| **CPT Code 72141** | $244.06 | $224.52 | $225.73 | $228.00 | $229.91 |
| **CPT Code 72146** | $223.40 | $224.52 | $225.73 | $228.35 | $230.26 |
| **CPT Code 72148** | $223.33 | $223.44 | $224.66 | $227.29 | $229.91 |
| **CPT Code 73221** | $235.81 | $236.99 | $237.80 | $240.78 | $242.67 |
| **CPT Code 73721** | $325.45 | $236.63 | $238.16 | $240.42 | $242.67 |

800.   Michigan Medicaid paid for MRIs performed from 2015 through 2018 at the following amounts:

161

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| CPT Code 70551 | $127.77 | $128.37 | $129.16 | $129.76 |
| CPT Code 72141 | $124.01 | $124.80 | $125.60 | $126.19 |
| CPT Code 72146 | $124.01 | $124.80 | $125.79 | $126.39 |
| CPT Code 72148 | $123.22 | $124.21 | $125.20 | $126.19 |
| CPT Code 73221 | $130.75 | $131.54 | $132.73 | $133.32 |
| CPT Code 73721 | $130.75 | $131.74 | $132.53 | $133.32 |

801.  The Michigan workers' compensation program paid for MRIs performed from 2015 through 2018 at the following amounts:

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| CPT Code 70551 | $321.48 | $298.30 | $300.36 | $304.95 |
| CPT Code 72141 | $319.35 | $290.21 | $292.34 | $296.70 |
| CPT Code 72146 | $319.35 | $290.21 | $292.79 | $297.16 |
| CPT Code 72148 | $319.99 | $288.84 | $291.43 | $296.70 |
| CPT Code 73221 | $334.04 | $305.46 | $308.47 | $312.95 |
| CPT Code 73721 | $334.51 | $305.92 | $308.02 | $312.95 |

802.  The payment amounts from other payors are indicative of the range for what a reasonable charge and payment is per MRI.

803.  Metro MRI's charges are well outside this range and the spectrum of reasonableness and the defendants cannot sustain their burden of proving otherwise.

**B.    EXCESSIVE AND UNREASONABLE TRANSPORTATION CHARGES**

804.  The transportation charges submitted by Motion Transportation and Rent A Ride to Allstate are unreasonable and excessive.

162

805.   Neither Motion Transportation nor Rent A Ride used medical or specialized vehicles, but rather just used normal vehicles to transport (if at all) patients.  In other words, there was nothing unique or special about the transportation billed by Motion Transportation or Rent A Ride.

806.   For most patients at issue herein, Motion Transportation billed Allstate $30 pick-up and drop off fees, plus $2.50 per mile per day per patient.

807.   Rent A Ride nearly always billed Allstate exactly $230 per day per patient, regardless of the distance traveled between a patient's home and clinic to which he or she was allegedly transported.

808.   Both Motion Transportation and Rent A Ride billed these unreasonable amounts even when they transported multiple patients in the same vehicle at the same time.

809.   The charges for transportation services submitted by Motion Transportation and Rent A Ride are particularly unreasonable when compared to pricing from taxicab or ridesharing services for the same distance.

810.   For example, Motion Transportation submitted bills to Allstate for patient J.P. (Claim No. 0507664340) charging a $30 pick-up fee and a total mileage charge of $148.50 ($2.50 per mile) for a $178.50 total charge for roundtrip transportation to Kinetix on each date of service.

811.   These rates are more than triple the cost to take an application-based ride-hailing service, such as Uber or Lyft, or a roundtrip taxi.

812.   J.P. could have obtained transportation to Kinetix in a taxi, with 15% tip, for $30.68.

813.   If J.P. were to ride as a single passenger using Uber, his estimated fare would be $24.19 in each direction.

814.   If J.P. were to ride as a single passenger using Lyft, his estimated fare would be $24-$28 in each direction.

815.   Despite these outrageous charges for J.P. alone, J.P. testified that Motion Transportation transported other passengers at the same time.

816.   Patient C.R. (Claim No. 0519936925) allegedly received roundtrip transportation to Level 1 of Michigan billed by Rent A Ride.

817.   Rent A Ride billed $230.00 per trip for 137 purported dates of service over more than ten (10) months.

818.   This uniform $230.00 charge is grossly excessive considering C.R. was transported less than thirteen (13) miles in each direction, yet was uniformly billed at this exorbitant rate to improperly generate more than $30,000 in transportation charges for C.R. alone.

819.   Motion Transportation and Rent A Ride charged excessive rates for transportation services and cannot sustain their burden of proving otherwise.

## C.  Excessive and Unreasonable Urine Drug Testing Charges

820.   AMC routinely submitted charges to Allstate that were hundreds of times more than the customary amounts charged by other providers for the same urine drug testing services.

821.   AMC's billing rates were set by a third party who lives in Florida named David Winter ("Winter"), who owns and operates billing companies called Claims Reimbursement Specialists, LLC and GLM Healthcare Services, Inc.

822.   As discussed *supra,* Hassan, who controlled AMC despite not having any medical licensure or certification, informed Allstate that presumptive urine drug testing is billed for every patient because AMC is located in a "high risk" area.

823.   These purported presumptive tests included testing conducted using reagent dipsticks that were billed to Allstate using CPT Code 80305 for $400.00 per test.

824.   Reagent dipsticks can be purchased for less than $1.00, and the highest-end reagent dipstick products rarely sell for more than $5.00 each.

825.   The process of performing a reagent dipstick test takes only seconds.

826.   The 2017 Medicare fee schedule amount for performing a urine screen with a reagent dipstick is $14.86.

827.   AMC also submitted charges for purported presumptive urine drug testing performed by chemistry analyzing instruments using CPT Code 80307.

828.   The 2017 Medicare fee schedule amount for presumptive urine drug testing using chemistry analyzing instruments was $79.25.

829.   AMC charged Allstate as much as $1,400.00 for this same testing.

830.   In addition to being significantly excessive, AMC's charges for presumptive drug testing using CPT Code 80307 fluctuated greatly for no apparent reason.

831.   For example, AMC billed Allstate $165.00 for an alleged urine screen of patient J.M. (TXA-0193420) on March 14, 2018.  AMC then submitted a second bill for this same alleged urine screen that charged $1,400.00.

832.   AMC billed Allstate various amounts using the same CPT Code 80307 for the same type of urine screens performed on patient C.B. (Claim No. 0358449998), including $660.00 on May 20, 2017, $165.00 on June 6, 2018, $1,400.00 on July 25, 2018, and $1,200.00 on December 13, 2018.

833.   There is no basis for these extreme fluctuations in charges for the same service, and nearly all were many times higher than any charge that could be considered reasonable for this basic test.

834.   Allstate is not obligated to pay any pending bills for urine drug testing billed by AMC at excessive amounts, and it is entitled to reimbursement for all bills for which it has already tendered payment.

### D.   EXCESSIVE AND UNREASONABLE DME CHARGES

835.   In addition to being medically unnecessary and issued contrary to applicable standards of care, as discussed *supra*, items of DME issued by AMC were charged at unreasonable rates.

836.   As discussed above, the predetermined treatment protocol used by the defendants involved the issuance of DME, including a variety of knee and back braces and TENS devices.

837.   All of the DME billed by AMC was charged at outrageous prices many times higher than the actual cost of these off-the-shelf (i.e., non-custom) braces.

838.   For example, for patient G.N. (Claim No. 0394032551), AMC billed Allstate $11,750 for a back brace allegedly provided on June 23, 2016 using HCPCS Code L0648 *("Lumbar-sacral orthosis, sagittal control, with rigid anterior and posterior panels, posterior extends from sacrococcygeal junction to t-9 vertebra, produces intracavitary pressure to reduce load on the intervertebral discs, includes straps, closures, may include padding, shoulder straps, pendulous abdomen design, prefabricated, off-the-shelf").*

839.   This same type of brace can be purchased on Amazon for $60.00:

Alpha Medical Pain Relieving Back Brace, Lumbo-Sacral Orthosis Corset, Spinal Decompression, LSO, L0631 / L0648, Universal Back Support
by Alpha Medical
★★★★☆   15 customer reviews
Amazon's Choice   for "lso back brace"

Price: $60.00 & FREE Shipping. Details

840.   DME charged for more than 195 times its publically available purchase price cannot be considered a "reasonable" charge, and AMC cannot sustain its burden of proving otherwise.

841.   AMC also charged Allstate $3,555.00 for a TENS device allegedly issued to G.N.

842.   The 2020 CMS average payment amount for TENS devices is approximately $75.00, and TENS units can be purchased for less than $40.00 retail.

843.   AMC routinely charged Allstate at least $1,800.00 for a back brace using HCPCS Code L0650, including billing as much as $2,480.00 for such a brace allegedly issued to patient C.B. (Claim No. 0358449998).

844.   This same back brace can be purchased retail for less than $90.00:



845.   AMC also frequently billed Allstate $1,600.00 for a knee brace using HCPCS Codes L1832 and L1833, a device which can be purchased for less than $65.00:



846.   AMC uniformly charged Allstate $295.00 using HCPCS Code L3908 for a wrist brace that can be purchased retail for less than $30.00.

847.   Allstate is not required to compensate AMC for DME fraudulently billed pursuant to a predetermined treatment protocol, or charged for more than reasonable and customary rates, and is entitled to return of all sums paid due to the fraudulent issuance of DME by AMC.

## XII.   <u>MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE</u>

### A.   <u>MISREPRESENTATIONS BY THE DEFENDANTS</u>

848.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

849.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

850.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

851.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault payments, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

852.   There are no less than seventeen (17) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

    a.   AMC, Kinetix, Level 1 of Michigan, Level 1 PT & Rehab, Michigan First, Northland Chiropractic, Northland Healthcare, Motion Transportation, Rent A Ride, Norman Dehko, Sabah Dehko, Jordan Dehko, Sagala, Shah, and Hassan billed Allstate for treatment and services that were not actually provided as evidenced, *inter alia*, by the multiple patients at issue in this Complaint who testified under oath that they did not receive the treatment or services that the defendants billed to Allstate.

    b.   The defendants offered improper inducements to patients to undergo medically unnecessary treatments, including cash payments.

c.    The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with each other. The defendants utilized tow truck drivers, runners, police reports, hospitals, and telephonic solicitation to identify and recruit individuals who claimed to be in motor vehicle accidents to receive unnecessary treatment and intentionally sought out patients who did not require medical care. The defendants' methods of obtaining patients did not include considerations of medical necessity and allowed individuals with no medical training to control patients' treatment. The defendants participated in numerous *quid pro quo* relationships that derived profit for themselves without regard for the necessity and lawfulness of medical treatment.

d.    AMC and Level 1 altered and fabricated medical records submitted to Allstate to induce payment, including by falsifying patient histories and misrepresenting the qualifications of the individuals who purportedly performed the services.

e.    The defendants used an improper predetermined treatment protocol, implemented by use of pre-printed and boilerplate purported examination findings, to order excessive physical therapy, chiropractic treatment, urine drug testing, medically useless P-Stim devices, injections, electrodiagnostic testing, DME, medications, and MRIs. This predetermined protocol is confirmed by the identical purported findings and treatment plans ordered for patients at issue in this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

f.    AMC billed for unnecessary and excessive urine drug testing. AMC also made referrals to associated entities for medically unnecessary and redundant testing. Numerous patients at issue in this Complaint received definitive urine drug testing with no justification or basis for such testing. AMC billed for purported drug testing for nearly every patient at every appointment, regardless of whether medications were actually prescribed. This further demonstrates that the defendants conducted urine drug testing as part of a predetermined treatment protocol and not based upon the particular needs of the patient.

g.    AMC, Select Medical, Sagala, and Hassan indiscriminately referred patients for physical therapy and chiropractic treatment at the defendant

clinics without any individual determination of medical necessity, and without any evaluation of the efficacy of such treatment. The defendants' *quid pro quo* referral relationship is evidenced by the numerous emails and payments exchanged between the defendants and AMC's initial examination notes that explicitly identify "1-800-PAIN" and "Level 1" as patient referral sources.

h.     AMC, Select Medical, Sagala, and Hassan referred patients for MRIs, and Metro MRI billed for MRIs, that were medically unnecessary and performed in violation of applicable standards of care in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

i.     Metro MRI submitted bills to Allstate seeking payment for medically unnecessary MRIs that were ordered as a matter of course at the outset of treatment and were excessive in number.

j.     AMC, Level 1 of Michigan, Michigan First, Metro MRI, Norman Dehko, Sabah Dehko, and Jordan Dehko submitted bills to Allstate for unlawful and unlicensed treatment and services. AMC billed for unlicensed issuance of DME and narcotic medication prescribed in violation of Michigan law and Motion Transportation and Rent A Ride billed for unlicensed transportation services. Allstate is not required to pay the defendants for unlawful treatment that violated Michigan laws and regulations.

k.     AMC prescribed medications, including narcotics, on a *pro forma* basis in an attempt to incentivize patients to continue to return to the clinic for medically unnecessary treatment. The predetermined nature of the prescriptions written by the defendants is evidenced by the lack of influence of urine drug test results on their prescription habits, which continued without change even in the face of evidence that patients were abusing or diverting the drugs prescribed.

l.     AMC ordered and billed for medically unnecessary injections and electrodiagnostic testing in violation of applicable standards of care.

m.     AMC and Hassan fraudulently submitted claims for payment to Allstate for alleged urine drug testing and DME that were also billed by

different medical providers for the exact same purported testing and equipment.

n.    AMC, Northland Chiropractic, Sagala, and Hassan fraudulently upcoded office visits, as the vast majority of the office visits billed to Allstate were for level four or level five even though the office visits did not meet the criteria set by the AMA to bill at such high levels. When done intentionally, as the defendants did, upcoding constitutes a fraudulent billing practice.

o.    AMC, Select Medical, Kinetix, Level 1 Health, Level 1 PT & Rehab, Northland Healthcare, Northland Chiropractic, Sagala, Shah, and Hassan submitted claims using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

p.    AMC and Hassan submitted charges to Allstate for clinically-useless P-Stim acupuncture devices using CPT Codes that they knew described procedures that were far more complex and invasive than P-Stim, which merely involves placing an adhesive behind patients' ears.

q.    AMC, Metro MRI, Motion Transportation, Rent A Ride, Norman Dehko, Shah, and Hassan submitted charges to Allstate at amounts that were excessive and unreasonable for nearly all services at issue herein, including P-Stim, MRIs, transportation, urine drug testing, and DME.

853.   As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and rendered treatment without basis or adequate substantiation.

854.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

855.   The foregoing facts – billing for services not rendered, unlawfully soliciting patients, paying kickbacks, falsifying documents to justify excessive

treatment and improper referrals, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of treatment and testing on submitted bills – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

856.  Allstate had and has no contractual relationship with any of the defendants at all, including with respect to the claims at issue herein, and had no access to information or documents exposing the defendants' fraudulent conduct until it conducted the investigation that led to the filing of this action.

857.  Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing allegedly provided by the defendants unnecessary and unlawful.

858.  The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 12.

859.  Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

860. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

861. Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, screenings, testing, procedures, and ancillary services for which they billed Allstate.

862. As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

## B. ALLSTATE'S JUSTIFIABLE RELIANCE

863. The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

864. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided

and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

865. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

866. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

867. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

868. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

869. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

870.   As a result, Allstate has paid in excess of $563,804 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XIII.  **MAIL AND WIRE FRAUD RACKETEERING ACTIVITY**

871.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

872.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 12, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were a product of unlawful solicitation, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

873.   This objective necessarily required the submission of claims for payment to Allstate.

874.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

177

875.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

876.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Georgia until November 2013 and thereafter were faxed to Allstate in Iowa.

877.   Allstate received all medical records and bills faxed to it by the defendants in Georgia until November 2013 and thereafter in Iowa.

878.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the applications, notice of claim, insurance payments, benefits payment checks, and the return of the cancelled check drafts.

879.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

880.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

881.   The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

882.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 19.

883.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

884.   It was within the ordinary course of business for Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, and Rent A Ride to submit claims for No-Fault payment to insurance carriers like Allstate through interstate wires and the U.S. Mail.

885.   Moreover, the business of providing medical services by each of the Defendant Entities at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

886.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

887.   The Defendant Entities, at the direction and with the knowledge of their owners and managers (i.e., the individual defendants), continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

888.   Thus, the defendants' commission of mail and wire fraud continues.

889.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

890.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

891.   Allstate reasonably relied on the submissions it received from Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, and Rent A Ride, including the representative submissions set out in Exhibits 1 through 12 annexed hereto and identified in the exemplar claims above.

892.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIV.  **DAMAGES**

893.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

894.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $563,804.

895.   Exhibits 20 through 30 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to and for the benefit of the defendants by date, payor, patient claim number, check number, and amount.

896.   Exhibit 20 (Kinetix), 21 (Level 1 PT & Rehab), 22 (Level 1 Health), 23 (Level 1 of Michigan), 24 (AMC), 25 (Select Medical), 26 (Northland Healthcare), 27 (Northland Chiropractic), 28 (Metro MRI), 29 (Motion Transportation), and 30 (Rent A Ride), annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

897. Allstate's claim for compensatory damages, as set out in Exhibits 20 through 30, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

898. Every payment identified in Exhibits 20 through 30 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 20 through 30.

899. Moreover, every payment identified in Exhibits 20 through 30 derives from a check sent by Allstate to the defendants through the U.S. Mail.

900. As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

901. Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

902. Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XV.   CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Kinetix Enterprise)
### Against Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems, LLC, Motion Transportation, Inc., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, and Zahir Shah, P.T.

903.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

904.   Kinetix constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

905.   In connection with each of the claims identified in the within Complaint, Level 1 PT & Rehab, Level 1 Health, Motion Transportation, Somerset Auto, 1-800-PAIN, Norman Dehko, and Shah ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Kinetix, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Kinetix's business, or should have reasonably foreseen that the mailing of such false medical documentation by Kinetix would occur, in furtherance of the Count I defendants' scheme to defraud.

906.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

907.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Kinetix, which they knew would be billed by Kinetix, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

908.   Shah owned and managed Kinetix and was responsible for all actions taken by Kinetix and its staff.

909.   Motion Transportation and Shah were responsible for transporting patients to Kinetix for unnecessary treatment, which allowed Kinetix to submit bills to Allstate.

910.   Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful and unnecessary treatment by Kinetix that was billed to Allstate.

911.   Level 1 PT & Rehab and Level 1 Health made and received patient referrals to and from Kinetix that allowed Kinetix to continue billing Allstate and falsely giving the appearance of injury.

912.   The Count I defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Kinetix to continue providing unlawful and medically unnecessary treatment, if provided at all.

913.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Kinetix for the benefit of the Count I defendants that would not otherwise have been paid.

914.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

915.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Kinetix Enterprise)
### Against Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems, LLC, Motion Transportation, Inc., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, and Zahir Shah, P.T.

916.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

917.   Defendants Level 1 PT & Rehab, Level 1 Health, Motion Transportation, Somerset Auto, 1-800-PAIN, Norman Dehko, and Shah ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Kinetix.

918.   The Count II defendants each agreed to further, facilitate, support, and operate the Kinetix enterprise.

919.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

920.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Kinetix even though Kinetix was not eligible to collect such payments by virtue of its unlawful conduct.

921.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

922.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

923.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

# COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Level 1 PT & Rehab Enterprise)
### Against Kinetix Rehab Services, Inc., Motion Transportation, Inc., and Zahir Shah, P.T.

924.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

925.   Level 1 PT & Rehab constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

926.   In connection with each of the claims identified in the within Complaint, Kinetix, Motion Transportation, and Shah ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Level 1 PT & Rehab, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Level 1 PT & Rehab's business, or should have reasonably foreseen that the mailing of such false medical documentation by Level 1 PT & Rehab would occur, in furtherance of the Count III defendants' scheme to defraud.

927.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

928. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Level 1 PT & Rehab, which they knew would be billed by Level 1 PT & Rehab, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

929. Shah owned and managed Level 1 PT & Rehab and was responsible for all actions taken by Level 1 PT & Rehab and its staff.

930. Motion Transportation and Shah were responsible for transporting patients to Level 1 PT & Rehab for unnecessary physical therapy, which allowed it to bill Allstate.

931. Kinetix made and received patient referrals to and from Level 1 PT & Rehab that allowed Level 1 PT & Rehab to continue billing Allstate and falsely giving the appearance of injury.

932. The Count III defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Level 1 PT & Rehab to continue providing unlawful and medically unnecessary treatment, if provided at all.

933. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Level 1 PT & Rehab for the benefit of the Count III defendants that would not otherwise have been paid.

934.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

935.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Level 1 PT & Rehab Enterprise)
### Against Kinetix Rehab Services, Inc., Motion Transportation, Inc., and Zahir Shah, P.T.

936.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

937.   Defendants Kinetix, Motion Transportation, and Shah ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Level 1 PT & Rehab.

938.   The Count IV defendants each agreed to further, facilitate, support, and operate the Level 1 PT & Rehab enterprise.

939.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

940.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Level 1 PT & Rehab even though Level 1 PT & Rehab was not eligible to collect such payments by virtue of its unlawful conduct.

941.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

942.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

943.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Level 1 Health Enterprise)
### Against Kinetix Rehab Services, Inc., Northland Healthcare Services PLLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Zahir Shah, P.T., and Geoffrey Sagala, D.C.

944.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

945.   Level 1 Health constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

946.   In connection with each of the claims identified in the within Complaint, Kinetix, Northland Healthcare, Somerset Auto, 1-800-PAIN, Norman Dehko, Shah, and Sagala ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Level 1 Health, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Level 1 Health's business, or should have reasonably foreseen that the mailing of such false medical documentation by Level 1 Health would occur, in furtherance of the Count V defendants' scheme to defraud.

947.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

948.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Level 1 Health, which they knew would be billed by Level 1 Health, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

949.   Norman Dehko controlled Level 1 Health and was responsible for all actions taken by Level 1 Health and its staff.

950.   Sagala signed medical records and bills on behalf of Level 1 Health for treatment that he allegedly performed on patients at issue herein.

951.   Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Level 1 Health that was billed to Allstate.

952.   Kinetix, Northland Healthcare, Shah, and Sagala made and received patient referrals to and from Level 1 Health that allowed Level 1 Health to continue billing Allstate and falsely giving the appearance of injury.

953.   The Count V defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Level 1 Health to continue providing unlawful and medically unnecessary treatment, if provided at all.

954.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Level 1 Health for the benefit of the Count V defendants that would not otherwise have been paid.

955.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

956.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Level 1 Health Enterprise)
**Against Kinetix Rehab Services, Inc., Northland Healthcare Services PLLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Zahir Shah, P.T., and Geoffrey Sagala, D.C.**

957.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

958.   Defendants Kinetix, Northland Healthcare, Somerset Auto, 1-800-PAIN, Norman Dehko, Shah, and Sagala ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Level 1 Health.

959.   The Count VI defendants each agreed to further, facilitate, support, and operate the Level 1 Health enterprise.

960.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

961.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Level 1 Health even though Level 1 Health was not eligible to collect such payments by virtue of its unlawful conduct.

962.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

963.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

964.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Level 1 of Michigan Enterprise)
**Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.**

965.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

966.   Level 1 of Michigan constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

967.   In connection with each of the claims identified in the within Complaint, AMC, Select Medical, Northland Healthcare, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Hassan, and Sagala ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Level 1 of Michigan, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Level 1 of Michigan's business, or should have reasonably foreseen that the mailing of such false medical documentation by Level 1 of Michigan would occur, in furtherance of the Count VII defendants' scheme to defraud.

968.   The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates,

including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

969.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Level 1 of Michigan, which they knew would be billed by Level 1 of Michigan, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

970.   Norman Dehko and Sabah Dehko controlled Level 1 of Michigan and were responsible for all actions taken by Level 1 of Michigan and its staff.

971.   AMC, Select Medical, Northland Healthcare, Hassan, and Sagala were responsible for the prescriptions, diagnoses, and referrals that allowed Level 1 of Michigan to submit bills to Allstate for medically unnecessary treatment.

972.   Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Level 1 of Michigan billed to Allstate.

973.   Rent A Ride and Norman Dehko were responsible for transporting patients to Level 1 of Michigan for unnecessary physical therapy, which allowed Level 1 of Michigan to submit bills to Allstate.

974.   The Count VII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Level 1 of Michigan to continue providing unlawful and medically unnecessary treatment, if provided at all.

975.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Level 1 of Michigan for the benefit of the Count VII defendants that would not otherwise have been paid.

976.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

977.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Level 1 of Michigan Enterprise)**
**Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group
of Michigan PLLC, Northland Healthcare Services PLLC, Rent A Ride of
Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-
PAIN-800, Norman Dehko, Sabah Dehko, Najm-Ul Hassan, and Geoffrey
Sagala, D.C.**

978.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 902 set forth above as if fully set forth herein.

979.    Defendants AMC, Select Medical, Northland Healthcare, Rent A Ride,

Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Hassan, and Sagala

("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c)

through the facilitation of the operation of Level 1 of Michigan.

980.    The Count VIII defendants each agreed to further, facilitate, support,

and operate the Level 1 of Michigan enterprise.

981.    As such, the Count VIII defendants conspired to violate 18 U.S.C. §

1962(c).

982.    The purpose of the conspiracy was to obtain insurance payments from

Allstate on behalf of Level 1 of Michigan even though Level 1 of Michigan was not

eligible to collect such payments by virtue of its unlawful conduct.

983.    The Count VIII defendants were aware of this purpose and agreed to

take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

984.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

985.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan First Enterprise)
### Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Jordan Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.

986.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

987.   Michigan First constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

988.   In connection with each of the claims identified in the within Complaint, AMC, Select Medical, Somerset Auto, 1-800-PAIN, Norman Dehko, Jordan Dehko, Hassan, and Sagala ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Michigan First, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Michigan First's business, or should have reasonably foreseen that the mailing of such false medical documentation by Michigan First would occur, in furtherance of the Count IX defendants' scheme to defraud.

989.   The Count IX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

990.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Michigan First, which they knew would be billed by Michigan First, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

991.   Jordan Dehko and Norman Dehko controlled Michigan First and were responsible for all actions taken by Michigan First and its staff.

992.   AMC, Select Medical, Sagala, and Hassan were responsible for the medically unnecessary physical therapy prescriptions that allowed Michigan First to submit bills to Allstate.

993.   Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Michigan First that was billed to Allstate.

994.   The Count IX defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Michigan First to continue providing unlawful and medically unnecessary treatment, if provided at all.

995.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

996.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Michigan First Enterprise)
### Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Jordan Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.

997.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

998.   Defendants AMC, Select Medical, Somerset Auto, 1-800-PAIN, Norman Dehko, Jordan Dehko, Hassan, and Sagala ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Michigan First.

999.   The Count X defendants each agreed to further, facilitate, support, and operate the Michigan First enterprise.

1000. As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

1001. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Michigan First even though Michigan First was not eligible to collect such payments by virtue of its unlawful conduct.

1002. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to

Allstate of insurance claim and medical record documents containing material misrepresentations.

1003. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has expended costs in investigating and adjusting the fraudulent claims caused to be submitted by the Count X defendants.

1004. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(AMC Enterprise)**
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, and Najm-Ul Hassan**

1005. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1006. AMC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1007. In connection with each of the claims identified in the within Complaint, Level 1 of Michigan, Michigan First, Metro MRI, Somerset Auto, 1-

203

800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, and Hassan ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by AMC, or knew that such false medical documentation would be faxed and mailed in the ordinary course of AMC's business, or should have reasonably foreseen that the mailing of such false medical documentation by AMC would occur, in furtherance of the Count XI defendants' scheme to defraud.

1008.  The Count XI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

1009.  As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by AMC, which they knew would be billed by AMC, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1010.  Hassan controlled AMC and was responsible for all actions taken by AMC and its staff.

1011.  Level 1 of Michigan, Michigan First, Metro MRI, Sabah Dehko, and Jordan Dehko billed Allstate for medically unnecessary treatment, testing, and services ordered and prescribed by AMC, which were used to create the appearance

that AMC was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment.

1012. Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by AMC that was billed to Allstate.

1013. The Count XI defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted AMC to continue providing unlawful and medically unnecessary treatment, if provided at all.

1014. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to AMC for the benefit of the Count XI defendants that would not otherwise have been paid.

1015. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1016. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(AMC Enterprise)**
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab,**
**LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln**
**International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan**
**Dehko, and Najm-Ul Hassan**

1017. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1018. Defendants Level 1 of Michigan, Michigan First, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, and Hassan ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of AMC.

1019. The Count XII defendants each agreed to further, facilitate, support, and operate the AMC enterprise.

1020. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1021. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of AMC even though AMC was not eligible to collect such payments by virtue of its unlawful conduct.

1022. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

1023. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

1024. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Select Medical Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, and Geoffrey Sagala, D.C.**

1025. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1026. Select Medical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1027. In connection with each of the claims identified in the within Complaint, Level 1 of Michigan, Michigan First, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, and Sagala ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Select Medical, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Select Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by Select Medical would occur, in furtherance of the Count XIII defendants' scheme to defraud.

1028. The Count XIII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

1029. As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Select Medical, which they knew would be billed by Select Medical, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1030. Sagala controlled Select Medical and was responsible for all actions taken by Select Medical and its staff.

1031. Level 1 of Michigan, Michigan First, Metro MRI, Sabah Dehko, and Jordan Dehko billed Allstate for medically unnecessary treatment, testing, and services prescribed by Select Medical, which were used to create the appearance that Select Medical was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment.

1032. Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Select Medical that was billed to Allstate.

1033. The Count XIII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Select Medical to continue providing unlawful and medically unnecessary treatment, if provided at all.

1034. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Select Medical for the benefit of the Count XIII defendants that would not otherwise have been paid.

1035. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1036. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT XIV**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Select Medical Enterprise)**
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, and Geoffrey Sagala, D.C.**

1037. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1038. Defendants Level 1 of Michigan, Michigan First, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, and Sagala ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Select Medical.

1039. The Count XIV defendants each agreed to further, facilitate, support, and operate the Select Medical enterprise.

1040. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

1041. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Select Medical even though Select Medical was not eligible to collect such payments by virtue of its unlawful conduct.

1042. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1043. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XIV defendants' unlawful conduct described herein.

1044. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Northland Healthcare Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Northland Chiropractic Centre P.C., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Geoffrey Sagala, D.C.**

1045.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1046.  Northland Healthcare constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1047. In connection with each of the claims identified in the within Complaint, Level 1 of Michigan, Northland Chiropractic, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, and Sagala ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Northland Healthcare, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Northland Healthcare's business, or should have reasonably foreseen that the mailing of such false medical documentation by Northland Healthcare would occur, in furtherance of the Count XV defendants' scheme to defraud.

1048.  The Count XV defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

212

1049. As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Northland Healthcare, which they knew would be billed by Northland Healthcare, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1050. Sagala controlled Northland Healthcare and was responsible for all actions taken by Northland Healthcare and its staff.

1051. Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Northland Healthcare that was billed to Allstate.

1052. Level 1 of Michigan and Sabah Dehko made and received patient referrals to and from Northland Healthcare that allowed Northland Healthcare to continue billing Allstate and falsely giving the appearance of injury.

1053. The Count XV defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Northland Healthcare to continue providing unlawful and medically unnecessary treatment, if provided at all.

1054. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Northland Healthcare for the benefit of the Count XV defendants that would not otherwise have been paid.

1055. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1056. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### <u>COUNT XVI</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Northland Healthcare Enterprise)**
**Against Level 1 Health Systems of Michigan, LLC, Northland Chiropractic Centre P.C., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Geoffrey Sagala, D.C.**

1057. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1058. Defendants Level 1 of Michigan, Northland Chiropractic, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, and Sagala ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Northland Healthcare.

1059. The Count XVI defendants each agreed to further, facilitate, support, and operate the Northland Healthcare enterprise.

1060. As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

1061. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Northland Healthcare even though Northland Healthcare was not eligible to collect such payments by virtue of its unlawful conduct.

1062. The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1063. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XVI defendants' unlawful conduct described herein.

1064. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Northland Chiropractic Enterprise)
### Against Northland Healthcare Services PLLC and Geoffrey Sagala, D.C.

1065. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1066. Northland Chiropractic constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1067. In connection with each of the claims identified in the within Complaint, Northland Healthcare and Sagala ("Count XVII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Northland Chiropractic, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Northland Chiropractic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Northland Chiropractic would occur, in furtherance of the Count XVII defendants' scheme to defraud.

1068. The Count XVII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

1069. As documented above, the Count XVII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Northland Chiropractic, which they knew would be billed by Northland Chiropractic, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1070. Sagala controlled Northland Chiropractic and was responsible for all actions taken by Northland Chiropractic and its staff.

1071. Northland Healthcare made and received patient referrals to and from Northland Chiropractic that allowed Northland Chiropractic to continue billing Allstate and falsely giving the appearance of injury.

1072. The Count XVII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Northland Chiropractic to continue providing unlawful and medically unnecessary treatment, if provided at all.

1073. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Northland Chiropractic for the benefit of the Count XVII defendants that would not otherwise have been paid.

1074. The Count XVII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1075. By virtue of the Count XVII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XVIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Northland Chiropractic Enterprise)
### Against Northland Healthcare Services PLLC and Geoffrey Sagala, D.C.

1076. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1077. Defendants Northland Healthcare and Sagala ("Count XVIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Northland Chiropractic.

1078. The Count XVIII defendants each agreed to further, facilitate, support, and operate the Northland Chiropractic enterprise.

1079. As such, the Count XVIII defendants conspired to violate 18 U.S.C. § 1962(c).

1080. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Northland Chiropractic even though Northland Chiropractic was not eligible to collect such payments by virtue of its unlawful conduct.

1081. The Count XVIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1082. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XVIII defendants' unlawful conduct described herein.

1083. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
## VIOLATION OF 18 U.S.C. § 1962(c)
## (Metro MRI Enterprise)
## Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Rent A Ride of Michigan, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.

1084.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1085.  Metro MRI constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1086. In connection with each of the claims identified in the within Complaint, AMC, Select Medical, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Hassan, and Sagala ("Count XIX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Metro MRI, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Metro MRI's business, or should have reasonably foreseen that the mailing of such false medical documentation by Metro MRI would occur, in furtherance of the Count XIX defendants' scheme to defraud.

1087. The Count XIX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

1088. As documented above, the Count XIX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Metro MRI, which they knew would be billed by Metro MRI, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1089. Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful imaging by Metro MRI that was billed to Allstate.

1090. AMC, Select Medical, Hassan, and Sagala were responsible for the MRI prescriptions that allowed Metro MRI to submit bills to Allstate for medically unnecessary imaging.

1091. Rent A Ride and Norman Dehko were responsible for transporting patients to Metro MRI for unnecessary imaging.

1092. The Count XIX defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Metro MRI to continue providing unlawful and medically unnecessary treatment, if provided at all.

1093. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Metro MRI for the benefit of the Count XIX defendants that would

not otherwise have been paid.

1094.  The Count XIX defendants' conduct in violation of 18 U.S.C. § 1962(c)

was the direct and proximate cause of Allstate's injury.

1095. By virtue of the Count XIX defendants' violation of 18 U.S.C. §

1962(c), Allstate is entitled to recover from them three times the damages sustained

by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit,

including reasonable attorney's fees.

## <u>COUNT XX</u>
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Metro MRI Enterprise)
### Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Rent A Ride of Michigan, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.

1096.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 902 set forth above as if fully set forth herein.

1097.  Defendants AMC, Select Medical, Rent A Ride, Somerset Auto, 1-800-

PAIN, Norman Dehko, Hassan, and Sagala ("Count XX defendants") conspired with

each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of

Metro MRI.

1098. The Count XX defendants each agreed to further, facilitate, support, and operate the Metro MRI enterprise.

1099. As such, the Count XX defendants conspired to violate 18 U.S.C. § 1962(c).

1100. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Metro MRI even though Metro MRI was not eligible to collect such payments by virtue of its unlawful conduct.

1101. The Count XX defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1102. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XX defendants' unlawful conduct described herein.

1103. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XX defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XX defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Motion Transportation Enterprise)
### Against Kinetix Rehab Services, Inc., Level 1 Physical Therapy & Rehab LLC, and Zahir Shah, P.T.

1104.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1105.  Motion Transportation constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1106.  In connection with each of the claims identified in the within Complaint, Kinetix, Level 1 PT & Rehab, and Shah ("Count XXI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Motion Transportation, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Motion Transportation's business, or should have reasonably foreseen that the mailing of such false medical documentation by Motion Transportation would occur, in furtherance of the Count XXI defendants' scheme to defraud.

1107.  The Count XXI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

1108. As documented above, the Count XXI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for transportation services that were purportedly performed by Motion Transportation, which they knew would be billed by Motion Transportation, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1109. Shah controlled Motion Transportation and was responsible for all actions taken by Motion Transportation and its staff.

1110. Kinetix and Level 1 PT & Rehab billed for medically unnecessary treatment for patients transported by Motion Transportation that allowed Motion Transportation to submit bills to Allstate for medically unnecessary transportation.

1111. The Count XXI defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Motion Transportation to continue providing unlawful and medically unnecessary transportation services, if provided at all.

1112. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Motion Transportation for the benefit of the Count XXI defendants that would not otherwise have been paid.

1113. The Count XXI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1114. By virtue of the Count XXI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Motion Transportation Enterprise)
### Against Kinetix Rehab Services, Inc., Level 1 Physical Therapy & Rehab LLC, and Zahir Shah, P.T.

1115. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1116. Defendants Kinetix, Level 1 PT & Rehab, and Shah ("Count XXII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Motion Transportation.

1117. The Count XXII defendants each agreed to further, facilitate, support, and operate the Motion Transportation enterprise.

1118. As such, the Count XXII defendants conspired to violate 18 U.S.C. § 1962(c).

1119. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Motion Transportation even though Motion Transportation was not eligible to collect such payments by virtue of its unlawful conduct.

1120. The Count XXII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1121. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XXII defendants' unlawful conduct described herein.

1122. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XXII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Rent A Ride Enterprise)
### Against Level 1 Health Systems of Michigan, LLC, Greenfield and 9 Mile Medical Center PLLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Najm-Ul Hassan

1123. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1124. Motion Transportation constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1125. In connection with each of the claims identified in the within Complaint, Level 1 of Michigan, AMC, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, and Hassan ("Count XXIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Rent A Ride, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Rent A Ride's business, or should have reasonably foreseen that the mailing of such false medical documentation by Rent A Ride would occur, in furtherance of the Count XXIII defendants' scheme to defraud.

1126. The Count XXIII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 19.

1127. As documented above, the Count XXIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for transportation services that were purportedly performed by Rent A Ride, which they knew would be billed by Rent A Ride, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1128. Norman Dehko controlled Rent A Ride and was responsible for all actions taken by Rent A Ride and its staff.

1129. AMC and Hassan were responsible for issuing patients medically unnecessary disability certificates that included driving restrictions as a matter of course, which allowed Rent A Ride to submit bills to Allstate for medically unnecessary transportation.

1130. Level 1 of Michigan, Metro MRI, and Sabah Dehko billed for medically unnecessary treatment and testing for patients transported by Rent A Ride that allowed Rent A Ride to submit bills to Allstate for medically unnecessary transportation.

1131. Somerset Auto, 1-800-PAIN, and Norman Dehko were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful transportation by Rent A Ride.

1132. The Count XXIII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of

injury and permitted Rent A Ride to continue providing unlawful and medically unnecessary transportation services, if provided at all.

1133. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Rent A Ride for the benefit of the Count XXIII defendants that would not otherwise have been paid.

1134. The Count XXIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1135. By virtue of the Count XXIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Rent A Ride Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Greenfield and 9 Mile Medical Center PLLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Najm-Ul Hassan**

1136. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

230

1137. Defendants Level 1 of Michigan, AMC, Metro MRI, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, and Hassan ("Count XXIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Rent A Ride.

1138. The Count XXIV defendants each agreed to further, facilitate, support, and operate the Rent A Ride enterprise.

1139. As such, the Count XXIV defendants conspired to violate 18 U.S.C. § 1962(c).

1140. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Rent A Ride even though Rent A Ride was not eligible to collect such payments by virtue of its unlawful conduct.

1141. The Count XXIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1142. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XXIV defendants' unlawful conduct described herein.

1143. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XXIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXV
## COMMON LAW FRAUD
### Against All Defendants

1144. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1145. The scheme to defraud perpetrated by Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, Shah, Hassan, and Sagala ("Count XXV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

1146. The misrepresentations of fact made by the Count XXV defendants include, but are not limited to, those material misrepresentations discussed in section XII, *supra*.

1147. The Count XXV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1148. The misrepresentations were intentionally made by the Count XXV defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

1149. The Count XXV defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1150. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1151. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XXVI
## CIVIL CONSPIRACY
### Against All Defendants

1152. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1153. Defendants Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, Shah, Hassan, and Sagala ("Count XXVI defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

1154. The Count XXVI defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1155. This purpose was known to all of the Count XXVI defendants and intentionally pursued.

1156. Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XXVI defendants

nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

1157. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1158. All of the Count XXVI defendants directly benefited from the payments made to Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, and Rent A Ride.

1159. All of the Count XXVI defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XXVI defendants in the commission of acts done for the benefit of all Count XXVI defendants and to the unjustified detriment of Allstate.

1160. Accordingly, all of the Count XXVI defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XXVII
### PAYMENT UNDER MISTAKE OF FACT
**Against Kinetix Rehab Services, Inc., Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems of Michigan, LLC, Level 1 Health Systems of Michigan, LLC, Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Northland Chiropractic Centre P.C., Mobile MRI Staffing, LLC, Motion Transportation, Inc., Rent A Ride of Detroit, and Somerset Auto Body of MI, Inc.**

1161. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1162. Allstate paid the amounts described herein and itemized in Exhibits 20 through 30 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, Rent A Ride, and Somerset Auto ("Count XXVII defendants").

1163. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XXVII defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1164. The Count XXVII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1165. Allstate is entitled to restitution from each of the Count XXVII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

**COUNT XXVIII**
**UNJUST ENRICHMENT**
**Against All Defendants**

1166. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1167. Defendants Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, Shah, Hassan, and Sagala ("Count XXVIII defendants") submitted, caused to be submitted, or benefited indirectly from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1168. Allstate's payments constitute a benefit which the Count XXVIII defendants aggressively sought and voluntarily accepted.

1169.  The Count XXVIII defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

1170.  The Count XXVIII defendants have been unjustly enriched by receipt of or benefit from these wrongfully obtained payments from Allstate.

1171.  The Count XXVIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

1172.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 902 set forth above as if fully set forth herein.

1173.  Defendants Kinetix, Level 1 PT & Rehab, Level 1 Health, Level 1 of Michigan, Michigan First, AMC, Select Medical, Northland Healthcare, Northland Chiropractic, Metro MRI, Motion Transportation, Rent A Ride, Somerset Auto, 1-800-PAIN, Norman Dehko, Sabah Dehko, Jordan Dehko, Shah, Hassan, and Sagala ("Count XXIX defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1174.  The Count XXIX defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

238

1175. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

1176. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107.

1177.  The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.

1178.  Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1179. The Count XXIX defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1180. The Count XXIX defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-

denied insurance claims submitted by any of the Count XXIX defendants for any or all of the reasons set out in the within Complaint.

1181. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

1182. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1183. As such, the Count XXIX defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1184. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate

policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVI. __DEMAND FOR RELIEF__

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Kinetix Enterprise)
### Against Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems, LLC, Motion Transportation, Inc., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, and Zahir Shah, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Kinetix Enterprise)**
**Against Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems, LLC, Motion Transportation, Inc., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, and Zahir Shah, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Level 1 PT & Rehab Enterprise)**
**Against Kinetix Rehab Services, Inc., Motion Transportation, Inc., and Zahir Shah, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Level 1 PT & Rehab Enterprise)
**Against Kinetix Rehab Services, Inc., Motion Transportation, Inc., and Zahir Shah, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Level 1 Health Enterprise)
**Against Kinetix Rehab Services, Inc., Northland Healthcare Services PLLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Zahir Shah, P.T., and Geoffrey Sagala, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Level 1 Health Enterprise)
**Against Kinetix Rehab Services, Inc., Northland Healthcare Services PLLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Zahir Shah, P.T., and Geoffrey Sagala, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Level 1 of Michigan Enterprise)
**Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Level 1 of Michigan Enterprise)
### Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan First Enterprise)
### Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Jordan Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

245

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

<u>**COUNT X**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Michigan First Enterprise)**
**Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group**
**of Michigan PLLC, Somerset Auto Body of MI, Inc., Lincoln International**
**LLC / 1-800-PAIN-800, Norman Dehko, Jordan Dehko, Najm-Ul Hassan, and**
**Geoffrey Sagala, D.C.**

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (AMC Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, and Najm-Ul Hassan**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (AMC Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, and Najm-Ul Hassan**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Select Medical Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, and Geoffrey Sagala, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Select Medical Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, and Geoffrey Sagala, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Northland Healthcare Enterprise)
**Against Level 1 Health Systems of Michigan, LLC, Northland Chiropractic Centre P.C., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Geoffrey Sagala, D.C.**

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Northland Healthcare Enterprise)
### Against Level 1 Health Systems of Michigan, LLC, Northland Chiropractic Centre P.C., Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Geoffrey Sagala, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Northland Chiropractic Enterprise)
### Against Northland Healthcare Services PLLC and Geoffrey Sagala, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## <u>COUNT XVIII</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Northland Chiropractic Enterprise)**
**Against Northland Healthcare Services PLLC and Geoffrey Sagala, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## <u>COUNT XIX</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Metro MRI Enterprise)**
**Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Rent A Ride of Michigan, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XX
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Metro MRI Enterprise)**
**Against Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Rent A Ride of Michigan, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Najm-Ul Hassan, and Geoffrey Sagala, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXI
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Motion Transportation Enterprise)**
**Against Kinetix Rehab Services, Inc., Level 1 Physical Therapy & Rehab LLC, and Zahir Shah, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Motion Transportation Enterprise)
### Against Kinetix Rehab Services, Inc., Level 1 Physical Therapy & Rehab LLC, and Zahir Shah, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Rent A Ride Enterprise)
### Against Level 1 Health Systems of Michigan, LLC, Greenfield and 9 Mile Medical Center PLLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Najm-Ul Hassan

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XXIV
## VIOLATION OF 18 U.S.C. § 1962(d)
## (Rent A Ride Enterprise)
## Against Level 1 Health Systems of Michigan, LLC, Greenfield and 9 Mile Medical Center PLLC, Mobile MRI Staffing, LLC, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, and Najm-Ul Hassan

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XXV
## COMMON LAW FRAUD
## Against All Defendants

(a)      AWARD Allstate its actual and consequential damages against the

defendants jointly and severally in an amount to be determined at trial;

(b)      AWARD Allstate its costs, including, but not limited to, investigative

costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XXVI
## CIVIL CONSPIRACY
## Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the

defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative

costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XXVII
## PAYMENT UNDER MISTAKE OF FACT
**Against Kinetix Rehab Services, Inc., Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems of Michigan, LLC, Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Northland Chiropractic Centre P.C., Mobile MRI Staffing, LLC, Motion Transportation, Inc., Rent A Ride of Detroit, and Somerset Auto Body of MI, Inc.**

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XXVIII
## UNJUST ENRICHMENT
## Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XXIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Kinetix Rehab Services Inc., Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems, LLC, Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Northland Chiropractic Centre P.C., Mobile MRI Staffing, LLC, Motion Transportation, Inc., Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, Zahir Shah, P.T., Najm-Ul Hassan, and Geoffrey Sagala, D.C. for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Kinetix Rehab Services Inc., Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems, LLC, Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Northland Chiropractic Centre P.C., MRI Staffing, LLC, Motion Transportation, Inc., Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, Zahir Shah,

P.T., Najm-Ul Hassan, and Geoffrey Sagala, D.C., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Kinetix Rehab Services Inc., Level 1 Physical Therapy & Rehab LLC, Level 1 Health Systems, LLC, Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Greenfield and 9 Mile Medical Center PLLC, Select Medical Group of Michigan PLLC, Northland Healthcare Services PLLC, Northland Chiropractic Centre P.C., Mobile MRI Staffing, LLC, Motion Transportation, Inc., Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC / 1-800-PAIN-800, Norman Dehko, Sabah Dehko, Jordan Dehko, Zahir Shah, P.T., Najm-Ul Hassan, and Geoffrey Sagala, D.C., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVII.     DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, Allstate Property and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

Dated: October 15, 2020